Legier, William 08-03-07.txt

1

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4

5

6

7

8   * * * * * * * * * * * * * *  NUMBER 06-4700
    CONSOLIDATED COMPANIES, INC.  *
9                                 *  JUDGE LEMMON
    VERSUS                        *
10                                *  MAG. SHUSHAN
    LEXINGTON INSURANCE COMPANY   *
11  * * * * * * * * * * * * * * *

12

13

14

15

16

17

18

19

20

21          Deposition of WILLIAM R. LEGIER,

22  taken on Friday, August 3, 2007, commencing at

23  10:19 a.m., in the offices of Lemle & Kelleher,

24  L.L.P., 601 Poydras Street, Suite 2100, New

25  Orleans, Louisiana 70130.

☐                                            2

```
                    Legier, William 08-03-07.txt
 1                       INDEX

 2

 3

 4                                              Page

 5

 6  Caption                                       1

 7  Appearances                                   3

 8  Agreement of Counsel                          4

 9

10  Examination

11      JOHN E.W. BAAY II                         5

12  Witness' Certificate                        226

13  Reporter's Certificate                      227

14      ********************

15

16  Exhibits:

17      Exhibit No. 1                            59

18      Exhibit No. 2                            70

19      Exhibit No. 3                            74

20      Exhibit No. 4                            99

21      Exhibit No. 5                           137

22      Exhibit No. 6                           164

23      Exhibit No. 7                           168

24      Exhibit No. 8                           166

25
```

⧠                                                    3


```
 1  APPEARANCES:

 2    Representing Consolidated Companies,
      Incorporated:
 3
```
                          Page 2

```
                      Legier, William 08-03-07.txt
           LEMLE & KELLEHER, L.L.P.
    4      601 Poydras Street, Suite 2100
           New Orleans, Louisiana 70130

    5
           BY:  ALAN H. GOODMAN AND WILLIAM R.
    6           FORRESTER, JR.

    7    Representing Lexington Insurance Company:

    8      GIEGER, LABORDE & LAPEROUSE, LLC
           701 Poydras Street, 48th Floor
    9      New Orleans, Louisiana 70139

   10      BY:  JOHN E.W. BAAY II

   11

   12   ALSO PRESENT:
        Scott Stephenson, Consolidated Companies,
   13   Incorporated
        Jacqueline C. Tuthill, Legier & Materne
   14   Jeanne Lehman, Hagan, Streiff, Newton & Oshiro
        (via telephone)
   15

   16

   17

   18

   19

   20

   21

   22

   23   Reported by:
                          BUFFIE VINDEL FLAIR, CCR, RPR
   24                     Certified Court Reporter
                          Registered Professional Reporter
   25                     State of Louisiana
```

                                                                 4

```
    1          S T I P U L A T I O N

    2

    3          It is stipulated and agreed by and

    4   among Counsel that the deposition of WILLIAM R.

    5   LEGIER is hereby being taken pursuant to Notice
```

Legier, William 08-03-07.txt

6  under the Federal Rules of Civil Procedure for

7  all purposes permitted under the law.

8

9       The formalities of sealing and

10 certification are hereby waived.  The witness

11 reserves the right to read and sign the

12 deposition.  The party responsible for service of

13 the discovery material shall retain the original.

14

15      All objections are to be made in

16 accordance with the Code of Civil Procedure.

17

18              * * * * *

19      Buffie Vindel Flair, Certified Court

20 Reporter, Registered Professional Reporter, in

21 and for the State of Louisiana, officiated in

22 administering the oath to the witness.

23

24

25

                                              5

1       WILLIAM R. LEGIER, 701 Poydras Street,

2  34th Floor, New Orleans, Louisiana 70139, after

3  having been first duly sworn, testified on his

4  oath as follows:

5       MR. BAAY:

6       Just note in the record that she's

7  appearing by telephone.  Her name is Jeanne

8  Lehman, L-E-H-M-A-M, who's the expert accountant

Legier, William 08-03-07.txt

9   in the case.

10          MR. GOODMAN:

11          We'll do the standard stipulations,

12  objections reserved.

13          MR. BAAY:

14          Right.

15          THE WITNESS:

16          And I'd like to read and sign.

17  BY MR. BAAY:

18      Q.  Can you state your name for the record,

19  please?

20      A.  William R. Legier, L-E-G-I-E-R.

21      Q.  Mr. Legier, can I get your professional

22  address, please?

23      A.  1100 Poydras Street, 34th Floor, New

24  Orleans 70163.

25      Q.  And what is your occupation?

                                                    6

1       A.  I'm the managing director of the CPA and

2   consulting firm with Legier & Materne.

3       Q.  You are, in fact, a CPA?

4       A.  I am.

5       Q.  And a CFE; what is a CFE?

6       A.  Certified fraud examiner.

7       Q.  We are here today about the Conco case,

8   correct?

9       A.  That is correct.

10      Q.  You've been retained to be an expert in

                        Page 5

Legier, William 08-03-07.txt

11    your capacity as a CPA to provide opinions in

12    this case, correct?

13        A.  That is correct.  And also as a

14    certified fraud examiner, forensic accountant,

15    and all the other areas that I have testified in,

16    in the past.

17        Q.  I see you have the copy of the report

18    that you prepared in front of you.  Did you bring

19    any other documents today for your deposition, or

20    that's the only one you've got?

21        A.  Well, I've got supporting documents.

22        Q.  What I have in front of me, I wanted to

23    see if we have the same things in front of us.  I

24    have your report, which is about a 3-inch binder,

25    Tabs A through N; is that the substance of your

                                                    7

1    expert report in this case with the attachments?

2        A.  I understand that that is the substance

3    of the supporting documents behind my report.

4        Q.  Do you have a copy of that here with you

5    today to reference?

6        A.  I do.

7        Q.  Do you have any other documents at this

8    time that you need to add to your expert report,

9    disclosures, documents that you are going to rely

10   on to give your opinion, other than what's been

11   produced as your report?

12        A.  I believe that's everything.  Obviously,

13   there were other documents that were provided;

Legier, William 08-03-07.txt

14  but we culled out of those, those documents.

15      Q.  So this is the universe of documents

16  that you are relying on to give your opinion

17  culled down -- there may be -- I understand there

18  are reams of pages of documents supporting

19  invoices and things like that.

20          But if we look in here, we'll either

21  find summaries of those documents or your

22  calculations or the narrative of your report is

23  confined within this disclosure, correct?

24      A.  That is correct.

25          MR. GOODMAN:

                                                        8

1           Well, I just -- just to be clear, I

2  mean, he's reviewed, you know, thousands upon

3  thousands of pages of documents.  And what you

4  have in front of you is probably not even a

5  thousand.

6           So I don't know what you are trying to

7  drive at.  I mean, he's looked at a lot of

8  documents at Conco.  So that's not the universe

9  that he's relied on.

10          MR. BAAY:

11          No, no.  It's either here or it's a

12  summary or a reference to those bulk documents is

13  made in here.

14          MR. GOODMAN:

15          Can you make that representation, that

                        Page 7

Legier, William 08-03-07.txt
16  every document you've reviewed, there's a

17  reference in that binder to?

18        THE WITNESS:

19        No, I can't, because as you know, I said

20  that there are lots of other documents; but for

21  the purpose of facilitating our report, we

22  endeavored to put together those documents that

23  most supported our calculations.

24        But I can't tell you that each and every

25  case, you've got the extensive document that may

                                                      9

 1  have been referred to.  You may have one page of

 2  it.  You may have a reference to it.  You may

 3  have a comment about it.

 4  BY MR. BAAY:

 5        Q.  But in the binder?

 6        A.  Well, I assume that you've got what I

 7  have; but if that's the binder that I've got,

 8  then it may contain additional updates that we've

 9  done since my report was issued.  There may be

10  any number of things.

11        Q.  Do you know if in the -- as your client,

12  the big universe of documents, all of the boxes

13  of documents and everything, do you know if

14  you've reviewed anything that has not been

15  produced to Lexington?

16        A.  Well, I'm sure there were a lot of

17  documents that I reviewed that was not produced

18  to Lexington.  Those documents that were produced

Legier, William 08-03-07.txt

19  in connection with this case, we reviewed them.

20      So I can't tell you that everything that

21  we read and we reviewed would be produced to

22  Lexington directly through that report; but I'm

23  sure that they've got that in other discoveries.

24      MR. GOODMAN:

25      I don't know what you are driving at

                                                    10

1  here, but Lexington has gotten maybe 10,000 to

2  20,000 documents from Conco not through discovery

3  in this case, prior to the case.

4      He doesn't know what was produced --

5  maybe he does, I don't know -- what was produced

6  to Lexington.  He's reviewed at Conco all of the

7  documents he deemed necessary to review to

8  prepare the report.  I don't know what else you

9  are trying to get him to say.

10      MR. BAAY:

11      I'm not trying to get him to say

12  anything.  All I want to do is make sure that

13  there's not some document out there or something

14  out there that he's relied on that has not been

15  produced to us.

16      MR. GOODMAN:

17      He can't make that representation to

18  you, because he doesn't know what's been produced

19  to you.

20      MR. BAAY:

                    Legier, William 08-03-07.txt
21          Then he can say that.

22          MR. GOODMAN:

23          Listen to the question and tell him

24    that.

25          MR. BAAY:


                                              11


 1          But you see what I'm trying to say.  I

 2    just want to make sure that if there's something

 3    out there that he knows we don't have --

 4    BY MR. BAAY:

 5      Q.  And if you don't know what we have or

 6    what's been produced in this case that's relevant

 7    to what has been produced, then you can just tell

 8    me that, and I'll have to figure it out some

 9    other way.

10      A.  Well, I don't know.

11      Q.  Okay.  There you go.  Did you review

12    electronic -- documents stored electronically at

13    Conco or were all the documents that you reviewed

14    actually printed and put into paper form for your

15    review?

16      A.  All of the above.

17      Q.  You reviewed both?

18      A.  That's correct.

19      Q.  In preparation for your deposition

20    today, did you review any additional documents

21    that you had not previously reviewed before your

22    report was produced?  You understand the

23    question?

Legier, William 08-03-07.txt

24      A.  Yes, I do.

25      Q.  Are there any such documents?


                                        12


1       A.  Well, I'm sure there would have been.

2       Q.  What is the nature of those documents?

3  I'm talking about -- I want to make sure you

4  understand, because I'm not sure if I asked the

5  question very well.

6          You reviewed a bunch of documents and

7  produced a report, correct, that expert report

8  that we have?

9       A.  Well, we did other things.  We reviewed

10 documents.  We did other things.

11      Q.  You made calculations, you talked to

12 people, you did a bunch of stuff to be able to

13 prepare yourself, gathering facts, doing

14 calculations to be able to prepare yourself for

15 generating this report, correct?

16      A.  Yes.

17      Q.  The date of this report is May 31st,

18 2007?

19      A.  That is correct.

20      Q.  What I want to know is:  Did you do

21 anything else past May 31st, 2007 that either

22 changes or modifies your opinions in any way in

23 this case?

24          Did you talk to anybody, did you review

25 any documents that you hadn't reviewed before

Legier, William 08-03-07.txt

13

1  that have any impact or bearing on this May 31st,
2  2007 report?
3          A.  Well, my work is ongoing.
4          Q.  What particularly have you done since
5  May 31st that you will rely on to give opinions
6  in this case or that impacts the opinions that
7  are presented in this report?
8          MR. GOODMAN:
9          I'm going to object to the form of the
10 question.  If you can answer everything you've
11 done since May 31 relating to this case, try to
12 answer it.
13         THE WITNESS:
14         I can't.  It's an ongoing process.
15 BY MR. BAAY:
16         Q.  Can you tell me generally -- you don't
17 have to give me the page and line of each
18 document.  Can you tell me generally what
19 documents you've reviewed, what people you've
20 talked to that impact on your opinion?
21         A.  Not with great specificity.  To be sure
22 that I would cover everything, I would have to go
23 back and actually go through my various thought
24 processes and give that some thought; but there
25 have been ongoing services performed.

14

Legier, William 08-03-07.txt

1       Q.  With regard to this case, obviously?

2       A.  Yes.

3       Q.  Not just in your work -- well, let me

4  back up and ask you this question:  Do you

5  provide accounting services in general to Conco

6  outside of this case?

7       A.  No.

8       Q.  Let me -- I'm going to back up and see

9  if I can go at this a different direction.  When

10  were you first retained in this case?

11      A.  I don't have a date specific.  It's been

12  a number of months.

13      Q.  Was it in 2007?

14      A.  Within the last year.

15      Q.  Did you assist Conco at all in its

16  claims presentation that was made to Lexington?

17      A.  What claim are you referring to?

18      Q.  Its claim for business interruption,

19  specifically?

20      A.  What date?

21      Q.  In -- well, have you done that at all?

22      A.  I don't know what information that we

23  have provided in connection with this matter that

24  has been used for what purpose.

25      Q.  You don't remember when you were first

                                                15

1  retained?

Legier, William 08-03-07.txt

2      A.  I can't tell you with specificity.

3      Q.  How do you keep your record of time that
4  you've spent in this case?

5      A.  It's inputted into a computer.

6      Q.  Who else at your firm has done work on
7  this case besides you?

8      A.  There will be a number of people who
9  have assisted me under my direct supervision and
10  control.

11      Q.  What are their names?

12      A.  We have Ms. Tuthill, who sits here
13  today.  We've got other various members of the
14  staff.  I can't tell you exactly who worked on it
15  when.  But I can certainly tell you that there
16  have been occasions where certain functions were
17  done by others in my staff.

18      Q.  So data input and things like that?

19      A.  Correct.

20      Q.  Have you presented a bill for your
21  services or for the services of your firm to
22  date?

23      A.  To which date?

24      Q.  Through today.

25      A.  No.

16

1      Q.  When was the last bill that you
2  prepared, do you remember?

3      A.  No.  I don't have a specific date.

4      Q.  Do you know how much time your firm has

Page 14

Legier, William 08-03-07.txt

 5  spent on this case, either in terms of hours or

 6  dollars?

 7       A.  I don't.

 8       Q.  Do you know how much you've been paid to

 9  date?

10       A.  I do not.

11       Q.  How were you first contacted to

12  participate in this case, to be retained?

13       A.  I don't remember specifically.

14       Q.  You don't remember who called you or how

15  you received the assignment?

16       A.  I do not.  I don't know who called, but

17  someone would have called, and certainly, we

18  would have taken that call.

19       Q.  I'm assuming you've had meetings with

20  the attorneys in this case?

21       A.  We have.

22       Q.  During those meetings, do you maintain

23  records of those meetings?  Do you keep notes or

24  do those meetings get memorialized on paper

25  somehow?


                                                    17


 1       A.  I don't keep those notes.

 2       Q.  You take them and then discard them?

 3       A.  I don't make it a practice of keeping

 4  notes.

 5       Q.  Have you had E-mail communication

 6  between the lawyers in this case and yourself or

Legier, William 08-03-07.txt
7  your firm?

8      A.  I don't recall any specific E-mail.  I
9  can't tell you that I have or I haven't; but none
10 come to my mind, as I sit here today.

11     Q.  Have you had written correspondence in
12 terms of letters, other than this May 31st
13 report, to the lawyers in this firm?

14     A.  I don't recall any specifically as I sit
15 here today.  I can't say that there was or there
16 wasn't for sure; but I don't have any that I have
17 committed to my memory at this time.

18     Q.  But letters and E-mails either to
19 your -- between the two firms, between the law
20 firm and your firm, would be maintained in your
21 file, correct?

22     A.  They would be.

23     Q.  And the E-mails would be maintained in
24 the file; are those printed out and maintained,
25 if there are some?


⬜                                                      18


1      A.  No.  We don't print out E-mails
2  customarily.

3      Q.  But they are maintained on your computer
4  system, they're not just sent and deleted; is
5  that right?

6      A.  Well, I can't tell you.  My own practice
7  is when I read them, I delete them.

8      Q.  Can you just give me very quickly what
9  your educational background is?
                        Page 16

Legier, William 08-03-07.txt

10      A.  Well, I graduated from Louisiana State
11  University with a BS in accounting in 1970.
12      Q.  What have you done since -- do you have
13  any formal education beyond that, other than
14  continuing education and seminars and things like
15  that?
16      A.  That would be correct, and that
17  associated with preparation and completion of the
18  CPA examination.
19      Q.  Then can you give me your employment
20  background since you graduated from LSU?
21      A.  Yes.  For specific dates and things like
22  that, I'd like to have a copy of my CV, if I may.
23      Q.  Sure.  You don't have that with you?
24      A.  Attached to here, maybe.  Would you
25  repeat the question, please.

                                                    19

 1      Q.  After graduating from LSU, can you give
 2  me a chronology of your employment history?
 3      A.  Yes.  I began work immediately upon
 4  graduation with the New Orleans office of Arthur
 5  Andersen & Company.
 6      Q.  In what capacity?
 7      A.  I was an auditor, both auditor and
 8  senior auditing accountant.
 9      Q.  How long were you with Arthur Andersen?
10      A.  From graduation until 1973.
11      Q.  What did you do --
                        Page 17

Legier, William 08-03-07.txt

12    A.  That was 1970 to 1973.

13    Q.  What did you do next?

14    A.  I became the vice-president and general

15  manager of Louisiana News Company.

16    Q.  How long were you in that position?

17    A.  From the time I left Arthur Andersen in

18  1973 until 1975.

19    Q.  What did you do after that?

20    A.  I became the chief financial operating

21  officer for McDonald Sales Corporation

22  immediately after that from 1975 until 1983.

23    Q.  What is McDonald Sales Corporation?

24    A.  It was a privately held group of

25  companies that were in a number of different

                                                20

 1  businesses, wholesale distribution, some

 2  manufacturing, financial services, mail order,

 3  retail, real estate, and maybe a few others that

 4  don't come to mind; but those are the general

 5  areas that the company operated.

 6    Q.  What was that period?

 7    A.  That was from 1973 until -- 1975 until

 8  1983.

 9    Q.  What did you do after that?

10    A.  I founded the firm that I currently am

11  the managing director of, beginning immediately

12  after that, 1984 until this date.

13    Q.  In your work at Arthur Andersen, did you

14  ever do any work calculating business

                    Page 18

Legier, William 08-03-07.txt
15  interruption losses for clients?

16      A.  Not that I can recall.

17      Q.  How about for Louisiana News Corp, did

18  you-all ever have insurance claims that included

19  business interruption losses?

20      A.  I don't specifically remember any.

21  There may have been; but as I sit here today,

22  it's been a while, so I can't tell that you we

23  didn't, but if we did, I would have been involved

24  in it.

25      Q.  But you don't, as we sit here today, you

                                                    21

1  don't have a specific recollection of making that

2  kind of a claim in your work for Louisiana News

3  Corporation?

4      A.  Not at this time.

5      Q.  How about for McDonald Sales

6  Corporation, were you involved in your capacity

7  as CFO in any claims for business interruption

8  against any insurance policies?

9      A.  None that come to mind, as I sit here

10  today.

11      Q.  In your work with your current firm,

12  have you had the opportunity to advise clients

13  and calculate business interruption losses?

14      A.  I have.

15      Q.  What is the frequency of your performing

16  that kind of a task?  Is that something you do on

Legier, William 08-03-07.txt
17  a regular basis?  Have you done it ten times, a

18  hundred times, can you give me any sense?

19        MR. GOODMAN:

20        I'm going to object to the form, because

21  you've asked about three different questions.

22  Which part of it do you want him to answer?

23  BY MR. BAAY:

24     Q.  Can you give me a sense of how many

25  times you've performed business interruption


⬜                                                    22


1  calculations for clients, whether those clients

2  are law firms or actual business clients?

3     A.  As I sit here today, I can't tell you

4  with specificity, but there have been many.

5     Q.  More than ten?

6     A.  Yes.

7     Q.  More than a hundred?

8     A.  I can't say if it was more than a

9  hundred, but certainly upwards of a hundred.

10    Q.  Have you given testimony in court on any

11  of those, on any of that work, that subset of

12  work that you've done, where you've done

13  calculations of business interruption losses for

14  insurance claims?

15        Have you testified in court and given an

16  opinion on that calculation as an expert?

17    A.  I have.

18    Q.  How many times have you done that?

19    A.  Well, I've given with my CV a list of

Legier, William 08-03-07.txt

20  various testimonies in court, depositions, so it
21  would be reflected on that.
22       Q.  Is the list that is dated May 31st,
23  2007, that is a current list through today?
24       A.  I would think it would be updated.  When
25  did you get it?

                                                    23

1        Q.  I got it with the report, and it has
2   that revised date on it.  Are there any others?
3        A.  Well, I can't tell you as I sit here
4   today; but it would require a great deal of
5   comparison and thought to see what may not be on
6   this list.
7            It's maintained by my office, and we
8   endeavor to keep it current; and it indicates
9   that it was updated last May 31st, 2007; but
10  beyond that, I can't tell you.
11       Q.  How about in June and July of this year,
12  have you provided testimony either in court or in
13  deposition regarding business interruption
14  losses?
15       A.  I don't recall any in court.  There
16  could have been a deposition.  I just don't know.
17  I'd have to go back and look at my calendar.
18       Q.  Do you recall giving your deposition in
19  the last two months?
20       A.  I can't tell you if it was in the last
21  two months or three months; but I think that I
                        Page 21

Legier, William 08-03-07.txt

22  have, at least -- I've given a deposition -- I

23  would say that I've given a deposition in the

24  last three months.  I can't tell you if it was in

25  the last two months or not.


⬚                                                          24


 1        Q.  In the last three months, what

 2  depositions have you given?

 3        A.  Actually, I think it was a trial.  There

 4  was a trial in Baton Rouge, CDC.  And again, I

 5  can't tell you exactly which date it was,

 6  Counselor; but I'd be happy to go back and look,

 7  but I'd have to go through this listing.

 8        Q.  As long as you can tell me what the

 9  current stuff is, we'll assume that that list is

10  correct.

11            Can you tell me what the name of the

12  case was in Baton Rouge?

13        A.  It would have dealt with Capitol House

14  Gaming versus a company by the name of Argosy

15  Gaming.

16        Q.  Who was your client in that case?

17        A.  There could have been a deposition as

18  well just prior to that trial.

19        Q.  But still within that case?

20        A.  Yes.

21        Q.  Who was your client in that case?

22        A.  Actually, the case is captioned.  I see

23  it's on here.  Capitol House Preservation

24  Company, L.L.C. versus Perriman Consultants,

Legier, William 08-03-07.txt

25  Inc., et al.  And my client was Charles Lambert,

                                                      25

1  Jr.
2       Q.  Who was his client?
3       A.  He was the Plaintiff.  His son was the
4  attorney.  I think it's Charles Lambert, Sr. and
5  Jr.
6       Q.  That's the second to the last, if we're
7  looking at this list on page 18, it's the second
8  to the last entry, correct?
9       A.  That's correct.
10      Q.  Is this list prepared chronologically?
11  The things at the end of this list are the most
12  recent testimony?
13      A.  Generally speaking, it should fall that
14  way; but I can't tell you that in each and every
15  case, it is chronological.
16      Q.  But the first one on the list, the
17  Zapata Gulf case, do you remember the approximate
18  date of that case?
19      A.  That goes back quite a way.
20      Q.  Relatively speaking, the older cases are
21  first; and then as we come to the present, we go
22  through the list, correct?
23      A.  Generally speaking, but I can't say that
24  it is exclusively that way.
25      Q.  Is the Arnaud's case on that list?

Legier, William 08-03-07.txt

26

```
 1      A.  I don't see it.  That was one that was
 2  recent.  That would be one.
 3      Q.  Did you testify in court or in
 4  deposition in that case?
 5      A.  Deposition.
 6      Q.  Do you remember when that deposition
 7  was?
 8      A.  No.  I can't tell you as I sit here
 9  today.  It was probably the last 90 days.
10      Q.  Who was your client in the Arnaud's
11  case?
12      A.  Arnaud's Restaurant and their attorneys.
13      Q.  Did you offer any opinions regarding
14  business interruption in that case?
15      A.  I did.  It did not go to trial, but in
16  deposition, I did.
17      Q.  You rendered a report in that case,
18  also?
19      A.  I did.
20      Q.  Any other cases come to mind in the last
21  90 days you've testified by deposition that are
22  not on the list?
23      A.  I'm not sure.  Not on the list?
24      Q.  Not on the list, right.
25      A.  No, I don't.  Not as I sit here today.
```

27

Legier, William 08-03-07.txt

1        Q.  Do you recall giving a deposition in the
2   last 90 days, other than in Arnaud's and the
3   Capitol House case that you just don't remember
4   the name of it, but you know you've given a
5   deposition in the case?
6        A.  I give a lot of depositions.  I don't
7   have any specific recollection of anything other
8   than that.
9        Q.  Okay.  Fair enough.  Now, in the prior
10  cases where you've offered testimony about
11  business interruption losses, can you tell me
12  what your methodology is?
13          Tell me what the steps are that you go
14  through in every case where that's an issue.
15  What do you do, what calculations are you trying
16  to make to get to the final number that says this
17  is the loss, this is the amount of the claim?
18          MR. GOODMAN:
19          I'm just going to object to the form,
20  because, I mean, are you talking about insurance
21  cases, are you talking about non-insurance cases?
22  BY MR. BAAY:
23       Q.  Let's see if we can fine-tune it.  Cases
24  like we have here today, okay, where there's a
25  business interruption and a policy of insurance


                                              28


1   that may or may not cover that business
2   interruption loss.  That's what I'm talking
                        Page 25

Legier, William 08-03-07.txt

3   about.

4          Those assignments that you've told me

5   you've handled upwards of a hundred times,

6   whether they've been whether you testified in

7   court or whether you provided that service for a

8   client, you've done that work before, correct?

9          You've made the calculations.  What is

10  the amount of the business interruption loss for

11  this client, right?

12      A.  Well, Counselor, you are asking a lot of

13  questions and a long phrase of clauses.  One

14  thing that you said that contradicted yourself,

15  and I want to make sure that we are clear for the

16  record, is that I've testified in hundreds of

17  cases.

18          And preceding that, you said insurance

19  matters, insurance policies.  So you are going to

20  have to break your questions down and give them

21  to me more specifically.  And I'll be very

22  specific in giving you the answer.

23      Q.  No problem.  Cases like we are here

24  about today, where a company is making a claim

25  for business interruption loss pursuant to a

                                                29

1   policy of insurance, okay?  You understand what

2   I'm talking about?

3          MR. GOODMAN:

4          What is the question?

5   BY MR. BAAY:

                        Page 26

Legier, William 08-03-07.txt

6     Q.  The question is:  I want to understand
7  what the methodology is when you are assigned to
8  perform the work that you do as an expert in that
9  kind of case, in that situation, where there is a
10  claim by a company under a business interruption,
11  for business interruption loss under an insurance
12  policy, okay.
13     A.  And the question is?
14     Q.  The question is:  What do you do?
15     A.  Well, that's a very broad question,
16  Counselor.  It's not the kind of thing that you
17  can just follow a cookbook and say this is what I
18  do in every case.  It's based on the
19  circumstances, the facts and circumstances.
20     Q.  In order to testify as an expert, one of
21  the things that is required is that you follow
22  some accepted methodology; do you understand
23  that, that there's some accepted methodology that
24  your field has accepted as the way to approach a
25  problem.

                                              30

1        I mean, it's a very general question;
2  but do you understand that to be kind of the
3  world as an expert testifying in court, do you
4  understand that to be the constraints on what
5  your testimony is?
6     A.  Counselor, that's a very broad
7  characterization of what an expert does.  It's

Page 27

Legier, William 08-03-07.txt
8   fact specific.  It's based on circumstances.

9   It's based on a lot of things.

10          Now, you are speaking about an expert in

11  general; but earlier, you were speaking about an

12  insurance policy.  So you are asking a lot of

13  questions in a lot of different directions; but

14  yet, they conflict with your earlier question.

15          So I want to make sure that I understand

16  specifically what you are getting at.

17      Q.  Well, here's what I'm trying to do.  I'm

18  trying to go from the really broad down to the

19  specifics, and we'll talk about the nuts and

20  bolts of the facts and circumstances of this case

21  and what you did.

22          But I'm trying to understand:  Is there

23  an accepted methodology to approaching business

24  interruption losses that I could go pick up a

25  book and say, This is how, if you are an expert,

31

1   this is how you approach this kind of a problem?

2       A.  I don't think that there's any one way,

3   Counselor.  I think that there are accepted

4   methodologies; but I think if you're asking me to

5   categorize one way, I think that that would not

6   be appropriate.  I think that it depends on the

7   facts and the circumstances.

8       Q.  In general, can you tell me what your

9   general approach is, what facts do you want to

10  look at when you -- and in general broad
                        Page 28

Legier, William 08-03-07.txt

11 categories, and we can talk about the specifics,

12 what facts do you need to be able to render an

13 opinion regarding business interruption loss?

14          MR. GOODMAN:

15          Under an insurance policy?

16 BY MR. BAAY:

17     Q.  Under an insurance policy.

18     A.  Well, Counselor, it would take a lot

19 more time than we have here today to go through

20 each and every one of those.  And I think you are

21 asking for a general answer to something that

22 requires a lot of specificity.

23          So I don't know that you can just

24 characterize something so general as an answer

25 like you are asking for, especially in cases

                                        32

1 dealing with insurance policies, where we spend

2 literally hundreds of hours of services in doing

3 those assessments.  So I'm reluctant to give a

4 broad answer to something that involves specifics

5 more so than you are asking.

6     Q.  Well, let me see if I can make it

7 easier, because I'm really not trying to make it

8 hard.  You need a copy of the insurance policy?

9     A.  Do I need a copy of what insurance

10 policy?

11     Q.  The insurance policy that the claim is

12 being made under, the insurance policy that

Legier, William 08-03-07.txt
13  includes the language that -- the contract

14  between the company and the insurance company

15  that the claim is being made?

16      A.  Do I need it for what?

17      Q.  To review it, to render an opinion.

18      A.  An opinion on what?

19      Q.  On business interruption loss.

20      A.  I've done that in my report.

21      Q.  I know.  I'm asking you in general.  In

22  general, do you need a copy of the insurance

23  policy?

24      A.  Oh, sure.

25      Q.  Why is that important?

                                                    33

1       A.  The policy wording is something that

2  would guide you.

3       Q.  Are you an expert in interpreting

4  insurance policies?

5       A.  Well, to the extent that they deal with

6  business interruption losses, I am.

7       Q.  Have you offered opinions in court about

8  what certain policy language means and how it

9  should be interpreted?

10      A.  No.  From a legal standpoint, that's not

11  my expertise; but certainly, reading a policy and

12  gleaning from it the wording as it relates to a

13  business interruption claim, I've done quite a

14  bit of that.

15      Q.  Okay.  So you'd have to look at the
                        Page 30

Legier, William 08-03-07.txt

16  policy language to make your calculations; but
17  you are not going to offer an opinion in court as
18  to what the court should accept as the proper
19  interpretation of the policy, correct?
20      A.  Well, I would give my interpretation for
21  the court's consideration.
22      Q.  And then whatever calculations yield
23  from that interpretation, your expertise is in
24  making those calculations from the raw data,
25  correct, from all the accounting data?

34

1       A.  Well, my expertise covers a lot of
2  areas, Counselor.  I've been testifying and
3  involved in forensic matters and expert witness
4  services in connection with that for many year.
5           And so I would be reluctant to
6  categorize it just one simple way, but rather all
7  of those ways that would bear on those particular
8  experiences that I've brought to the table.
9       Q.  In a case where there has been a
10  business interruption and a client is making a
11  business interruption loss under a policy of
12  insurance, do you need their historical financial
13  information?
14      A.  That would be one thing that you would
15  look at.
16      Q.  With the historical financial
17  information, do you want to look at their past

Legier, William 08-03-07.txt

18  budgets?

19      A.  You would.

20      Q.  And would you want their past actuals?

21      A.  I say you would.  You may, depending on

22  what the facts and circumstances are and what

23  would be the approach that you'd be using.

24      Q.  That's one of the things that you would

25  want to look at, perhaps?

                                                    35

 1      A.  Maybe, depending on the case.

 2      Q.  And then you would want to see the --

 3  and when I say historical financial information,

 4  I'm talking about financial information prior to

 5  the loss, correct?

 6          I mean, I don't want to be misleading.

 7  Financial information, historical financial

 8  information I was talking about was before the

 9  loss.

10      A.  Well, that would be part of what you

11  would want to look at.

12      Q.  Then you would want to see what actually

13  happened after the loss, correct?

14      A.  That would be part of what you'd look

15  at.  Now, Counselor, are we referring to the

16  policy wording or are we referring to generally

17  calculating lost profits?

18      Q.  We're talking about just in general

19  calculating business interruption losses.

20      A.  Well, earlier, you were speaking of this

Legier, William 08-03-07.txt

21  particular policy.  And that's why I want to make

22  this clear, that we don't go off on a tangent and

23  get away from your original predicate.

24      Q.  I don't know that I've ever said this

25  particular policy yet; but I'm happy to.  I was

                                                    36

 1  talking about just in general, when there's an

 2  insurance policy, because as we will see, I'm

 3  assuming, different policies have different

 4  language, correct?

 5      A.  They do.

 6      Q.  Every policy has to be interpreted based

 7  on the facts of that particular policy, correct?

 8      A.  Well, certainly, you would look at that

 9  policy.

10      Q.  Obviously, that's the contract between

11  the insurance company and the company making the

12  claim?

13      A.  Could be.

14      Q.  Right.  In this case, did you receive a

15  copy of the policy?  It's attached to your report

16  under Tab B, so I'm assuming that you did, and

17  this is the policy that you reviewed?

18      A.  I did.

19      Q.  In this case, you also reviewed

20  historical financial information, both budgets

21  and actual and both before and after the storm;

22  is that correct?

Legier, William 08-03-07.txt
23      A.  That is correct.
24      Q.  Let's start, if we can, by looking at a
25  copy of the policy.  Then we'll see if we can

                                                    37

 1  work some examples.  Do you have a clean copy of
 2  the policy?  It's your Tab B.
 3          MR. GOODMAN:
 4          We didn't bring anything.  I don't know
 5  what -- if you want to show it to him, you show
 6  it to him.
 7  BY MR. BAAY:
 8      Q.  I thought you said you had this binder
 9  with you.
10      A.  We have a copy of that binder.
11      Q.  Can you get it for me, please.
12          MR. GOODMAN:
13          I don't know if it's the same binder you
14  have.
15          MR. BAAY:
16          Well, certainly, we can figure that out.
17          MR. GOODMAN:
18          I don't know that we are going to figure
19  that out.  You want him to look at the policy?
20          MR. BAAY:
21          Please.
22  BY MR. BAAY:
23      Q.  On page 3, it's the number of the page,
24  it might not be the actual page 3.  Let me just
25  start by asking you a few general questions
                        Page 34

Legier, William 08-03-07.txt

⬜                                                                38

1   first, and then we'll look at the policy
2   language.
3           Do you have an understanding of the
4   purpose of an indemnity insurance policy is to
5   indemnify the insured for the loss that is
6   sustained and covered?  Just in general, that's
7   what it's for, correct?
8        A.  In general.  But I'm not here to give a
9   legal opinion, so I want to preface what I'm
10  saying by that.
11       Q.  Also, in general, that concept is -- and
12  let me know if this is a familiar concept to
13  you -- that the purpose of insurance is to put
14  the insured where you would have been, but for
15  the loss, right?
16       A.  I can't tell you that in general.  I
17  think that you'd have to go back to the policy
18  and show me that wording.
19       Q.  I'm not talking about the wording.  I'm
20  talking about in general, the purpose of
21  insurance is to put the insured back where he
22  would have been before the loss.
23           That's the general purpose of having
24  insurance, and if you wreck your car, the purpose
25  of the car insurance is to fix your car and get

⬜                                                                39

Legier, William 08-03-07.txt

1  you your car back fixed the way it was before the
2  accident, right?
3      A.  Well, I think that's a very broad
4  explanation, Counselor.  I think that you'd have
5  to go to the policy itself and see what it says.
6          I wouldn't want to categorize all
7  policies in any one way.  I think you need to go
8  to the specific wording of the policy.
9      Q.  Exactly.  And because the wording of the
10  policy could provide limits as to the coverage
11  that would be provided, that would limit you from
12  getting back to the way you would have been,
13  correct?
14      A.  I suppose the policy can state anything.
15  You have to read the policy, and you have to look
16  at each specific policy wording before you can
17  categorize anything.
18      Q.  To take another simple example, in a lot
19  of the homeowners cases that we've seen since the
20  storm, people were underinsured; for example, a
21  lot of people have the $250,000 in flood
22  insurance, and there was maybe worth $350,000,
23  even if it was a total loss under that flood
24  policy, they only get $250,000, right, because
25  that's the limit of the policy, correct?

                                                    40



1      A.  Well, Counselor, I think that very point
                          Page 36

Legier, William 08-03-07.txt

2  is being litigated as we sit here today in many
3  venues.  So I'm reluctant to make broad-brush
4  categorizations as to those policies.  I think as
5  you know as a lawyer that that would be
6  inappropriate.
7       Q.  Well, these are really not trying to be
8  tricky.  I really want to understand and make
9  sure that we are talking about really simple
10  concepts.
11          Policies have limits.  There are limits
12  of -- the limits of coverage are dollar amount
13  limits.  You've certainly seen that in cases
14  before, right?
15       A.  Well, certainly, there is such a thing
16  as limits in insurance policies, among other
17  things.
18       Q.  Setting aside the legal arguments about
19  whether things are covered or not covered, if a
20  loss is insured to a certain amount, for example,
21  $250,000, and the loss is greater than that
22  amount, setting aside any legal arguments, the
23  policy at least on its face would only provide
24  part of the total loss that had been sustained,
25  if the limit was less than what the actual loss

                                        41

1  was; I mean, that's a pretty simple concept?
2       A.  Well, it's a very general observation.
3  And as you know, policies are very detailed, and
                    Page 37

Legier, William 08-03-07.txt
4  they get into a lot of different areas.

5          So I would say that if you want to speak

6  in very general terms, if something is limited,

7  then it's limited, if you tell me it's limited.

8  But I can't tell you beyond that, that that is

9  everything that you would deal with in a policy,

10  because it's not.

11      Q.  Obviously, I've struggled to come up

12  with a simple example.  Do you have an example

13  that -- I mean, have you encountered an example

14  in an insurance policy where the insurance policy

15  provided less than what the total loss was?  Have

16  you ever encountered that?

17      A.  Well, I'm sure that there are cases like

18  that.

19      Q.  Have you personally ever encountered

20  that?

21      A.  I have.

22      Q.  In what situation?

23      A.  I would have to go back and look at my

24  files.  I've got lots of real estate and lots of

25  insurance policies, and I've had experience in


                                              42


1  every direction.

2      Q.  Have you had the experience where the

3  amount of insurance that was purchased was less

4  than the total amount of the loss?

5      A.  I have.

6      Q.  Great.  So that's all I was trying to
                    Page 38

Legier, William 08-03-07.txt

7   do.  Those situations exist in the real world,
8   correct?
9       A.  They go in both directions.
10      Q.  No doubt.  The other thing that I want
11  to see if I can get you to agree to is:  The
12  limit on that policy is paid for by a premium,
13  correct?
14      A.  What policy?
15      Q.  On a policy in general, on a policy that
16  provides some limit that we've talked about, some
17  limit of coverage; there's a corresponding
18  premium that's paid by the insurer, correct?
19      A.  Generally speaking.
20      Q.  And if the insured wants a higher limit,
21  they, generally speaking, would pay a higher
22  premium, correct?
23      A.  I don't know that it's as simple as
24  that.  I don't know that if you want a higher
25  limit, you simply pay more money.  I think that's

                                           43


1   an oversimplification.
2       Q.  In the real world, have you ever
3   encountered a situation where you've increased
4   the limit on a policy of insurance on property,
5   on an insurance policy that you've had?
6       A.  Well, I'm sure that there have been
7   cases where insurance limits have been increased;
8   but they generally coincide with what both

                         Page 39

Legier, William 08-03-07.txt

9  parties agree are the appropriate limits.

10      You can't just raise something beyond

11  the limit of what it realistically is.  So I

12  think it's a process where that assessment is

13  made.

14      Q.  Generally speaking, if you want to

15  increase the limit of coverage, there's a

16  corresponding increase in the premium, generally

17  speaking; would you not agree with that?

18      A.  Where it would be appropriate, and to

19  increase the coverage.  But what I'm saying is

20  that you just can't increase coverage.  I think

21  the parties have got to agree that that's

22  appropriate.

23      Q.  With that qualification, the parties

24  agree that it's appropriate to increase the

25  limits of coverage, would you agree that

                                        44

1  ordinarily, there would be an increase in the

2  premium paid by the insurer?

3      A.  There could be.

4      Q.  Because the limit represents -- the

5  limit of insurance represents the risk to the

6  insurance company, correct?

7      A.  It could be.

8      Q.  Well, if that represents what could

9  ultimately be paid out, assuming that there are

10  not any other -- assuming that the policy

11  applies, and there is $250,000 worth of

                    Page 40

Legier, William 08-03-07.txt

12    insurance, and a court decides that the maximum

13    amount of coverage that an insurance company owes

14    is $250,000, then that $250,000 represents the

15    risk to the insurance company, correct?

16         A.   It could.  But Counselor, you are

17    simplifying something that could be a lot more

18    complicated, and I'm trying to accommodate you.

19              I mean, for example, you've got

20    deductibles.  You've got lots of other issues

21    that go into premiums and go into limits of

22    coverage.  And you've got actual values that you

23    have to look at.

24              It's much more complicated than what you

25    are asking me, and I'm reluctant to give an

&#x2B1C;                                                        45

1    answer to something so broad and general that it

2    might be misleading otherwise.

3         Q.   I'm not trying to make you be misleading

4    or to do anything of the sort.  All I want to do

5    is try and understand that there are some

6    generally accepted relationships that exist in

7    the world of insurance policies and insurance

8    coverage.

9              And one of them that until a few minutes

10    ago I thought was pretty well settled was if you

11    increase the amount of coverage that you have,

12    which represents the risk to the insurance

13    company, there is a corresponding increase in the

Page 41

Legier, William 08-03-07.txt

14  premiums that are charged.

15        If you want to argue with me about that

16  concept, I mean, we can argue about it; but I

17  don't -- that seems pretty simple to me.

18      A.  Well, it may be simple to you.  But as

19  you know, insurance is a very complicated area.

20  And there's lot of what-ifs associated with each

21  and every aspect of what you are saying.

22        So I fear to oversimplify.  It could be

23  potentially misleading, and I don't want to do

24  that.

25      Q.  Can you give me an example where there's


                                                        46


 1  an increase in the risk to the insurance company

 2  and a corresponding decrease in the premium?

 3      A.  Now you are changing your words,

 4  Counselor.

 5      Q.  Right.

 6      A.  You are talking about risk now as

 7  opposed to policy limits.  That's an example of

 8  where I want to be very careful, because I want

 9  to be accurate, and I don't want to answer the

10  question that's so general that it doesn't

11  provide enough foundation for me to give a

12  general answer.

13      Q.  Then we'll speak in terms of the limit

14  of the policy, the coverage limit of the policy,

15  if you don't want to accept that as the risk of

16  the insurance company.

Legier, William 08-03-07.txt

17          The limits of the policy, do you have an
18   example or can you give me a situation where the
19   increase, where you would have an increase in the
20   limit and a corresponding decrease in the
21   premium?
22       A.  Generally speaking, I can't -- nothing
23   comes to mind where that could happen.  But I'm
24   not going to tell you that there couldn't be
25   what-ifs and other surrounding facts and

47

 1   circumstances that could lead to that.  You could
 2   have a higher deductible, for example.
 3       Q.  Exactly.
 4       A.  There's lots of things.  You'd have to
 5   look at the facts and circumstances surrounding
 6   that and the specific business, the specific
 7   assets, and how they are being viewed in terms of
 8   the policy limits.
 9       Q.  So what I was trying to do was, without
10   changing any other term in the policy, the only
11   term that changes -- don't change the deductible,
12   don't change any of the language -- the only
13   thing you change is the limit of coverage,
14   generally speaking, an increase in the limit,
15   there would be a corresponding increase in the
16   premium?
17       A.  I can't say generally, but I would say
18   that that would not be inconsistent necessarily.

Legier, William 08-03-07.txt
19 Could be.

20      Q.  As we sit here today, you can't think of

21 an exception to that, other than changing things

22 like the deductible; if you increase the

23 deductible, there should be generally a

24 corresponding decrease in the premium, correct?

25      A.  Well, I think that there could be

                                                    48

 1 negotiations, Counselor, there's lots of things

 2 that go into insurance policies.  And I think

 3 that you have to get to that level of the

 4 analysis.

 5           And if you are asking for a general

 6 answer, I can give you a general answer; but I'm

 7 reluctant to do that beyond what I've said

 8 already, because I do think that there's facts

 9 and circumstances surrounding a lot of those

10 issues that would need to be viewed to give a

11 more accurate answer.

12      Q.  I understand that, and I appreciate

13 that.  What I'm trying to do is, and I'm sure you

14 do this all the time in your field, you hold

15 everything else constant.  There are a lot of

16 variables.  That's what you're talking about.

17           I can't appreciate all these variables.

18 Different variables may increase or decrease the

19 premium one way or the other, and I'm not going

20 to -- I can't wrap my head around all of those,

21 and I can't, either.  What I'm asking you to do

Legier, William 08-03-07.txt

22  is:  Hold all of those variables fixed, and only

23  change the limit of coverage.

24          Generally speaking, with all other

25  variables fixed, and the only variable change is

                                                    49

1  the limit of coverage, there would be a

2  corresponding increase in the premium; those

3  things are directly related, holding all other

4  variables fixed.

5      A.  I wouldn't say that.  I wouldn't say

6  that.  I think what you are saying, a

7  corresponding increase proportionate, as though

8  it's proportionate.  You have increased risks

9  that may be less with increased coverage.

10          Once you get to a basic risk, the

11  additional risk may be less proportionate.  So

12  you have to look at the facts and circumstances

13  behind increasing that coverage and the risk

14  associated with that increase in coverage.

15      Q.  Fair enough.  Do they move in the same

16  direction?

17      A.  They would generally move in the same

18  direction, but not necessarily proportionate and

19  not necessarily always.

20      Q.  No doubt.

21      A.  There's exceptions to all of that.

22      Q.  No question about that.  But holding all

23  else, holding all other variables fixed, coverage

Legier, William 08-03-07.txt

24  and premiums move in the same direction; and you

25  are right, maybe not proportionately, but they

                                                           50

 1  move in the same direction.  Increases in

 2  coverage results in increases in premiums, all

 3  other things held constant?

 4      A.  Well, I don't know what else you're

 5  considering as being held constant; but I will

 6  tell you that generally, that could be the case.

 7  But without a more specific question, I'm

 8  reluctant to give a more specific answer, and I'm

 9  not going to tell you that it's in each and every

10  case.

11          MR. GOODMAN:

12          When you get to a good break, let's take

13  a break.

14          MR. BAAY:

15          Okay.

16          MR. GOODMAN:

17          I think you probably beat this horse to

18  death, but I don't want to interrupt you.

19          MR. BAAY:

20          I have, but partly not my own fault.

21  BY MR. BAAY:

22      Q.  Let me just ask you one more question:

23  The deductible that you talked about a minute

24  ago, again, and I know you seem to have a

25  difficulty doing this; but holding all other

Legier, William 08-03-07.txt

51

1   variables fixed, an increase in the deductible

2   will generally result in a decrease in the

3   premium, generally?

4        A.   Generally, yes.

5             MR. GOODMAN:

6             Good time for a break or no?  Just a

7   quick one?

8             MR. BAAY:

9             Yes.  That's fine.

10             (Short break taken.)

11  BY MR. BAAY:

12       Q.   Let's take a look now at page 3 of the

13  policy.  What I want to spend a little bit of

14  time on is Section B, business interruption.

15             And this is the policy and the policy

16  language that governs the business interruption

17  claim that Conco is making to Lexington, agreed?

18       A.   That's correct.

19       Q.   The first paragraph is:  Business

20  interruption means loss resulting from necessary

21  interruption of business conducted by the insured

22  and caused by direct physical loss or damage by

23  any of the perils covered herein during the term

24  of the policy or to real and/or personal property

25  as covered herein.

52

Legier, William 08-03-07.txt

```
 1          My question is:  The business
 2  interruption loss that you calculated under this
 3  section, when the language reads "resulting from
 4  and caused by direct physical loss or damage," do
 5  you appreciate that to be the damage to the roof
 6  and the other damage sustained to the physical
 7  property at Conco?
 8      A.  I do.
 9      Q.  Have you made an effort to understand
10  what that physical damage was?
11      A.  I have.
12      Q.  And in part of your calculation, have
13  you made an effort to calculate the business
14  interruption loss that resulted from and was
15  caused by the direct physical loss and damages to
16  the property?
17      A.  Yes.  If you're referring to this first
18  paragraph, the wording there, which you did not
19  recite the way that you did the first time the
20  second time, according to this, I did.
21      Q.  You appreciate that this language
22  applies, and you attempted to make your
23  calculation consistent with this language?
24      A.  That is correct.  But you restated that
25  language the second time you asked the question.
```

```
 1  I want to be clear that you were aware of that.
 2      Q.  If I skipped some words, it was just in
```
                          Page 48

Legier, William 08-03-07.txt

3  brevity.  I was just referring to that same

4  paragraph.  I'm not trying to change the words.

5  I want to make sure that we are both living and

6  dying by these words.  That's fine.

7      A.  I don't know that I'm going to die by

8  the words here.

9      Q.  I'm not trying to change them.  Next

10  paragraph has got some things that I need to make

11  sure I understand.  If such loss occurs during

12  the term of the policy, it shall be adjusted on

13  the basis of the actual loss sustained by the

14  insurer during the period of restoration

15  consisting of the net profit or loss which is

16  thereby prevented from being earned and all

17  charges and expenses, excluding ordinary payroll,

18  but only to the extent that they necessarily

19  continued during interruption of business and

20  only to the extent to which they would have been

21  incurred, had no loss occurred.

22         Okay.  That's the paragraph I want to

23  talk about next.

24         MR. GOODMAN:

25         Just for clarity, what you read into the

                                                    54

1  record is not precisely the language.

2         MR. BAAY:

3         If I missed it, that's what I meant to

4  read into the record.

                    Page 49

Legier, William 08-03-07.txt

```
 5          MR. GOODMAN:
 6              I understand.
 7          MR. BAAY:
 8              I just want to make sure that we're
 9   talking about the same --
10          MR. GOODMAN:
11              Right.  We're on that second paragraph.
12   Go ahead.
13   BY MR. BAAY:
14      Q.  The first concept that I want to make
15   sure I understand, and I want to maybe try and do
16   a simple example to make sure that I understand
17   how the numbers work before we get into the
18   millions of dollars that we're talking about in
19   this case; is that okay?
20      A.  Sure.
21      Q.  Net profit or loss which is thereby
22   resulting -- I'm sorry.  Net profit or loss which
23   is thereby prevented from being earned; okay,
24   that's what I want to talk about first.
25              How do you understand that phrase to
```

⬜                                                    55

```
 1   read?  What do you understand that to mean?  And
 2   you can use numbers or you can use -- in very
 3   simple terms, is that the net profit that the
 4   firm would have earned but for the physical
 5   property damage?
 6      A.  But for whatever it is that qualifies
 7   for their coverage.
```

Page 50

Legier, William 08-03-07.txt

8      Q.  Okay.  And we agreed in the first
9  paragraph that the loss that we're talking about
10  needed to be caused by direct physical loss or
11  damage, right?
12      A.  I think we agreed on the wording.
13      Q.  Right.
14      A.  Yes.  The wording is the wording.
15      Q.  So what I want to make sure I understand
16  is in this next discussion:  The net profit or
17  loss which is thereby prevented from being earned
18  is the net profit or loss which is prevented from
19  being earned due to the physical property damage,
20  correct?
21      A.  Whatever the cause of loss is.  Whatever
22  that is.  You referred to it up here, it's
23  physical loss or damage by any of the perils
24  covered within -- herein during the term of this
25  policy to real and/or personal property as

                                              56


1  covered herein.
2          So I keep referring back to that,
3  because you characterize it a little bit
4  differently, and I want to make sure that we are
5  on the same page.
6      Q.  I do, too, because this is important.
7  So what we're talking about is the net profit
8  that the firm would have earned, but for the
9  damage or loss that is the covered peril, that
                    Page 51

Legier, William 08-03-07.txt
10  whatever happened, it triggered the coverage,

11  right?

12      A.  But for the event.

13      Q.  But for the event.  That's perfect.  But

14  for the event.

15          MR. GOODMAN:

16          Why don't you call it the peril, but for

17  the peril?

18          MR. BAAY:

19          But for the peril.  Well, it's not but

20  for the peril.  It's but for the direct physical

21  loss or damage caused by the peril.

22          MR. GOODMAN:

23          That's not what it says.  We all have it

24  in front of us.  We don't need to argue.  Ask

25  your question.


                                                57


 1  BY MR. BAAY:

 2      Q.  That's what I want to understand.  This

 3  first net profit number that you need to figure

 4  out is the net profits which would have been

 5  earned but for the loss that is caused by the --

 6      A.  I'd prefer to go back to the policy

 7  wording, because you are using words that are

 8  terms of art in the accounting profession I don't

 9  necessarily -- I don't see in here.

10          And I think that you've got to be aware

11  that you just can't recharacterize the words, the

12  words are the words are the words, whatever they
                    Page 52

Legier, William 08-03-07.txt

13  say.

14      Q.  Tell me how you read them.

15      A.  Well, let's read the second paragraph.

16  Is that the one we're dealing with?

17      Q.  That's the one.

18      A.  That's the best way to read it, is just

19  how it reads.

20      Q.  Okay.

21      A.  Rather than recharacterize it, it is

22  what it is.

23      Q.  And let me ask you this:  If we have a

24  simple example, then maybe I can understand so we

25  can be talking about and using corresponding

                                                    58

1  numbers.

2          If we have a firm that, for example, has

3  $1,000 in sales, and the cost of those sales are

4  $600, they have a gross margin of $400, charges

5  and expenses, excluding ordinary payroll, of

6  $100, ordinary payroll of $50, the net profit or

7  loss of $250, okay?  That's a specific example

8  that I want to talk about.

9      A.  May I see that?

10      Q.  That will help us, hopefully, talk about

11  this language.  I'm talking about the first

12  column.

13          MR. GOODMAN:

14          You have $1,000.  You said $100.

                        Page 53

Legier, William 08-03-07.txt

15          MR. BAAY:

16          I'm sorry, $1,000 in sales -- well, as

17   it reads.  I won't read it again.

18   BY MR. BAAY:

19      Q.  Do you understand the hypothetical?

20      A.  I see what you've got on this sheet of

21   paper before me.

22      Q.  What I want to try and do is I want to

23   try and apply this hypothetical to the policy

24   language so that we can make sure that we're

25   talking about the same -- that I can understand

                                              59

1   from a very simple profit and loss statement

2   where we can pull different numbers.

3          MR. GOODMAN:

4          Are you going to mark this?

5          MR. BAAY:

6          Sure.  I'll mark that as Exhibit 1,

7   Legier 1.

8   BY MR. BAAY:

9      Q.  Looking at Legier 1, I'd like to use --

10          MR. GOODMAN:

11          You are using the first column?

12          MR. BAAY:

13          First column as a hypothetical.

14          MR. GOODMAN:

15          But for property damage.

16   BY MR. BAAY:

17      Q.  But for property damage.  Given that

                    Page 54

Legier, William 08-03-07.txt

18  hypothetical firm, what number would you tell me
19  is the net profit which is thereby prevented from
20  being lost?
21      A.  I don't want to slow the process down,
22  but you're saying but for physical damage.  We
23  had a debate on that earlier as it related to the
24  interpretation of this policy.
25          And I think that I don't want to get

                                                    60

1  caught up in that, but I don't necessarily agree
2  with the physical damage component of this.  I
3  think it is what it is in the policy.  But with
4  that exception, I will address the first column.
5          MR. GOODMAN:
6          I don't understand what your question
7  is.  I don't know if he does.  Do you want to --
8          THE WITNESS:
9          I don't understand the question.
10 BY MR. BAAY:
11      Q.  I don't know that I have a question yet.
12 My hypothetical is this:  I've got a hypothetical
13 firm that I want to try and apply this policy
14 language to.
15          And what the first column is attempting
16 to do is to figure out what the net profit or
17 loss which is prevented from being earned is in
18 this hypothetical firm.  Would you agree that
19 it's $250?

                        Page 55

Legier, William 08-03-07.txt
20    A.  Well, the but for profit is $250, but
21  for whatever the issue is as it recites in the
22  policy, that is correct.
23    Q.  Let's --
24    A.  Based on this hypothetical.
25    Q.  Right.  Whatever -- however somebody


                                              61


 1  interprets the first paragraph that we talked
 2  about, caused by physical loss or damage, that's
 3  what I'm trying to portray in the first column,
 4  that if that hadn't happened, then this is the
 5  but for profit in this hypothetical, this $250,
 6  okay?
 7    A.  That's what you are saying.
 8    Q.  That's what I'm saying, right.
 9        MR. GOODMAN:
10        Do you want me to interrupt or you
11  prefer I don't?
12        MR. BAAY:
13        I prefer you don't.  But I think it's
14  going to make sense, and hopefully it will, but
15  if not, then --
16        MR. GOODMAN:
17        It doesn't make sense to me so far, for
18  what it's worth, but go ahead.
19  BY MR. BAAY:
20    Q.  Well, let me just ask a really stupid
21  question:  Is this -- generally, is this an
22  acceptable way to display or portray the net

Legier, William 08-03-07.txt
23  profits of a firm that has a sales, cost of

24  sales, expenses, and ordinary payroll, I mean,

25  those are the things that would go into

                                                    62

 1  calculating net profits, correct?

 2       A.  It depends on what you mean by net

 3  profits.  Also, I might comment that this plus

 4  recoverable BI claim is not something you would

 5  see, generally speaking.  I don't know where that

 6  comes from.

 7       Q.  Well, we're going to talk about that

 8  next.  I'm really just right here, net profit or

 9  loss.  In a hypothetical firm that has sales, it

10  has cost of sales, it has some charges and

11  expenses, and it has ordinary payroll; and if you

12  take the sales minus the cost of sales, you have

13  a gross margin; if you subtract the charges and

14  expenses and the ordinary payroll, you get to a

15  net profit number?

16           MR. GOODMAN:

17             Is that a budget or an actual?

18           MR. BAAY:

19             That is the but for the peril, but for

20  the loss.  That's what this firm would have made.

21           MR. GOODMAN:

22             So it's a budget.  Okay.  Go ahead.

23           MR. BAAY:

24             Yes.  It's the budgeted numbers.

                    Page 57

```
                    Legier, William 08-03-07.txt
25          MR. GOODMAN:
```

                                                                    63


```
 1          Budgeted number of this hypothetical
 2  firm, what it would have made but for the --
 3          THE WITNESS:
 4          Peril.
 5          MR. GOODMAN:
 6          Peril.
 7          MR. BAAY:
 8          But for the loss.
 9          MR. GOODMAN:
10          But for Katrina.  I understand.  Okay.
11  Go ahead.
12          MR. BAAY:
13          Well, it's not really but for Katrina.
14          MR. GOODMAN:
15          But for the wind of Katrina?
16          MR. BAAY:
17          The damages caused by Katrina.
18          MR. GOODMAN:
19          Right.  Okay.  This is a budget.  Go
20  ahead.
21          THE WITNESS:
22          And you define net profit here as before
23  taxes, I guess?
24  BY MR. BAAY:
25      Q.  How would you -- how do you think
```

Legier, William 08-03-07.txt

64

1    that -- I mean, how do you interpret the second
2    paragraph, the net profit prevented from being
3    earned?  How do you interpret that phrase, before
4    or after taxes?
5         A.  Well, I'm only asking this, because
6    you've given me a paper in front of me that says
7    net profit, and it doesn't have taxes.  So I
8    presume it's without taxes.  That's your
9    definition of net profit.
10        Q.  Okay.  Assume that that's correct.
11        A.  All right.
12        Q.  For right now, we'll set that aside; and
13   if that has an impact, you can tell me later.
14   Then the next part of this phrase says:  And of
15   all charges and expenses, excluding ordinary
16   payroll, but only to the extent that they
17   necessarily continue during the interruption of
18   business and only to the extent to which they
19   would have been incurred had no loss occurred.
20            Okay.  That's the next thing I want to
21   talk about.
22        A.  Let me see that.  Which paragraph is
23   that?
24        Q.  In paragraph 2, all charges and
25   expenses, excluding ordinary payroll.

65

```
                    Legier, William 08-03-07.txt
 1     A.  Okay.
 2     Q.  Assume for the purposes of my example
 3 that the charges and expenses excluding ordinary
 4 payroll is $100, and that the ordinary payroll is
 5 $50, okay?
 6     A.  Okay.
 7     Q.  In the but for case.
 8     A.  Okay.
 9     Q.  The way it's presented right there.
10 Now, next column, let's assume that there's no
11 resumption of operation for a corresponding term.
12        MR. GOODMAN:
13        What does with OP coverage mean?
14        MR. BAAY:
15        Ordinary payroll coverage.
16        MR. GOODMAN:
17        Okay.
18 BY MR. BAAY:
19     Q.  So let's talk about the first column.
20        MR. GOODMAN:
21        The second column.
22 BY MR. BAAY:
23     Q.  I mean the second column.  I'm sorry.
24 If there's no resumption of operations, then
25 sales are going to be zero, right?
```

```
 1     A.  Correct, assuming that they don't resume
 2 operations.
 3     Q.  Assume for purposes of my hypothetical
```

Legier, William 08-03-07.txt

4  that sales are zero, cost of goods sold are zero,
5  the gross margin is going to be zero, the charges
6  and expenses continue.
7          Those are the, because I'm assuming that
8  those are the charges and expenses, to the extent
9  that they must necessarily continue during the
10 interruption of the business and only to the
11 extent that they would have been incurred had no
12 loss occurred, okay.  So that's the $100.  That's
13 what I'm talking about, okay?
14     A.  What's happening here with your ordinary
15 payroll?  It goes from $50 to $25.  What does
16 that mean?
17     Q.  Assume for the sake of this hypothetical
18 that the hypothetical firm decides to pay half of
19 its ordinary payroll people and keep them and pay
20 them throughout the interruption, okay.  Assume
21 that for the sake of this hypothetical.
22     A.  And you are assuming that there is no
23 sales that they are creating?
24     Q.  That's correct.  Assuming that they are
25 shut down, there's no resumption of operations,

                                                    67

1  there's no sales that they are creating, so
2  they've got charges and expenses that are affixed
3  that are continuing, and they've reduced their
4  ordinary payroll from $50 to $25.
5      A.  Uh-huh.

                    Page 61

Legier, William 08-03-07.txt

6      Q.  Now, using the second paragraph, how

7   would you interpret the business income -- the

8   business interruption claim for in that case?

9         MR. GOODMAN:

10         I don't understand your question.  I'll

11   object to the form, but I don't want to clarify,

12   because you are trying to get something.  So go

13   ahead.

14   BY MR. BAAY:

15      Q.  Assuming that -- let's do this:

16   Assuming that -- and let me back up, and maybe I

17   probably have these out of order.  Let's do

18   column three first.  If we do column three first,

19   the way that is captioned is without OP coverage;

20   and what that means is without ordinary payroll

21   coverage.

22         And just as an aside, in paragraph 2

23   where we've read, you see that all charges and

24   expenses, there's a parentheses that says

25   excluding ordinary payroll; do you see that?


                                                68


1      A.  I do.

2      Q.  So do you understand that in this --

3   when we are talking about this coverage, that

4   ordinary payroll is excluded, but that there

5   are -- it could be purchased; you can buy

6   coverage.  You understand that you can buy

7   coverage for ordinary payroll that where your

8   ordinary payroll is covered during a business

Page 62

Legier, William 08-03-07.txt

 9  interruption?

10      A.  I've never seen that offered.  I can't

11  tell you that it would be offered.  Are you

12  saying that they offer that, when they sell a

13  policy?

14      Q.  Yes.  Let me -- let's make sure --

15      A.  Assuming that they must offer it.

16      Q.  Assume that you can buy for an

17  additional premium, you can buy that coverage so

18  that basically reads out that, excluding ordinary

19  payroll.

20      A.  But I would assume that in order to buy

21  it, you must be advised that it's available.

22      Q.  Exactly.

23      A.  So you would be offering that as an

24  optional type thing?

25      Q.  Assume for the sake of this discussion

                                               69

 1  that, yes, that that's offered; and we have two

 2  different scenarios, one where they purchased it

 3  and one where they haven't purchased it.

 4      A.  Or they declined it when it was offered.

 5      Q.  That's right.  That's the scenario.  Do

 6  you understand that?

 7      A.  Well, I think I do.  I want to make sure

 8  that I do.

 9      Q.  In the case where we read it the way

10  it's written and it's excluded, that's the third

                        Page 63

Legier, William 08-03-07.txt

11  column, would you agree with me that the business

12  interruption loss under that paragraph should be

13  $350?

14      A.  It appears that that's correct.

15  Assuming your hypotheticals and assuming your

16  comments, it would be the $100, plus the $250

17  that wasn't made, is $350; and they would not pay

18  for the $25 of ordinary payroll, if there was no

19  coverage for that.

20      Q.  Then if they purchase that coverage,

21  then it would be the $250, the but for net

22  profit, the $100, plus the $25, right, so it

23  would be $375?

24      A.  That's correct.  The $100, the $25, the

25  $250, and the -- equal the $375, given all of


                                                    70


1   your assumptions and hypothets.

2       Q.  Okay.  Let's look at another one.

3           MR. BAAY:

4           I'll call this Legier 2.

5   BY MR. BAAY:

6       Q.  In this one, the firm is not --

7       A.  If you'd just give me a few minutes.

8   It's totally different.  I want to take a moment

9   and read it.

10      Q.  That's fine.  They would have had a net

11  loss of $150?

12          MR. GOODMAN:

13          Column 1, right?

Legier, William 08-03-07.txt

14  BY MR. BAAY:

15      Q.  In column 1, our but for net profit

16  loss.

17      A.  Can I see the last one?

18      Q.  Sure.

19      A.  You've got some things on this one that

20  were not on the last one down here on the bottom.

21      Q.  Yes.  We'll talk about that in just a

22  second.

23      A.  The scenario just stopped at what point?

24          MR. GOODMAN:

25          You are stopping at the net profit loss


                                              71


 1  the first time it appears?

 2          MR. BAAY:

 3          That's right.

 4          MR. GOODMAN:

 5          I think he's looking at --

 6          MR. BAAY:

 7          You can cover that up.

 8          MR. GOODMAN:

 9          We're right there.

10          THE WITNESS:

11          Okay.

12  BY MR. BAAY:

13      Q.  In this case, obviously, the firm is

14  projecting to lose $150, but for the damage.  So

15  if the damage doesn't occur, and this firm goes

Legier, William 08-03-07.txt
16  on during the period, it would have lost $150,

17  okay.

18          Now, it has the loss, and we have again

19  the two scenarios, one where ordinary payroll is

20  covered, and one where it isn't covered.  Would

21  you agree with me that if they had no ordinary

22  payroll coverage --

23          MR. GOODMAN:

24          The third column.

25  BY MR. BAAY:

                                                    72

1          Q.  The third column, that the business, the

2   recoverable business interruption claim is $50?

3          A.  Assuming your hypothetical numbers and

4   the assumptions that you've got here in your

5   hypothetical question, it would appear that way.

6          Q.  In this exhibit, I've got the numbers

7   actually broken out.  That formula is embedded in

8   this Excel spreadsheet, but I figured that's hard

9   to see.

10          So I just put it down below.  The way

11  you would get to it, and again, following the

12  language of the policy is, it's the but for net

13  profit, in this case loss, plus the charges and

14  expenses, excluding ordinary payroll, plus

15  ordinary payroll, if you have it or if you don't

16  have it, whatever the case may be, right; so

17  that's the formula?

18          A.  Based on your hypothetical questions and

Legier, William 08-03-07.txt

19  with the caveats that I mentioned earlier on

20  Legier 1 being applicable to Legier 2, it would

21  appear that that would be correct.

22      Q.  And consistent with paragraph 2 of the

23  policy, right?

24      A.  It appears so.

25      Q.  Okay.


                                                    73


1       A.  And I also understand, based on the

2   nature of your question, it appears that this is

3   your interpretation of the policy as well?

4       Q.  Actually, I'm not going to be testifying

5   about what the interpretation of the policy is.

6   So really we are only here to find out what your

7   interpretation of the policy is.

8       A.  No.  But I just wanted to understand

9   that that's something that you're interpreting in

10  the policy language that we're reading, because

11  you did the calculations; so I gather that it is.

12  Anyway, that's my observation.

13      Q.  Okay.  Well, then, as far as we've gone,

14  then, we have -- you agree with my calculations,

15  how about we can -- and we'll leave it at that;

16  how about that?

17      A.  Well, it's not just calculations.  I

18  think it goes to the interpretation of the policy

19  language that you have applied here in terms of

20  your model and your numbers and your assumptions.

Legier, William 08-03-07.txt

21    Q.  Right.  But you wouldn't come up with

22 different numbers, applying this policy language,

23 you wouldn't come to a different number for the

24 recoverable BI claim?

25        A.  Well, again, you are limiting it to two

                                                    74

 1 paragraphs, though.

 2        Q.  No, that's right.  And this is the total

 3 shutdown case.

 4        A.  Right.  That's exactly right, limited to

 5 two paragraphs, as though nothing else existed.

 6        Q.  Exactly.

 7        A.  The facts and circumstances.

 8        MR. GOODMAN:

 9        Let's go on.

10        MR. BAAY:

11        Let's mark the next one as Legier 3.

12        MR. GOODMAN:

13        You don't have an extra copy of these,

14 do you?

15        MR. BAAY:

16        I sure don't.  I apologize.

17 BY MR. BAAY:

18    Q.  The first -- let's compare it to this.

19 This is the same as Legier 1 for the first three

20 columns.  Agreed?

21        MR. GOODMAN:

22        Wait.  Why don't you give us a few

23 minutes.  I would like to look at it, and I'm

                         Page 68

Legier, William 08-03-07.txt
24  sure he would, too.
25          MR. BAAY:

                                                     75

1           I'm sorry.
2           MR. GOODMAN:
3           What's your question?
4           THE WITNESS:
5           Wait.  Let me just hone in on a couple
6  of things before you ask.
7           MR. BAAY:
8           Take your time.
9           MR. GOODMAN:
10          Let him ask questions.
11          THE WITNESS:
12          Yes.  Go ahead.
13          MR. GOODMAN:
14          I think your first question was are the
15  first three columns the same as Legier 1.
16  BY MR. BAAY:
17     Q.  And we agreed to that?
18     A.  It appears that they are, but -- they
19  appear to be the same.  I didn't do an exact
20  comparison, but it appears on the surface.  They
21  are intended to be, right?
22     Q.  They are intended to be the same.  Let's
23  now assume that our hypothetical firm resumes
24  operations, last two columns -- no, last column;
25  and they generate sales of $600, their cost of

Legier, William 08-03-07.txt

1  sales are $360, so they've got a gross margin of
2  $240.
3          They still have the same $100 in charges
4  and expenses, and their ordinary payroll is $30.
5  Okay.  Now, let's talk about first -- well,
6  either one, how would you calculate whether they
7  have ordinary payroll coverage or not?  How would
8  you calculate the business interruption claim in
9  those two, using that?
10      A.  Based on these two first paragraphs?
11      Q.  Well, actually, we have to now
12  incorporate, one, resumption of operations.  So
13  let's look at that.  It is a condition of this
14  insurance that if the insurer could reduce the
15  loss resulting from the interruption of business
16  by a complete or partial resumption of operations
17  or by making use of other available stock,
18  merchandise, or location, such reduction will be
19  taken into account in arriving at the amount of
20  the loss hereunder.
21          So that paragraph and the subparagraphs
22  are implicated in the next hypothetical or in
23  this change of the hypothetical.
24      A.  You stopped reading at a critical point
25  in there.

Legier, William 08-03-07.txt

1      Q.  I'm sorry.  But only to the extent that
2  the business interruption loss covered under the
3  policy is thereby reduced.  That's the complete
4  wording of --
5      A.  Now, where does that apply?  Does that
6  apply to B or to A and B?
7      Q.  How would you apply it?
8      A.  Well, it's your policy.  I'm asking you.
9  It says comma, but.  My question is:  Are you
10  asking me to assume that it applies under A and
11  B?
12      Q.  Let's do this.  Let's use the numbers
13  and see if it makes a difference, in the
14  hypothetical, let's see if it makes a difference,
15  okay.
16          See if you agree with the BI claim that
17  I've calculated under the last two columns, under
18  columns 3 and 4.
19      A.  Are you saying that you want to stop
20  after 1 or consider the expenses to reduce the
21  loss?  I mean, all of this appears to be germane
22  to that.
23      Q.  Assuming that the entire paragraph B,
24  interruption, business interruption, assuming
25  that all of that applies to this firm, tell me

                                              78

1  what other facts you need to calculate the

Legier, William 08-03-07.txt
2  business interruption claim, given my
3  extraordinarily simple example, hypothetical.
4       A.  Well, I think we've done that in our
5  report, Counselor.  We've addressed these.
6       Q.  I know.  But I want to try and do it
7  with these simple numbers and just get you to --
8  so that I can figure out what the formula is and
9  how you would calculate it.
10       A.  I don't agree with these last two
11  columns, if that's what you're asking me.
12       Q.  Well, then, tell me, how would you -- in
13  this hypothetical, how would you calculate the
14  business interruption claim for this hypothetical
15  firm?
16       A.  Well, it's a fairly involved
17  calculation, which we've done already.  And you
18  are trying to simplify something that we've
19  already done in our report.
20           I'd prefer to go to the report and show
21  you how we actually did it with the numbers that
22  existed.  For one thing, I don't think that gross
23  profit is mentioned anywhere in here, is it?
24       Q.  No, it's not.  Those words don't appear.
25       A.  Okay.


                                              79


1       Q.  So can you or can you not do that?  Can
2  you, with my hypothetical, or can you calculate
3  what the business interruption claim would be
4  with and without ordinary payroll coverage, like
                      Page 72

Legier, William 08-03-07.txt

 5   you were able to do --
 6        A.  Well, as you just testified, Counselor,
 7   there's no gross profit mentioned in the policy.
 8   You'd have to take that out.  And you'd have to
 9   add that back to the number below.
10        Q.  Let me ask you this question:  Doesn't
11   it say -- assume for me, then, that where it
12   says:  It is a condition of this policy that if
13   the insured could reduce the loss resulting from
14   the interruption of the business --
15        A.  I don't follow you.  Which one are you
16   on?
17        Q.  Under 1, by complete or partial
18   resumption of operations; or B, by making use of
19   other available stock or merchandise or location,
20   such reduction, that would be the reduction in
21   the business interruption loss, based on the
22   operations, right?
23        A.  It would be the reduction from what it
24   would have been, had they not resumed operation
25   to what it was that they did.


                                              80


 1        Q.  Perfect.  Let's see if we can't, with
 2   that understanding, so let's see if we can figure
 3   out what my hypothetical firm decided and was
 4   able to start back up again.  And they made --
 5   they had net profits of $110.
 6            MR. GOODMAN:

Legier, William_08-03-07.txt

7          Why don't you do the last column,

8    because that's the policy.

9          MR. BAAY:

10         That's fine.

11   BY MR. BAAY:

12        Q.  They had $110 in net profit, right, and

13   they ordinarily would have made $250, okay.  So

14   before, we took the $250, and we added it to the

15   cost and expenses; and in this column, we don't

16   add ordinary payroll, so we have a zero in that

17   column.

18         If you subtract their gross profits,

19   because they earned money by operating, they had

20   some gross margin; if you apply that to your

21   claim, you've reduced it from, comparing columns

22   3 and 5, you've reduced it from $350 to $110 by

23   operating, right?

24        A.  Wait.  Now, you are saying the claim is

25   reduced?

⬚                                                       81

1         Q.  Right.  The claim is reduced; the loss

2    is reduced.

3         A.  The business interruption loss under

4    that scenario is the difference between the

5    actual and the but for, $250, reduced to $110.

6          MR. GOODMAN:

7          Reduced by --

8          THE WITNESS:

9          Reduced by or down to.  Okay.  So what

                        Page 74

Legier, William 08-03-07.txt

10   is the question, Counselor?

11   BY MR. BAAY:

12        Q.  I'm trying to see if that would be --

13   what you think the business interruption loss

14   would be for column 5 with that hypothetical,

15   based on our policy.  You think it's what?

16        A.  Well, it says:  It is a condition of

17   this insurance policy that if the insured could

18   reduce the loss resulting from the interruption

19   of business by complete or partial resumption.

20   And then you pick up with:  But only to the

21   extent that the business interruption loss could

22   under this policy be thereby reduced.

23        Q.  Right.

24        A.  So it's the amount that you reduced the

25   business interruption loss by as a result of the

                                              82

1   resumption of the operation.

2        Q.  Right.  And how much was that?  That

3   figure is pretty simple.  If they would have made

4   $250, and they only made $110, the business --

5   you told me under the business interruption

6   without ordinary payroll coverage was $350?

7        A.  Well, no.  You are back here, the but

8   for damages.  That's what they would have made.

9   That's their but for income, $250.

10        MR. GOODMAN:

11        He's got that here.  Why did you reduce

Page 75

Legier, William 08-03-07.txt
12  by $240 and not the $110?

13          MR. BAAY:

14          Because that's what it says.  But

15  reduced by -- and he just read it.  Reduced by

16  the operations.  So --

17          MR. GOODMAN:

18          It's $110.

19  BY MR. BAAY:

20      Q.  Yes.  But it's the amount that the BI

21  claim is reduced.  You've reduced the BI claim by

22  actually going out and generating $240 worth of

23  gross margin, right?  That's what your operation

24  has generated?

25      A.  The loss resulting from the interruption

                                                    83

 1  of the business.  Is that what the wording says?

 2      Q.  Where are you?

 3      A.  I'm under 1.

 4      Q.  Right.  The loss resulting from the

 5  interruption of the business, right.  So we

 6  already talked about we know what the loss is.

 7  We, I thought, agreed.

 8      A.  Now, wait.  You are talking about one

 9  thing as a claim and then another thing as a

10  loss.

11      Q.  The first paragraph that we talked about

12  was the business interruption means the loss

13  resulting from the interruption of business.

14      A.  The loss.

Legier, William 08-03-07.txt

15        Q.  Resulting from necessary interruption of
16   business.
17        A.  The loss, not the claim.  That's the way
18   I read it, Counselor.
19        Q.  Okay.  The business interruption loss,
20   right?
21        A.  The loss.
22        Q.  Resulting from the necessary
23   interruption of business?
24        A.  Right.
25        Q.  That's what I'm talking about.


⬚                                                        84


1        A.  No.  You were saying the claim.
2        Q.  Well --
3        A.  I want to make sure I understand your
4   question.
5             MR. GOODMAN:
6             I don't understand your question right
7   now.  I don't even know if there is one pending.
8   What is the question?
9   BY MR. BAAY:
10        Q.  The question is:  How do you calculate
11   the business interruption claim?
12             MR. GOODMAN:
13             In the last column?
14   BY MR. BAAY:
15        Q.  In the last column.  What do you think
16   it should be, if it's not $110?

Legier, William 08-03-07.txt

17    A.  Without ordinary payroll?

18    Q.  Right.  Yes.  In this scenario

19  without -- ordinary payroll is not covered.

20    A.  But the loss is the difference between

21  what they made and what they should have made.

22    Q.  So how would you calculate?  Can you

23  tell me what the number is?

24    A.  Well, if, based on your hypothetical

25  numbers, and given the methodology that we

                                                85

1  applied in the report, the actual net profit in

2  this particular fifth column is $110, and they

3  would have made $250; so it would be the

4  difference between the two, the diminution, the

5  reduction from where it should have been to where

6  it was, if these numbers are, in fact, what I

7  understand them to be.

8    Q.  The business interruption loss would be

9  the claim that would be $250 -- would be $140?

10    A.  Yes.  Based on that interpretation with

11  these numbers hypothetically, given that I've

12  done a calculation that was similar to that in my

13  report, but we put in much more time and effort

14  and were more refined in our approach, and yours

15  is a very broad-brushed approach.

16       But if I understand the questions and

17  the hypothetical, then that would be my initial

18  observation.

19    Q.  Let me ask you this question:  On the --

Legier, William 08-03-07.txt

20   what would it be, if there was ordinary payroll

21   coverage?

22        A.  But that isn't what the policy says

23   further.  You've got to read the whole thing.

24   You are stopping right there.

25        Q.  I'm including all of B.


86


1        A.  Well, obviously, where does it say that

2   you've taken into consideration gross profit?

3   That's my point earlier.

4        Q.  Isn't that --

5        A.  That says, if you read this further, it

6   says that you take the actual continuing

7   operating expenses, except ordinary income, based

8   either on the historical or whatever they were

9   during the period of loss, plus the profit that

10   they would have made; and that would be the

11   measure of loss undertaken as a whole.

12        Q.  Why don't we do it that way?

13        A.  So that would be something different

14   than this.

15        Q.  Wouldn't that be, reading that, wouldn't

16   it be the $250, which is their but for profits,

17   plus the $100, charges and expenses?

18        A.  Correct.

19        Q.  If they've got coverage for ordinary

20   payroll, plus $30?

21        A.  Correct.

Legier, William 08-03-07.txt
22     Q.  What's that?  That number is what?
23     A.  $350 plus $30 is $380.
24     Q.  And they have generated $240 in gross
25  margin, they've generated that much cash in their

                                                87

1  operations by selling product?
2     A.  I don't agree with that, Counselor.
3  Cash is different than profit.  But where in this
4  wording are you referring to that?
5     Q.  Under the resumption of the operation,
6  it is a condition of the insurance that if the
7  insured could reduce the loss resulting from the
8  interruption of the business by resuming
9  operations, then he needs to do that; and that
10  reduction will be taken into account.
11        So he's gone out and generated $250 in
12  gross profits.  So if you take that, if you take
13  the $380, and you subtract out, you reduce it by
14  the amount of money they've made during
15  operations --
16     A.  Just let me --
17     Q.  Let me finish the question.  You reduce
18  it by that amount, then you come up with your
19  number, right, the $140; that's what you told me
20  the recoverable BI claim should be.
21     A.  No.  You are assuming that credit is
22  given for gross profit margin, and you're
23  assuming just a part of this wording.  But if you
24  take the wording as a whole, it doesn't say that.

Legier, William 08-03-07.txt

25          And that's what my report says.  It says

                                          88

 1  that you take the continuing expenses, plus the
 2  profit that you didn't make, without ordinary
 3  payroll, and that is the amount of the loss.  And
 4  to the extent that you can reduce it from what it
 5  would have been otherwise, you get credit for
 6  those expenses which I calculate was some
 7  $13 million.
 8          MR. GOODMAN:
 9          Before you go on, I want to object to
10  the form of that last question.  I'll let him
11  answer, because I think you've grossly
12  mischaracterized what he said before.  Just so
13  it's on the record.
14  BY MR. BAAY:
15     Q.  Can we agree, then, if there is -- in
16  the fourth column over, the resumption of
17  operations with ordinary payroll coverage, you
18  would agree that the recoverable BI claim is
19  $140, right?  We've agreed on the number.
20     A.  No.
21          MR. GOODMAN:
22          No.  That's why you are just totally
23  misinterpreting his prior testimony.
24          THE WITNESS:
25          I didn't say that.

                        Page 81

Legier, William 08-03-07.txt

⬜                                                                    89


    1          MR. GOODMAN:
    2          He said no before.
    3          THE WITNESS:
    4          You keep putting in gross profit,
    5   Counselor.  And that's the point.  And you
    6   testified earlier that there is no place in there
    7   that it says gross profit.  And I agree with
    8   that.
    9          And I think that what you are trying to
   10   do with this is you're trying to back door
   11   something that's not in the policy.
   12   BY MR. BAAY:
   13      Q.  Well, I guess what I'm trying to
   14   understand is:  If the claim -- assume for me
   15   that in column number 4, okay, that the firm has
   16   a net profit of $110; and assume for me what you
   17   told me earlier that its BI claim would be $140,
   18   okay?
   19          MR. GOODMAN:
   20          That's not what he said.  I object.
   21          MR. BAAY:
   22          The record will reflect that he said
   23   that the claim would be $140.
   24          MR. GOODMAN:
   25          The record will reflect he said the net


⬜                                                                    90

Legier, William 08-03-07.txt

1  profit would be $140.

2         THE WITNESS:

3         The difference between one and the

4  other.  But that's not what this policy says.

5  This policy says nowhere that gross profit will

6  be taken into consideration in calculating the

7  amount of the claim.  And you know what my report

8  says.  It says that explicitly.

9  BY MR. BAAY:

10        Q.  Can we just please talk about this

11  hypothetical example for just a couple of more

12  minutes, okay, and then we'll move on.

13        A.  Sure.  But I don't want to have you

14  mischaracterize my opinion.

15        Q.  Okay.  Will you agree with me that in

16  the fourth column, the business interruption

17  claim should be $140?

18        A.  No.

19        Q.  What should it be?

20        A.  No.  It would not be.

21        Q.  What should it be?

22        A.  Well, it should be $100, plus $30, plus

23  $250.

24        Q.  $100, plus $30, assuming that that

25  income is -- I mean, assuming that ordinary

                                                    91

1  payroll is covered, so how much is that?

2         A.  That's $30 and $100 is $130, plus $250.

Legier, William 08-03-07.txt

3    Q.  So it's $380?

4    A.  $380.

5    Q.  So in that fourth scenario, you would

6  evaluate the business interruption claim at $380?

7    A.  Very generally speaking, based on these

8  hypothets and general numbers.  But again, if you

9  go into my report, you'll see that in much more

10  detail calculated appropriately.

11       This is back of the envelope, that I'm

12  trying to do it in the back of the envelope way;

13  and I don't think that that's really appropriate

14  in a case this complex.  But again, it's a

15  hypothetical.  And it's based on very general

16  numbers that don't apply to this case.

17    Q.  I'm not trying to suggest that these

18  numbers apply to this case.  I'm trying to apply

19  these numbers to the policy language.  That's all

20  I'm trying to do.

21    A.  What's the question?

22       MR. GOODMAN:

23       He's answered your question.

24  BY MR. BAAY:

25    Q.  The question is:  In the column 4, we

                                                    92

1  have a disagreement.  I thought a minute ago, you

2  calculated it at $140; but now you are telling me

3  you think the business interruption claim, the

4  loss, business interruption loss that should be

5  recoverable under this policy language in this

                    Page 84

Legier, William 08-03-07.txt

6   hypothetical is $380?

7       A.  That's what I testified to, based on the

8   totality of all of this wording.  And based on

9   your hypotheticals and your broad-brush approach,

10  which is really no substitute, in my opinion, for

11  my more detailed calculations relating to the

12  actual numbers and circumstances that we're here

13  today to testify to.

14          So with that caveat and the other

15  caveats that I've added throughout my testimony

16  regarding this, that's my answer.

17      Q.  Just so that I can understand, that's

18  the but for profit, the $250, plus the $100 in

19  continuing expenses, charges and expenses, plus

20  the $30, assuming that it's covered, gets you to

21  $380.

22          Now, let me ask you this question:  In

23  this hypothetical where they've resumed

24  operations, how under your reading of the policy

25  would the money that they made by resuming

                                                    93

1   operations get credited?  How would that or would

2   it, in your opinion, reduce their business

3   interruption loss?

4       A.  Well, I'm asking you, Counselor, and you

5   said it's not in there.  It's not provided in the

6   policy.

7       Q.  Sure, it is.  It says:  Under resumption

Legier, William 08-03-07.txt
8   of operations, that it is a condition of the

9   insurance, that if the insured could reduce the

10  loss resulting from the interruption of business

11  by resuming operations or by selling a stock,

12  that the money that he makes doing that should

13  reduce, such reduction will be taken into

14  account.  Show me where you've taken into

15  account --

16       A.  Let me just go back to your wording.

17  Such reduction will be taken into account, where

18  is that?

19       Q.  Right here (indicating).

20       A.  I know it's in here, but I just want to

21  make sure I'm following you.

22       Q.  That's fine.  Such reduction will be

23  taken into account.  So if you resume

24  operations --

25       A.  You are stopping short of the rest of


                                          94


1   the paragraph.  Read the rest of that, Counselor.

2   There's more to it than that.

3        Q.  No doubt.

4        A.  You are clearly leaving out some

5   critical parts of that.

6        Q.  But tell me how you would apply -- where

7   in your getting to $380, where do you give credit

8   for the reduction will be taken into account?

9   Where do you take it into account in arriving at

10  the amount of the loss?
                        Page 86

Legier, William 08-03-07.txt

11      A.  I've actually done that calculation in
12 the report.
13      Q.  I know.  I'd like for you to do it with
14 my hypothetical, because in my hypothetical, the
15 firm went back to business, sold $600 worth of
16 stuff that cost it $360.
17      A.  Well, to the extent, if you read this,
18 Counselor, provided such coverage shall not
19 exceed the amount by which the business
20 interruption loss covered under this policy is
21 thereby reduced.
22         So if you are comparing what they did
23 from resumption of operation to what they
24 actually did, what they should have done had they
25 not had the accident or the issue, then it's the

                                              95

 1 difference between the $110 and the $250,
 2 provided that that's the wording that you are
 3 applying here.  And I did that calculation and
 4 came up with $13 million.
 5      Q.  But if they've generated in sales, in
 6 gross margins $240 under my hypothetical, then
 7 the only -- the difference between the no
 8 operations and the resumption of operations is
 9 they've generated $240?
10      A.  Well, that's under one part of this
11 policy.  But you know in the policy, as we put in
12 our report, there's multiple applications that
                      Page 87

Legier, William 08-03-07.txt
13  can be performed in interpreting this policy.

14  There are actually four.

15          And we've done all four.  So we are

16  looking at one, but I think that it's important

17  for you to note that that is not the only

18  interpretation of the policy.  That's why we did

19  four different scenarios.

20      Q.  I understand that.

21      A.  You're aware of that?

22      Q.  I am.

23      A.  Okay.  So to the extent that we did a

24  calculation of what it would have been under one

25  scenario versus what it was because they

                                        96

 1  continued to operate, and the difference is $13

 2  million, then I think what your question is, if I

 3  understand it correctly, using that methodology,

 4  whatever it is in your numbers, and I can't say

 5  that they're anything but hypothetical and broad

 6  brush, we did the actual calculations.

 7          So I would like to stay with that

 8  methodology that we applied.  And if you are

 9  telling me that the methodology that we applied

10  in getting to $13 million is the same as what

11  you're doing here, if you took the difference

12  between the $110 and the $250, then

13  theoretically, that should be the same.

14          But I want to stick to what we did in

15  calculating that to make sure that something more

Legier, William 08-03-07.txt

16  complex is not oversimplified in a one-page
17  document when we've got a binder here with God
18  knows how many hundreds of pages, that we did
19  that calculation in much better detail and more
20  accurately.
21      Q.  We'll get to that.  And really, we will.
22  But it seems important that we understand what
23  numbers to use, what the word formula is, based
24  on the policy.  And we can agree on if there are
25  different scenarios, we can agree on that.  I was

                                                    97

 1  really trying to find out the one that you
 2  thought applied.
 3      A.  Well, you are using a very broad-brush
 4  approach, and you are leaving out a lot of facts
 5  and circumstances and details that we've got in
 6  our actual calculation that answers that exact
 7  question much more appropriately and much more
 8  accurately with the facts and circumstances.
 9         So to the extent that this differs from
10  that, I would have to take exception and tell you
11  that I do not agree with it.  So your
12  oversimplification, if you can take that
13  oversimplification and apply it to what I did and
14  fair out the differences, I think we would
15  probably be making more headway here.
16      Q.  We're going to do that in just a minute.
17  Let me see if I can finish with this hypothetical

Legier, William 08-03-07.txt
18    first, okay.  In the resumption of operations

19    with ordinary payroll coverage --

20         A.  Which column?

21         Q.  Column 4.

22         A.  Under one interpretation, I told you

23    that that would not be $110; it would be $300 --

24    if you added back the $240, it would be $100,

25    $130, plus the $250, it would be $380.  That's

                                                    98

 1    one interpretation of the policy.

 2         Q.  What do you believe is the appropriate

 3    interpretation of the policy?  What are you going

 4    to tell the court is your interpretation of this

 5    policy, and how do you calculate it?

 6         A.  I believe that that would be the

 7    appropriate calculation, based on the wording in

 8    the policy, that you take the continuing expenses

 9    without ordinary payroll, plus the profit that

10    you would have made, but for the peril.

11         Q.  Right.  I really thought that -- and you

12    actually did it, I mean, that would be the $250,

13    plus the $100, plus the $30; that's how you got

14    to $380?

15         A.  Right.  Yes.  That's consistent with the

16    policy wording.

17         Q.  And then in this case, there was a

18    resumption of operation, and so the loss, the

19    business interruption loss should be reduced,

20    should be taken into account; the operations,

Legier, William 08-03-07.txt

21  what was earned for the resumption of operations

22  by selling goods.

23      A.  Well, I did that in my report.  We gave

24  credit for that.

25      Q.  But given -- let me just see if I can

                                                    99

1   get this finished.  In the presumption of

2   operations column 4, if it's $380, the claim is

3   $380, and then the reduction, you think the

4   reduction for the resumption of operations should

5   be the difference between the but for and what

6   was actually made, the $110?

7       A.  It would -- no, no.  You don't have it

8   on here.  You'd have to take what the company

9   actually earned, as we did; and then you would

10  calculate the claim that it would have been but

11  for, under that interpretation.  I've got four of

12  them, as you know.

13          I believe the one I'm understanding

14  you're asking is to the extent that you made -- I

15  think in our case, we showed that the company

16  made 200-some-odd thousand dollars, and had they

17  not operated, they would have had a claim of some

18  $21 million.

19      Q.  I want to make this really simple and

20  finish it up.  What I'd like for you to do is:

21  Here is Legier No. 4.  It's the exact same thing

22  as Legier No. 3, without the breakdown of the

                         Legier, William 08-03-07.txt
23  formula in the bottom.  Can you just --

24          MR. GOODMAN:

25          Let's look at it.



                                                              100



 1          MR. BAAY:

 2          You can keep looking at it.

 3  BY MR. BAAY:

 4      Q.  Can you do me a favor and write in

 5  underneath each one of these columns what you

 6  believe the correct interpretation of the policy

 7  is, what their business interruption claim should

 8  be?

 9      A.  I would think that there are a lot more

10  facts and circumstances that we are dealing with

11  here that we spent God knows how much time and

12  effort on.  And you are asking me to do something

13  here that took us actually hundreds of hours.

14      Q.  Right.  This should be simple, then,

15  because it's just -- you have already got the

16  numbers.

17      A.  Well, there's many different -- we got

18  four different scenarios that we addressed.

19      Q.  Which is the proper one?

20      A.  As I told you, you have to leave that to

21  the court to look at what the wording says.  If

22  you ask my opinion, I believe that the one that

23  deals with the continuing expenses, plus the but

24  for profit, giving credit for whatever the actual

25  profit was, is the one that I would say is

Legier, William 08-03-07.txt

1  probably the one that I would subscribe to.

2          But I can tell you that I can accept the

3  trier of fact finding that another similar one

4  would be as well.

5      Q.  Then let's give that one -- put the

6  numbers to that scenario that you just gave me.

7      A.  Assuming which assumptions?

8      Q.  In each one.  If you agree with it, just

9  put a checkmark by it.  You already agreed with

10  me that in column number 2, $375 is correct?

11      A.  Wait, wait, wait, wait, wait.  Slow

12  down.  You are putting words in my mouth,

13  Counselor.  You're testifying for me.  I don't

14  know that I said that.

15          MR. GOODMAN:

16          Well, I'm going to object to the form,

17  because you've got columns with operating, with

18  ordinary payroll coverage; and this one excludes

19  ordinary payroll coverage.

20          But you are trying to interpret it under

21  the policy, but you are giving him assumptions

22  that aren't consistent with the policy.  That's

23  why this whole thing is, to me, very misleading.

24          MR. BAAY:

25          It's not meant to be misleading.  The

Legier, William 08-03-07.txt

1  policy excludes ordinary payroll.
2          MR. GOODMAN:
3          But you have columns with ordinary
4  payroll.  I don't know why you are doing that.
5          MR. BAAY:
6          Because the claim would be different.
7  If ordinary payroll is covered, if you pay for
8  that, then the claim would be different.  I think
9  we agreed to that under the first scenario.
10         MR. GOODMAN:
11         Go ahead.  You are asking the questions.
12         THE WITNESS:
13         What is your question?
14 BY MR. BAAY:
15     Q.  I would like for you to, underneath
16 column -- I thought we had already had an
17 agreement that $375 and $350 would be the
18 appropriate BI claims.
19     A.  If you took the $100, plus the $25, plus
20 the $250.
21     Q.  That's right.
22     A.  That's $375.
23     Q.  That's right.  Okay.  And so you can put
24 a checkmark by that.
25     A.  You want me to check what?

                                              103


1      Q.  The $375.

Legier, William 08-03-07.txt

2        A.  Put a check there (indicating)?

3        Q.  Right.  And that check signifies that

4   you agreed that that's the number under the

5   policy that would be generated in this

6   hypothetical?

7        A.  Well, Counselor, again, that's not what

8   I testified to.

9            MR. GOODMAN:

10           I object to the form.  That is not what

11  he testified to.  It excludes ordinary payroll.

12  You've got with ordinary payroll Coverage.

13  That's ridiculous.

14  BY MR. BAAY:

15       Q.  I'm really not trying to make this hard.

16           MR. GOODMAN:

17           Well, you are.

18  BY MR. BAAY:

19       Q.  We already had talked about it, if

20  ordinary payroll is covered.

21           MR. GOODMAN:

22           If it's covered.

23  BY MR. BAAY:

24       Q.  Then it's $375, check.  You agree with

25  that.  If it's covered, then it's $375, because

                                              104


1   you added it, correct?

2        A.  You add what?

3        Q.  What you just did, the $250, plus the

                  Page 95

Legier, William 08-03-07.txt

4  $100, plus the $25.

5      A.  Hypothetically, that's -- the math is

6  correct.

7      Q.  If it's not covered, it's $250, plus

8  $100, $350, right?  You agree with that number?

9      A.  The math is correct.  The $100 and

10 excluding the $25 ordinary payroll, plus the

11 $250.

12     Q.  So can you put a check by the $350?

13     A.  You want to check that?

14     Q.  Yes.

15     A.  (Witness complies.)

16     Q.  So that we can signify that we agree

17 that that's what it should be under the policy.

18 This one truly under the policy, because it's --

19 ordinary payroll is not --

20     A.  The math is correct.

21     Q.  Right.  Now, under columns --

22     A.  Hypothetically.

23     Q.  Under columns 4 and 5, I have

24 calculated, the way I read the policy, the

25 business interruption under 4, if ordinary

                                        105

1  payroll is covered, then I've taken $250, plus

2  $100, plus $30, minus reducing for what they've

3  generated.

4      A.  Uh-uh, no, sir.

5      Q.  I'm just telling you what I've done.

6  And I calculated it as $140.  That would be the

Page 96

Legier, William 08-03-07.txt

7  BI claim.  If you add the BI claim to the net
8  profit to get back to the but for number of $250.
9      A.  I don't agree with that.
10     Q.  I know you don't.
11     A.  What do you want me to do?  I said that.
12  The question has been asked and answered.
13  Numerous times.
14     Q.  What I would like for you to do is:
15  Down below here, I would like for you to tell me
16  what you believe the business interruption claim
17  should be under column 4 and 5.
18     A.  Well, I think I've answered that,
19  Counselor.  I think I've answered that question,
20  haven't I?
21     Q.  I think you have, too.  You've got the
22  $380, and then the credit that you wanted to give
23  them was the difference between these two, right?
24     A.  No.
25     Q.  The $140?

                                          106

1      A.  No, no.  It's the $100, the $30, and the
2  $250.
3      Q.  Right.  That's the 380.
4      A.  That's the amount.
5      Q.  You would pay them $380?
6      A.  That's the way I read the policy,
7  Counselor.
8      Q.  So you don't have any number -- that's
Page 97

Legier, William 08-03-07.txt
9   purely out of paragraph 2; you don't have any

10  number in that for the reduction for the

11  resumption of the operation; you don't give them

12  any credit for that?

13      A.  No.  And that's what I've got in my

14  report.  There is a scenario where I do take the

15  reduction of the loss.  But in this case, it

16  would be the $100, the $30, and the $250.

17          I've got four different scenarios, and I

18  think that's real important that you are trying I

19  think to put them into one or exclude some and

20  not consider others; but I took a lot of time to

21  express those opinions and provide my basis and

22  reasons for those, backed up by all the volumes

23  of information.

24          But I really want to be careful that you

25  don't confuse all of that by trying to change my

                                                    107

1   testimony and confuse the record.  But there are

2   four different methods that I used.  You are

3   familiar with that in my report, are you not?

4       Q.  I am.

5       A.  Those are the methodologies that I

6   applied; and to the extent that they relate to

7   these numbers, I don't know how, but we'll try to

8   do it.  I've done so.  I think I've testified.

9           MR. GOODMAN:

10          We've been through this twice now.

11  You're just not getting the -- you're getting the
                      Page 98

Legier, William 08-03-07.txt

12  same answers as you got before, and you don't

13  like the answers.  But we've been through it

14  twice now.

15          MR. BAAY:

16              I really actually do like the answers.

17  I just want to try and make sure that I've got

18  them down.

19          MR. GOODMAN:

20              I'm not going to let you do it a third

21  time, so move on.

22  BY MR. BAAY:

23      Q.  Well, then, let me see if I --

24          MR. GOODMAN:

25              If you have a different question, I'll


                                                    108


1   let you ask it.

2           MR. BAAY:

3               I don't have a different question.

4   BY MR. BAAY:

5       Q.  If this is what your testimony is, then

6   I just want to make sure that I understand it.

7       A.  No.  I think I testified, and it's on

8   the record.

9           MR. GOODMAN:

10              Right.

11          THE WITNESS:

12              But if you want to --

13  BY MR. BAAY:

Legier, William 08-03-07.txt

14      Q.  For column number 4, if they have

15  ordinary payroll coverage, you take the $100,

16  plus the $30, plus the $250 is 380; and then you

17  told me there was one of the four scenarios that

18  you ran where you get a credit, a reduction of

19  that $380 by $140, which would be the difference

20  between the net profit --

21          MR. GOODMAN:

22          I object to the form.  That is not what

23  he said.

24          MR. BAAY:

25          That is exactly what he said.

                                              109

1           MR. GOODMAN:

2           That is not.

3           THE WITNESS:

4           No.  You go back to my report,

5   Counselor; and that's the best place to

6   characterize what I say.  And it's all spelled

7   out in there.

8           You know, I've got four different

9   methods; and you have to look at each one of

10  them.  And I think I've testified as to how I

11  would do that with those numbers.  But again,

12  those are hypothets and very broad brush.

13  BY MR. BAAY:

14      Q.  I understand there are four scenarios.

15          MR. GOODMAN:

16          That's the third time we've been through

                        Page 100

Legier, William 08-03-07.txt

17   this.  Go ahead.
18   BY MR. BAAY:
19       Q.  Are you planning to come into the court
20   and testify that there are four different ways
21   that this language can be interpreted and four
22   different numbers that can be arrived at?
23       A.  I am.
24       Q.  Okay.  Under the -- do you have an
25   opinion as to which one of those is correct?


                                              110


1   We'll go to your report, since we're anxious to
2   go to the report.
3       A.  When you say correct, you mean --
4           MR. GOODMAN:
5           Wait.  I'm going to do a time out for
6   lunch, if we're going to the report.  It's 12:30.
7   I'm hungry.
8               (Lunch recess taken.)
9   BY MR. BAAY:
10      Q.  I think I've taken a deep breath, and I
11  understand where you are coming from and your
12  references back to your report.
13          So what I would like for you to do is,
14  if you can, I want to direct you to the first
15  calculation that you did in your report.  And I
16  think the first calculation that you did is
17  associated with the B, the second of the four
18  calculations at the end; is that correct?

```
                    Legier, William 08-03-07.txt
19    A.  Wherever it falls, yes.

20         MR. GOODMAN:

21         I need to follow that question, but go

22  ahead.

23  BY MR. BAAY:

24    Q.  It's sort of numbered differently.  When

25  you start out, you have number one, assuming that
```

⬜                                                                111

```
 1  Conco resumed operations, as it actually did?

 2    A.  You are right.

 3         MR. GOODMAN:

 4         Page 4?

 5         MR. BAAY:

 6         Right, page 4.

 7  BY MR. BAAY:

 8    Q.  And the number that you get to for

 9  business interruption loss is $7,984,000?

10    A.  Correct.  Are we finished with this over

11  here, Counselor?

12    Q.  Almost.

13    A.  Because I want to make sure that my

14  testimony was clear before.  After we broke, I

15  want to make sure that I was clear for the record

16  on one point.

17         When we talked about the amount without

18  ordinary payroll resumption, I think my testimony

19  was the $100, plus the $250 is $300,000, you

20  would give credit for the $100,000, $110,000.  I

21  just want to make sure that that's clear.  But
```

Legier, William 08-03-07.txt

22    you wouldn't take into consideration the

23    $240,000.

24        Q.  I understand that.  What I want to do is

25    I want you to apply what you did under your

112

1     resumption of operations calculation in your

2     report, which got you to the $7.9 million to my

3     hypothetical resumption of operations, my two

4     columns, one with and one without ordinary

5     payroll coverage.

6            Tell me what the numbers are, just using

7     my simple example, using that scenario from your

8     report.

9        A.  Using what's on page 5 compared to your

10    scenario in Exhibit 3, J3?

11       Q.  Yes.

12       A.  On the last column?

13       Q.  The last two columns.

14       A.  Well, it would be the but for first

15    column, which is what I call the but for profit,

16    $8.2 million.

17           MR. GOODMAN:

18           Which is the $250.

19           THE WITNESS:

20           $250 on here.

21    BY MR. BAAY:

22       Q.  The $250 corresponds to your 8.2?

23       A.  That's correct.

Page 103

Legier, William 08-03-07.txt

24    Q.  And then?

25    A.  The actual, the net income or loss that

                                        113

1  they actually earned would be the $110.

2        MR. GOODMAN:

3        Which corresponds to $279 on page 5 of

4  his report.

5        THE WITNESS:

6        Correct, $279.

7        MR. GOODMAN:

8        I'm just filling in with words what he

9  was pointing to on paper.

10  BY MR. BAAY:

11    Q.  So your calculation using my number, the

12  only thing you do is subtract the $250 from the

13  $110?

14    A.  Yes.  But I have a lot of information

15  and data that I compiled in getting there.  In

16  very simplistic forms, it is the corollary; but

17  behind these numbers, there's a lot of

18  information.

19    Q.  I understand that.

20    A.  And how we arrived at them.

21    Q.  I understand that.  But at least as I

22  appreciate the scenario, the resumption of

23  operations scenario that you've got in 5, and I

24  understand there are others, but just focusing on

25  that one, the calculation that you would do for

Page 104

Legier, William 08-03-07.txt

⬚                                                            114

 1   the resumption of operations scenario on my
 2   hypothetical, you would get to $140 for the BI
 3   loss, the $250 minus $110?
 4       A.  Yes.
 5       Q.  So you would agree, then, with my --
 6   under that scenario, you would agree, then, with
 7   my calculation of the recoverable BI claim as
 8   $140?
 9       A.  Being the difference between the but for
10   $250,000 and the $110.
11       Q.  Right.
12       A.  That calculation is correct.
13       Q.  Okay.
14           MR. GOODMAN:
15           I'm going to object to the form.  And
16   just so it's clear on the record, you are on
17   Legier 3, on column 4, you have with ordinary
18   payroll coverage.
19           MR. BAAY:
20           That's right.
21           MR. GOODMAN:
22           Go ahead.
23           MR. BAAY:
24           What I really want to do is I want to
25   look at Legier 4, because that's the one he's

⬚                                                            115

                         Page 105

Legier, William 08-03-07.txt

 1  already started to check.

 2  BY MR. BAAY:

 3      Q.  So can you do me a favor and check this

 4  $140, that that's what you would agree would be

 5  the recoverable BI claim based on resumption of

 6  operations in column 4, if there's no ordinary

 7  payroll coverage, given the scenario you've done?

 8      A.  You want me to check the $140?

 9      Q.  Yes.

10      A.  (Witness complies.)

11          MR. GOODMAN:

12          He's just putting a check mark.

13  BY MR. BAAY:

14      Q.  Then the only difference in column 5 is

15  that ordinary payroll is not covered; so if

16  ordinary payroll is not covered, then the

17  difference would be -- that $30 would not be

18  paid, and the difference would be -- the BI claim

19  would be $110; would you agree with that?

20      A.  No.  Not in my scenario that I've got

21  here before me.  It's the difference between the

22  actual and the but for.  If you took out the

23  ordinary payroll, you'd take it out of both

24  places, and it would still be the same.

25      Q.  So in your calculation number 1, you did

                                              116

 1  not exclude ordinary payroll, right?

 2      A.  Not in the form that you are saying.
                    Page 106

Legier, William 08-03-07.txt

3      Q.  Right.  So in my hypothetical, you

4   wouldn't come up with any different BI claim, if

5   ordinary payroll was not covered?

6      A.  I don't understand the question.

7      Q.  Given the policy language and given this

8   scenario that you've run, you've calculated the

9   BI claim as $140, the simple difference between

10  the but for profit and the profit they already

11  made, right?

12         MR. GOODMAN:

13         No.  I'm going to object to the form.

14  I'm just going to object to the form.  Are you

15  talking about the calculation on pages 4 and 5 of

16  the report?

17         MR. BAAY:

18         Right.

19         MR. GOODMAN:

20         If you want to limit it to that, okay.

21  BY MR. BAAY:

22      Q.  If you apply those calculations on page

23  4 and 5 of the report to the policy language,

24  that's what you were doing, right, trying to

25  calculate the business loss under the policy?


                                           117


1      A.  I believe I understand what you are

2   trying to get at; but this has nothing to do with

3   ordinary payroll.  This is the difference between

4   the actual and the but for profits, which is a

                    Page 107

Legier, William 08-03-07.txt

5  diminution.  It has nothing to do with ordinary

6  payroll.

7      Q.  Okay.  That's fine.  So if ordinary

8  payroll is not covered, then the BI claim would

9  be $30 less in my hypothetical?

10     A.  Not under this calculation.

11     Q.  Well, I understand the calculation is

12  just $250 minus $110, gets you to $140; but how

13  do you take into account ordinary payroll or you

14  don't?

15     A.  Not in this method that we applied here.

16  It's the actual versus the but for income.

17     Q.  Where in the policy does that -- what

18  policy language supports that calculation?

19     A.  Well, I'll go to the policy.

20     MR. GOODMAN:

21       Can we go off the record?

22       (Off-the-record discussion held.)

23     THE WITNESS:

24       This is a common method of calculating

25  lost profits.  It deals with what the company

118

1  would have made, but for the situation, the

2  peril, and what it actually made.  That's the

3  diminution.

4  BY MR. BAAY:

5      Q.  And it's pretty clear that if you simply

6  do that calculation and pay them $140 on my

7  example, plus the $110, it gets them back in

Page 108

Legier, William 08-03-07.txt

8    their whole, back to the $250, which is their but

9    for, right?

10        A.  It does.  The actual versus the but for.

11        Q.  That's what that calculation does,

12   really simply?

13        A.  It does.

14        Q.  What that calculation doesn't do is it

15   doesn't track the language of the policy

16   anywhere, does it?

17        A.  I think globally, if you look at

18   everything in here, you can probably get an

19   interpretation of this.  It's not as direct as

20   other methods that we've applied; but certainly,

21   it is a traditional method of doing it.

22        Q.  And certainly, it yields -- it makes

23   them whole; so it kind of satisfies that concept

24   that we talked about in general, in terms of

25   insurance, making somebody whole, that $140 and


                                        119


1    that very simple calculation does that?

2        A.  Well, I don't know that it makes them

3    whole.  I don't know that I can testify to that.

4    I can certainly say that what it does is it

5    accounts for the diminution in their profits as a

6    result of their peril.

7        Q.  Another way, will you agree with me,

8    that another way to calculate that $140 that you

9    calculated, if there is ordinary profit, ordinary

Legier, William 08-03-07.txt

10  payroll coverage, would be to take the $240, if

11  we want to track the policy language, for kicks,

12  if we take the $250 -- I'm sorry -- in but for

13  profit, plus the $100 in continuing expenses,

14  plus the $30, you get $380, right?

15          MR. GOODMAN:

16          That's under the policy language?

17          MR. BAAY:

18          I'm sorry.

19  BY MR. BAAY:

20      Q.  If it was covered.  The policy

21  language --

22          MR. GOODMAN:

23          So this is a hypothetical.  Go ahead.

24  BY MR. BAAY:

25      Q.  Hypothetical, assuming ordinary payroll


                                                    120


 1  coverage, in column 4, another way to get to that

 2  $140 would be the $250, which would be the net

 3  profits, the but for profits, the $100, which

 4  would be the continuing expenses, if ordinary

 5  payroll is covered, it would be the $30 in

 6  ordinary payroll, would get you to $380, if you

 7  subtracted gross margin of $240, you would get to

 8  $140, right?  That would be another way?

 9      A.  Mathematically, you would; but I don't

10  agree with that calculation and that

11  interpretation.

12      Q.  That's absolutely fine.  But certainly,

                        Page 110

Legier, William 08-03-07.txt

13   you would agree that in Legier No. 3, that if you

14   did that calculation, $250 plus the $100, plus

15   the $30, minus the gross margin, you would get to

16   $140.

17          The numbers are what the numbers are.

18   You don't have to agree with them.  That's what

19   they are.

20          MR. GOODMAN:

21          So why -- what's your question?  The

22   math is correct.  We'll stipulate your math is

23   correct.

24   BY MR. BAAY:

25     Q.  Would you agree with me that this would

                                                    121

 1   be one way of interpreting the policy language

 2   reading the $250 as the but for profit, plus the

 3   $100 in continuing expenses, plus the $30 in

 4   ordinary payroll if they are covered, minus --

 5   and this would be the reduction taken into

 6   account, based on the resumption of operations?

 7          MR. GOODMAN:

 8          This has been asked and answered three

 9   times now.  This is number four, but go ahead.

10          THE WITNESS:

11          I don't see that, Counselor.  In B, you

12   are trying to equate the gross profit offset by

13   paragraph 1B?

14   BY MR. BAAY:

                        Page 111

Legier, William 08-03-07.txt

15     Q.  All I'm trying to do is tell you that --

16  and I know you are not going to agree with me,

17  because it's contrary to your report.

18         But if you read the reduction in -- the

19  reduction taken into account, based on the

20  resumption of operations, paragraph 1, A and B.

21     A.  I don't read that.  Read it, point it

22  out again.  The reduction --

23     Q.  Such reduction.

24     A.  what reduction?  Where is the reduction

25  defined that you are speaking of?


                                        122


1     Q.  It is a condition of this insurance that

2  if the insured could reduce -- that's the

3  reduction I'm talking about -- reduce the loss

4  resulting from the interruption of business by

5  resuming operations, such reduction will be taken

6  into account.

7         Now, I'm not asking you to agree with me

8  that gross margin is the reduction; but if you

9  use the gross margin for my hypothetical of $240

10  as the reduction, taken into account from the

11  resumption of operations, you arrive at $140, the

12  same number that you told me you get if you just

13  simply subtract the but for profits from the

14  actual profits, right?

15     A.  The but for profits from the actual

16  profits?

17     Q.  Right.

Legier, William 08-03-07.txt

18      A.  Mathematically, the numbers work that

19  way.  But I clearly and definitely don't agree

20  with your interpretation that gross profit is an

21  appropriate offset and credit in this or any

22  other calculation dealing with this policy, based

23  on your reading of what you just read to me.  I

24  don't agree with that.

25      Q.  I understand you don't agree with that.


                                                    123


 1  And that's fine.

 2          MR. GOODMAN:

 3          That's what he wants.

 4  BY MR. BAAY:

 5      Q.  Now, let's look at the Conco report, and

 6  see if --

 7          MR. GOODMAN:

 8          The what report?

 9  BY MR. BAAY:

10      Q.  The Legier report that deals with Conco,

11  and let me see if I can make sure that I

12  understand what numbers you've got and what's in

13  those numbers.  And let's look at page 5.

14          First of all, the $205, the revenue

15  including inside margin, $205,840,489, right?

16      A.  Yes.

17      Q.  That is the revenues, including inside

18  margin that the company earned during the period

19  from August '05 through November '06, right?

Legier, William 08-03-07.txt

20    A.  Correct.

21       Q.  Then there are corresponding expenses,

22   and these are actuals, right, these are actual

23   expenses and actual revenues during this period?

24    A.  Correct.

25       Q.  So the total, all of the costs and

124

1   expenses is $205,561,483, right?

2    A.  Correct.

3       Q.  Now, will you agree with me that the

4   $205,561,483 includes or is made up of cost of

5   sales, right?

6    A.  Correct.

7       Q.  It's made of up continuing expenses,

8   charges and expenses, excluding ordinary payroll?

9    A.  It is.

10       Q.  And it's obviously got ordinary payroll

11   in it, right?

12    A.  It does.

13       Q.  So we can break down the cost and

14   expenses into those three numbers, using your --

15   the schedules that you and all the calculations

16   that you've made, can you calculate for me or

17   tell me just by looking what those three numbers

18   would be?

19    A.  I don't have them as I sit here before

20   me.  I can go back and do it, but I think it

21   would take some time.

22       Q.  Let me see if -- let me just make sure

Legier, William 08-03-07.txt

23  that I know where to go, because I think the
24  first number is going to be pretty easy to get.
25          You basically did two -- have two

                                                    125

 1  charts, right, one is August through December,
 2  and the next one is January through November,
 3  right?
 4      A.  That is correct.  Now, when you say
 5  charts, I presume you are referring to something
 6  that you are looking at.  What's it called there,
 7  so I make sure that we're talking about the same
 8  charts.
 9      Q.  Sure.  I'm under Tab D of your report,
10  and this is the spreadsheet for analysis of loss
11  due to Hurricane Katrina, actual versus budget
12  for the five months August through December of
13  '05.
14      A.  Yes, sir.
15      Q.  Can you flip to that real quick in your
16  chart?
17      A.  What tab?
18      Q.  Letter D.
19      A.  That is for the period ending 7 -- July
20  '05.
21      Q.  There are a couple of different
22  spreadsheets back behind there.  That first one
23  is the first half of the year, the pre-loss?
24      A.  Correct.

Legier, William 08-03-07.txt
25      Q.  We'll go back to that in a minute.

⬜                                                    126

1       A.  Which one?  Which one do you want to
2   look at?
3       Q.  Yes, that's the one.  For the five
4   months, August through December.
5       A.  Correct.
6       Q.  Now, given this chart, can you tell me
7   how you calculated the but for profits of
8   $8,247,449, using this actual versus budget?
9       A.  Well, you have to look at both of them.
10      Q.  Right.
11      A.  You have to go to both the schedule for
12  the period for August through December and then
13  go to the one for the period January through
14  November and combine those amounts.
15      Q.  Is it a single number?  Can you give me
16  the two sales numbers, what the two sales numbers
17  for those two periods were?  I'm trying to get
18  the $205,840,000 now.
19      A.  Let's see.  I may have it referenced so
20  we can get right to the number.  The
21  $205,840,000?
22      Q.  Right.
23      A.  B16.  You've got to go through several
24  numbers.  You've got on page 1, you've got sales.
25  Let's see, hold on.  You've got on page 28, or

Legier, William 08-03-07.txt
                                                    127

    1  scale 17A-1, you've got sales of $50,702,392.
    2       Q.  Tell me the page again.  I'm sorry.
    3       A.  Page 17A-1.
    4       Q.  So 1 of 13.  Which number are you
    5  reading?
    6       A.  You've got $50,702,000.
    7       Q.  $50 million, right?
    8       A.  $50,702,392.
    9       Q.  Okay.  And you've got inside margin on
   10  page 19, B19.  Which is what of 13, on the bottom
   11  of that spreadsheet?
   12       A.  19.
   13       Q.  413.  Okay.
   14       A.  No.  It's actually -- yes, 413.  Look on
   15  page 28, 13 of 13.
   16       Q.  Okay.
   17       A.  If you look on the bottom of that, you
   18  see two numbers, $53,735,679.  And you see the
   19  $152,104,811.  And you see the total of those
   20  next to that.
   21       Q.  Yes.
   22       A.  $205,840,489.
   23       Q.  Right.
   24       A.  That's the number that we are supporting
   25  there.

                                                    128

                      Page 117

Legier, William 08-03-07.txt

1    Q.  Perfect.  And then against that number
2  are the costs, the total costs as you've got of
3  $205,561,000.  And can we do that -- can we
4  figure out what the cost of goods are for those
5  two periods?
6       A.  Well, you've got it.  It's broken down
7  there on that schedule.
8       Q.  That's the revenue and inside number.
9       A.  Well, look above it.
10      Q.  Where?  I'm sorry.
11      A.  You see the $205,840,000?
12      Q.  Yes.
13      A.  You see above it?
14      Q.  Yes.
15      A.  What does that say on yours?
16      Q.  Oh, okay.  The $205,561,000.  Here it
17  is.  I understand.  I see where the confusion is.
18  I'm trying to get from the $205,561,483, right?
19  what's the cost of goods sold?  what's the cost
20  of sales?
21      A.  Cost and expenses -- well, it's not
22  broken out.  It's summarized here.  You'd have to
23  go back into each one of those -- are you saying
24  cost of goods sold, including the inside margin?
25      Q.  Just those two numbers.  The inside

                                              129


1  margin is included in the revenue; and you drop
2  down below that, and there's two numbers, cost of
3  goods sold?
                     Page 118

Legier, William 08-03-07.txt

4        A.   No.   It's cost and expenses.

5        Q.   Right.   You've got it cost and expenses.

6    What I'm trying to do is break it out and get

7    what the cost of goods are.

8        A.   Well, let's go back to where that came

9    from.  B26.  If you take on that page operating

10   expenses on 26, totalling $8,202,291, do you see

11   that?

12       Q.   Wait.   You are down too far.

13       A.   No, I'm not.

14       Q.   I want just the cost.

15       A.   Well, I'm going to give you the

16   components that make that up, which includes

17   cost.  So that's one of them.

18            So we'll now go to D-17A-1.   D-17A-1 on

19   the top.  And the cost is $45,788,689.

20       Q.   That's the cost of sales for August

21   through December, right?

22       A.   That's correct.

23       Q.   What's just the cost --

24       A.   $45,788,689.

25       Q.   What's the corresponding number for

⬜                                                            130

1    January through November of '06?

2        A.   Well, we'd have to go to that one.

3    Let's go to D52.  And then go to D30.

4        Q.   Which would be page 2 of 26 on mine?

5        A.   Yes.

                        Page 119

Legier, William 08-03-07.txt
6      Q.  That's the $129,844,855?

7      A.  Point 92.

8      Q.  Let's just deal with dollars.  So if you

9   take those two numbers, the $45,788,689 and the

10   $129,844,856, you get $175,633,545, right?

11      A.  I didn't do the math.

12      Q.  Do you need a calculator?  Do you

13   dispute that math?  That math is right.  How

14   about let's assume --

15      A.  Let's assume it, if you want me to

16   assume it; but I didn't do the calculation.  Let

17   me write it down.

18      Q.  You need a piece of paper?

19      A.  Okay.  Give me the two components.

20      Q.  The two components that you gave me were

21   for August through December is $45,788,689; and

22   for January through November of '06, it's

23   $129,844,856.

24      A.  Okay.  The total?

25      Q.  The total that I came up with was

⬜                                                     131

1   $175,633,545.

2      A.  Okay.

3      Q.  So that's the cost of sales component of

4   the cost and expense number that you have as the

5   top number, your 205, right?

6      A.  That's the component that would be

7   included in that.  That's correct.

8      Q.  So then if we take the difference
Page 120

Legier, William 08-03-07.txt

 9  between those two numbers, we get the difference

10  between the total, $205,561,483.  Did you come up

11  with a number?

12      A.  No.  I didn't do it.  I was waiting for

13  you.

14      Q.  My calculator tells me that it's

15  $29,297,938.

16      A.  Okay.

17      Q.  Now, from that number -- so those would

18  be all of the charges and expenses, including

19  ordinary income, after deducting the cost of

20  sales?

21          MR. GOODMAN:

22          Object to the form.

23          MR. BAAY:

24          That's just what it is.

25          THE WITNESS:

                                                132

 1          What is?

 2  BY MR. BAAY:

 3      Q.  That number, the resulting number is

 4  your -- it's the total cost and expenses number,

 5  minus the cost of sales?

 6      A.  Minus the two numbers that we just took

 7  off of here that were entitled cost of sales.

 8  The math is -- I haven't done it, but it looks

 9  like it -- if you tell me it's correct, I'll

10  assume that hypothetically.

Legier, William 08-03-07.txt
11        But the calculation is, it is what it

12   is.  It's the numbers that I just gave you, minus

13   the numbers that I just gave you.

14        Q.  Perfect.  Now, do you know or have you

15   calculated what the ordinary payroll component is

16   of those charges and expenses, the $29,927,938?

17   Have you calculated what the ordinary payroll is

18   as that is defined in the policy?

19        A.  I didn't calculate it per se.  I

20   calculated everything else.  And also, other

21   expenses that were -- no, I did not calculate the

22   ordinary payroll.  I did not.

23        Q.  But you will agree that ordinary payroll

24   is part of that number?

25        A.  It would be.


                                          133


 1        Q.  And I think there has been some effort

 2   to identify the people, some effort by Conco to

 3   identify these people are ordinary payroll people

 4   and these people aren't.

 5        And there's been some effort to go

 6   through these schedules, and believe me, I'm not

 7   going to do that, because I understand it's a

 8   couple of hundred accounts and line items; but

 9   that effort certainly has been made by somebody,

10   if not you.

11        Well, let me ask you this question:  Are

12   you aware that that has been done?

13        A.  I'm aware of what we did.  And what we
                    Page 122

Legier, William 08-03-07.txt

14  did is in here, and that's what I will testify

15  to.

16      Q.  So if Conco, separate from your work has

17  identified for Lexington who they believe is the

18  ordinary payroll accounts, you wouldn't have any

19  objection with that?

20      A.  I don't know if I would object to it or

21  not.  I haven't seen it.  I've got what we got

22  and what we did.

23      Q.  Let me ask you another question:  The

24  first tab, I mean, the first spreadsheet behind

25  D, tell me what this spreadsheet is.

                                                        134

1       A.  The first one would be number 1; that is

2  the financial statements through July of '05 that

3  we have gone beyond and calculated those expenses

4  that would be continuing versus not, assuming

5  that they would not resume operations.

6       Q.  So in doing that, did you include the

7  non-ordinary payroll?  Did you assume that that

8  would be continuing?

9       A.  We assumed that ordinary payroll would

10  not be continuing.

11      Q.  So you have done that calculation with

12  respect to the first part of '05 in terms of

13  trying to generate the continuing -- what the

14  continuing expenses would be, correct?

15      A.  No.  That calculation as you defined it

Legier, William 08-03-07.txt

16  earlier was to calculate those expenses.  We did

17  not calculate those expenses.  We calculated

18  other expenses, which excluded that, among

19  others.

20      Q.  So you made an effort, in this

21  spreadsheet, what you were trying to do was

22  figure out what the continuing expenses were,

23  excluding ordinary payroll, right?

24      A.  Correct.  And other continuing expenses

25  that were non-continuing.


⬜                                                       135


1      Q.  Okay.  But at least with respect to

2  ordinary payroll, if I go through here -- and let

3  me just find one.  For example, on page 6 of that

4  spreadsheet, it's a list of -- there are salesmen

5  and there's a sales manager for various -- and

6  these are all identified by different account

7  numbers, and I'm not going to go into what all

8  the account numbers are.

9          But just for simplicity and example

10  sake, the sales manager, which is about the

11  seventh line down, you have as a 100 percent

12  continuing cost, right?

13      A.  Well, there's more than one sales

14  manager, but there's one that falls first.  I

15  guess that's the one you're speaking of?  What's

16  the amount?

17      Q.  The year to date amount was $42,750.

18      A.  I can see that one.

Legier, William 08-03-07.txt

19      Q.  The salesmen above him, those salesmen

20  you did not continue; you have continuing cost 0

21  percentage, right?

22      A.  That's correct, in this analysis.

23      Q.  So for this very small for example, you

24  assumed that the manager's salary would be

25  continuing and that the salesmen's would not,


                                                    136


 1  right?

 2      A.  In this particular case, that's correct.

 3      Q.  Right.  And so we could go into the

 4  schedules that represent the actual, what

 5  actually happened, and we could do this same

 6  calculation.  We can add up who all the regular

 7  salesmen were and come up with a number, and we

 8  can add up all the other continuing expenses and

 9  come up with another number?

10      A.  You can do any number of things with it.

11  I'm sure that if you want to do that, I guess you

12  could do that.

13      Q.  Assume that we have done that, and

14  assume for me, just for the sake of keeping the

15  numbers simple, that the ordinary payroll, if we

16  do that calculation, comes to $12 million.

17          Of the $29 million that is left as

18  charge and expenses, assume for me that

19  $12 million is ordinary payroll.

20      A.  $12 million even?

                        Page 125

Legier, William 08-03-07.txt
21      Q.  $12 million even.  Then the other

22  charges and expenses, excluding ordinary payroll,

23  by definition would be $17,927,938?

24      A.  That would be what you would call the

25  continuing expenses?

                                              137

 1      Q.  Right.  Those would be the continuing

 2  charges and expenses, excluding ordinary payroll,

 3  obviously.

 4          MR. GOODMAN:

 5          What's the number $17.9?

 6          MR. BAAY:

 7          It's 17.9, $17,927,938.

 8          THE WITNESS:

 9          How do you define it, now?

10  BY MR. BAAY:

11      Q.  As charges and expenses, excluding

12  ordinary payroll.

13      A.  Okay.

14      Q.  Now, under your -- let me show you what

15  I've marked as Legier 5.  What I've done in

16  Legier 5 is I've taken -- and basically taken

17  your handwritten numbers, and they are typed out

18  so we can see it.

19          So do those numbers correspond to the

20  numbers in your report and the actual and but for

21  data that you are representing in your scenario

22  number 1, the resumption of operations scenario?

23      A.  Do they correspond?  What do you mean?

Legier, William 08-03-07.txt

24  Which number corresponds with what?

25       Q.  The actual sales.

138

1       A.  Well, let's take them one at a time.

2       Q.  Fine.

3           MR. GOODMAN:

4           What's the question?

5  BY MR. BAAY:

6       Q.  Do those numbers correspond to, with

7  some more detail, the numbers that you have in

8  your first scenario?

9       A.  Well, the first one, $205,840,489

10 corresponds to revenue including inside margin.

11 And you are calling that sales.

12      Q.  Right.

13      A.  Now, what else would you like me to do?

14      Q.  The cost of those sales, the cost of

15 goods we took from the two charts, and we added

16 those numbers up, and it came to $175.

17      A.  Well, that's not what I have on my

18 schedule here, though.  You said does it

19 correspond to my report, and it does not.

20      Q.  I think we've already -- your

21 $205,561,483, the charges and expenses, all I've

22 done is broken those into three categories that I

23 think we had agreed to.

24      A.  I don't know that I agreed with that.  I

25 think I agreed with the numbers and the math, but

Page 127

Legier, William 08-03-07.txt

139

1    not necessarily the methodology.
2          But let's see if you can put those
3    numbers together to tie back for me to the
4    $205,561,000 is what you say is comprised of some
5    of these numbers in here.
6        Q.  Sure.  The cost of goods, the charges
7    and expenses, excluding ordinary payroll, and the
8    ordinary payroll.  If you add those three --
9        A.  You are saying that those three will
10   equal the $205,561,483.
11       Q.  Right.
12       A.  You've done the math.
13       Q.  Right.  And the net profit is $279,006.
14   And that's the net profit that you've calculated
15   for the period, right?
16       A.  It corresponds with the net profit here
17   on page 5 of my report.
18       Q.  So at least it looks like we've got the
19   math right?
20       A.  What math?
21       Q.  The revenues minus expenses broken out
22   in those three categories, you come to the same
23   net profit number.
24       A.  If you are telling me that the math that
25   you've done arrives to the $279,006, then I will

140

Legier, William 08-03-07.txt

1  tell you that that corresponds with the same
2  $279,006 in the report.  But I didn't do the math
3  on your schedule.  I'm assuming you are correct.
4      Q.  And if you calculated the way you have
5  in scenario number 1 the recoverable business
6  interruption claim as being the difference
7  between the but for profit, which you'll see I
8  have in that first column, that corresponds to
9  your but for profit number, right, in this
10 scenario?
11     A.  It does.
12     Q.  I haven't gone through the trouble of,
13 not yet, anyway, calculating what the
14 corresponding but for numbers are with sales and
15 cost of goods sold, because it's really not
16 necessary, is it?  I mean, you don't need that to
17 do your calculation, do you?
18     A.  Well, I would certainly think that you
19 would want to do that.
20     Q.  Have you done that?
21     A.  We've done it within all of our reports,
22 sure.
23     Q.  And we could pull out -- it's sort of
24 complicated to get into each one of those
25 numbers, because those are the numbers you took

141

1  and applied, and you did adjustments, and you did

Legier, William 08-03-07.txt

2   the calculation and comparison of budget, prior

3   budgets to prior actuals, right, and you applied

4   the 91 percent factor?

5        A.  Well, I would characterize it

6   differently.  I would be happy to go through my

7   schedules and calculations.

8           But what we did was we took the budget

9   adjusted, and we came to the number that we have

10  on this report here, as their but for profits.

11       Q.  The but for profits are -- the but for,

12  as we talked about before, that's -- to look back

13  at the policy, that would be the profits that

14  were prevented from being earned; that's their

15  but for profits, but for the physical property

16  damage?

17       A.  The profits but for the peril, I think

18  we've said.

19       Q.  So you -- well, the peril caused

20  property damage that caused them to -- their

21  business to be interrupted, right?

22       A.  That's correct.

23       Q.  And the business interruption loss that

24  we're talking about, as we, I thought, had talked

25  about earlier was, and I just want to make sure

                                          142

1   if there's something different --

2        A.  Let me get to that policy language, if

3   we are going to read the policy.

4        Q.  Okay.

                    Page 130

Legier, William 08-03-07.txt

 5      A.  Okay.  Where are we reading?

 6      Q.  In the first and second paragraph.

 7  First paragraph --

 8          MR. GOODMAN:

 9          What is your question?

10  BY MR. BAAY:

11      Q.  I just want to make sure that the number

12  that we're talking about, the $8,247,449 is

13  the -- corresponds to net profits.

14      A.  where are we reading?

15      Q.  Second paragraph.  Net profits, which is

16  thereby prevented from being earned.

17      A.  That's correct.

18      Q.  We talked about it earlier, and I guess

19  there's going to be some discussion about that;

20  but the loss that we're talking about is the

21  business interruption loss caused by direct

22  physical loss or damage.

23          MR. GOODMAN:

24          I don't think there's a question

25  pending.  I think he's just reading from the

                                        143

 1  policy.

 2  BY MR. BAAY:

 3      Q.  But that's the number.  That's the

 4  $8 million number.  That corresponds back to,

 5  even though you didn't like it, that corresponds

 6  back to the $250 in my hypothetical, right, in

                    Page 131

Legier, William 08-03-07.txt
7   the but for physical damage?
8       A.  Well, I'm assuming that that's what you
9   are assuming that it does.  I didn't do those
10  calculations; but I'm assuming that that's what
11  you are representing it does.
12          But I think that the wording of the
13  policy speaks for itself.  I know that you have a
14  tendency to characterize it in a short fashion;
15  but I want to make sure that we go back to the
16  wording of the policy whenever we do that, that
17  actually exists in there, not as you are
18  shortcutting it.  Very important.
19          I don't want to be misconstrued as
20  accepting your definition of the wording when
21  it's different than the policy itself.
22      Q.  Let me ask you a question, and maybe we
23  can get this out of the way.  The way I read the
24  policy, the business interruption loss --
25          MR. GOODMAN:

                                                144


1           What paragraph?
2           MR. BAAY:
3           Paragraph 1.
4   BY MR. BAAY:
5       Q.  That results from the necessary
6   interruption of business conducted by the insured
7   and is caused by direct physical loss or damage
8   by any of the perils covered herein during the
9   term of the policy to the real or personal
                    Page 132

Legier, William 08-03-07.txt

10  property as covered herein.

11       The way I'm reading this policy, and

12  you've got to tell me if I'm reading it wrong, is

13  I'm talking about the business interruption loss

14  that resulted from the interruption of the

15  business conducted by the insured and caused by

16  the physical loss or damage to their property?

17       A.  That's not what it says.  If you read

18  it -- you see, you are characterizing it

19  differently, and I just want to make sure that,

20  for the record, that -- I don't assume that you

21  are quoting it correctly.  And you are really

22  not.

23       Q.  That's right.  What I want to make sure

24  is that if I'm assuming that caused by -- the

25  phrase caused by direct physical loss or damage,

145

1  I'm assuming that that means caused by direct

2  physical loss or damage to the property, the

3  physical property of Conco, to their buildings

4  and their trucks and their property.

5       A.  Well, I would prefer to read it the way

6  that it reads and not try to take a part of it

7  and recharacterize it differently than what it

8  says here.  It says what it says.  I mean,

9  there's no disputing the wording.  The wording of

10  it is the wording.

11       Q.  Let me ask you this question:  Is the

Legier, William 08-03-07.txt

12  business interruption loss that they would have

13  suffered, in your opinion, should it be caused by

14  damage to their property?

15      A.  I think it should be interpreted in

16  light of what this paragraph says.  And I think

17  that's why we are here today.

18          And that's why this thing is going to a

19  court of law, because your characterization of

20  the wording here may be different than what the

21  wording is.  The wording is the wording.  So I

22  don't want to recharacterize it outside of what

23  it says.  It says what it says.  And it can't be

24  recharacterized.

25      Q.  Let me give you two possible


                                        146


1  interpretations, and let me ask you which one,

2  because it's important that I understand how you

3  are interpreting this language.

4          Let me go back to my hypothetical

5  situation, where I got my $1,000 in sales, and

6  assume for me that to make those $1,000 in sales,

7  I need two trucks, okay, and that I can make $500

8  worth of sales with one truck and $500 of sales

9  with the other truck; and one of those trucks

10  gets damaged in Hurricane Katrina, okay.

11          And as a result, I can only operate one

12  truck, and I might be able to do more than $500,

13  but I'm not going to be able to do my $1,000,

14  because I only have one truck, I don't have two

Page 134

Legier, William 08-03-07.txt

15 trucks, because one of my trucks is damaged.

16 I've got direct physical loss to a truck caused

17 by Hurricane Katrina.

18          Now let me ask you to assume that half

19 of my customers are gone so that instead of

20 having $1,000 -- having customers that are

21 requiring $1,000 worth of sales, that I only

22 have, let's say I only have a third of my

23 customers, not half, a third.  Let's say there

24 are only $300 worth of orders coming in.  And

25 that's not due to any of my property damage.

                                          147

1 That's just due to Hurricane Katrina shut down

2 people and made it so that my business got less,

3 the market shrunk, okay?  You understand the

4 difference?

5     A.  I hear what you're saying, Counselor.

6 Is this a question?  It's a very long question.

7     Q.  No doubt.

8     A.  I'm trying to focus on everything you

9 are saying.  But it sounds to me like you need an

10 expert.

11    Q.  All I want to do is understand in your

12 but for case, did you assume but for profits, but

13 for the physical loss in this case to the roof,

14 in my hypothetical the loss of one truck, or did

15 you also assume changes in the marketplace due to

16 Hurricane Katrina?

                    Page 135

Legier, William 08-03-07.txt

17      A.  Well, Counselor, that's a very long

18  question.  And it has a lot of implications and a

19  lot of, how should I put it, what-ifs that could

20  be hinged on each one of those words that you

21  used.

22          So I would prefer that you ask a

23  specific question and not lay the background for

24  something that took us many months and hundreds

25  and hundreds of hours to assess and ask me to do

148

1   the same thing here with one question and one

2   answer, especially when the question is as broad

3   as it is.

4           So we studied this from top to bottom.

5   There's a lot of things we looked at, we studied,

6   we toured the operations and everything else.

7   But beyond that, I think that you have to be more

8   specific with that question.  And I'd like to go

9   back to the wording here as to how you are asking

10  it in terms of this wording, because I think

11  that's the backdrop of your question.

12      Q.  Did you calculate the but for profits

13  based on the physical damage to the building or

14  based on other market factors?

15      A.  We calculated, considering everything

16  that we learned from our study of the operations.

17  We considered all of those things and addressed

18  them in our report.

19      Q.  In your footnote number 3 on your

Legier, William 08-03-07.txt

20   report, page 4.

21          A.  Wait.  Let me get to that.  Page 4?

22          Q.  Right.

23          A.  Which footnote?

24          Q.  Number 3.  In determining Conco's actual

25   net profit, increased levels of operating

149

1    expenses were noted in areas, including payroll

2    and delivery expenses due to issues including

3    inefficiencies in operations resulting from

4    property damage to the warehouse.

5          A.  The Harahan warehouse.

6          Q.  The Harahan warehouse, right.  What

7    other issues besides the inefficiencies resulting

8    from the physical property damage did you

9    determine affected Conco's net profit?

10         A.  Well, a number of them.  As you can well

11   imagine, their building and their business was

12   pretty disrupted by all this damage.  And as a

13   result of that, all of its systems, businesses

14   are like that, all of their systems were

15   affected.  So that would be a good illustration.

16         Q.  Did you make an effort to quantify the

17   increases in operating expenses that were

18   resulting from or that directly tied to the

19   property damage and those that were due to

20   something else, like market changes?

21         A.  I don't know that market changes would

Page 137

Legier, William 08-03-07.txt
22   affect expenses, but we didn't see any evidence

23   of that.

24        Q.  Just so that I'm clear, and we don't

25   have to talk about it anymore, the $8.2 million


                                                    150


 1   is your number for the but for profit; if you

 2   subtract that from the actual profit, you come up

 3   with the business interruption loss, assuming

 4   resumption of operation, of $7,968,443, right?

 5        A.  That's what my analysis shows on page 5.

 6        Q.  Now, if you take the but for profit like

 7   we did on our hypothetical, if you take the but

 8   for profit -- and I'm not asking you to agree

 9   with this, but the numbers come out such that if

10   you take the but for profit, plus the charges and

11   expenses, excluding ordinary income, plus the

12   ordinary income, assuming it's covered.

13        A.  Ordinary income?

14        Q.  I mean ordinary payroll.  I'm sorry.

15   Ordinary payroll, if you assume that it's

16   covered, and you subtract the gross margin, you

17   come to the same number, correct?

18        A.  Well, I didn't do the math.  Give me --

19   have you done the math?

20        Q.  Yes.

21        A.  Walk through it one more time.

22        Q.  Following the language of the policy,

23   and assuming that ordinary payroll is covered.

24           MR. GOODMAN:
                       Page 138

Legier, William 08-03-07.txt
25          I'm going to object to the form already.

⬚                                                        151

 1  But go ahead.
 2  BY MR. BAAY:
 3      Q.  Let's just assume -- let me see if
 4  you'll just take me as far as you'll take me, and
 5  then I know you won't agree with the rest.  But
 6  at least the $8,200,000 is the net profit, the
 7  but for net profit, right?
 8      A.  Yes.
 9      Q.  And the charges and expenses, excluding
10  ordinary payroll, is $17.9; if you assume --
11      A.  Assuming these numbers, yes.
12      Q.  Assuming these numbers and assuming that
13  the ordinary payroll is $12.
14      A.  Okay.
15      Q.  And if you add ordinary payroll to that,
16  if you assume for the sake of this that they had
17  coverage for ordinary payroll, and you add those
18  three things together, and you subtracted -- you
19  reduced their loss by their gross margin of $30
20  million, you come up to the same $7.9 million
21  that you came up with in your scenario, correct?
22      A.  I didn't do the math, but Counselor, if
23  you tell me that you did the math, you added one,
24  two, three, and subtracted four, and came out
25  with what you call the recoverable BI, if you are

Legier, William 08-03-07.txt

152

1  telling me that that math works, then I will
2  accept what you said.
3          But I don't necessarily agree with your
4  implication of it, but the mathematics would be
5  correct, if you did that correctly.
6      Q.  Right.  And the thing that you don't
7  agree with is you don't agree that gross margin
8  should be the measure of the reduction for the
9  resumption of operations, right, as we talked
10  about in our simple hypothetical?
11      A.  Well, you are mixing and matching
12  methodologies.
13      Q.  How so?
14      A.  Well, as I said, I've got several
15  methodologies that I've done in this report.
16  This is one.
17      Q.  That's the only one I want to talk
18  about.
19      A.  But what I'm saying is that the credit
20  for the $30 million that you are putting before
21  me, you are saying in light of the policy
22  language, I don't know what policy language you
23  are referring to, because the policy says a lot
24  of things.
25          So that's why I did several iterations

153

Legier, William 08-03-07.txt

1    and several scenarios.  So in this one, if you

2    are telling me that the math works, I say the

3    math works.

4        Q.  So if the math works, then net profits,

5    plus charges and expenses, plus ordinary payroll,

6    if it's covered, minus gross margin, comes to the

7    correct number?

8        A.  In this approach, in this methodology,

9    it does; but I will tell you that I would not

10   construe that to be something that is globally

11   applied to the policy in every respect.

12           When I testified earlier that the credit

13   for gross profit was inappropriate, I still stand

14   by that testimony.

15       Q.  In this particular case, in Conco's

16   case, what should the reduction be?  What should

17   the credit be?

18       A.  What reduction?

19       Q.  The reduction in the loss for their

20   resumption of operations.  They resumed

21   operations and made money, right?  And their

22   resumption of operations generated them

23   $205,000,000 in sales.

24       A.  What's the question?

25       Q.  What should the reduction in their

                                                    154


1    business interruption loss be, based on those

2    sales?

Legier, William 08-03-07.txt

3     A.  What is the reduction in their loss?  I

4  think we said that they made $279,000.

5     Q.  Right.

6     A.  So that's what they made.  That's what

7  they were able to make versus what they should

8  have made, was $8,247,000.

9     Q.  Right.  But that's --

10     A.  I don't know how to answer your

11  question, because it's not very clear.

12     Q.  Let me see if I can make it clear.  If

13  you look at the policy language, look back at

14  your policy.

15     A.  (Witness complies.)

16     Q.  If the second paragraph, if we track the

17  language of the policy --

18     A.  This one here, such losses?

19     Q.  Yes, sir.  The net profit is the

20  $8.2 million, right?

21     A.  Correct.

22     Q.  The charges and expenses, excluding

23  ordinary payroll, is the $17 million, correct?

24     A.  Correct.

25     Q.  If ordinary payroll is covered, it would

⬚                                                        155

1  be an additional $12 million, correct?

2     A.  Assuming these numbers.

3     Q.  Right.  Assuming those numbers.

4     A.  You said the expenses, the ordinary, the

5  continuing expenses were $17,927,000?

Page 142

Legier, William 08-03-07.txt

6       Q.  Right.

7       A.  Okay.

8       Q.  So assuming that ordinary payroll is

9  covered, and you added those three things

10  together, then the business interruption loss,

11  just based on paragraph 2 would be the sum of

12  those three numbers, right?

13       A.  No.  It would be the $17.

14       Q.  Right.

15       A.  Plus the $8.2 million.  That's what it

16  says.  The profits that would have been earned

17  and the continuing expenses, without ordinary

18  payroll.

19       Q.  That would be -- that would be if

20  ordinary payroll wasn't covered?

21       A.  Was excluded.

22       Q.  Was excluded.  It would be the sum of

23  those two numbers.  What are they?  That would

24  be --

25       A.  $17,927,938.


                                                  156


1       Q.  And the $8,200,000 is --

2           MR. GOODMAN:

3           About $26 million.

4           THE WITNESS:

5           Subtract the actual profits.

6  BY MR. BAAY:

7       Q.  Before we do that --

                        Page 143

                         Legier, William 08-03-07.txt
 8      A.  Which is the $279,000.

 9      Q.  I know.  But we're not there yet.  I'm

10  just in paragraph 2 right now.  All I'm doing

11  right now is I'm adding the net profits and the

12  charges and expenses, excluding ordinary payroll.

13  So it would just be the 8, plus the 17, which

14  would be the $26 million, right?

15      A.  Correct.  Whatever those add up to.

16      Q.  Assume they add up to $26 million.  Then

17  the question is:  How much is the loss reduced

18  under paragraph, subparagraph B1, by the

19  resumption of the operation?

20      A.  It would be the $279,000.

21      MR. GOODMAN:

22          I need to take a break at some

23  appropriate minute.

24  BY MR. BAAY:

25      Q.  So given -- if that's your


                                              157


 1  interpretation, if that's the only credit for the

 2  resumption of operations is the $279, then the

 3  loss would be $25 million, right, the business

 4  interruption loss?

 5      A.  Based on your numbers.

 6      Q.  Well, these are the numbers.

 7      A.  Well, I've got different numbers.  My

 8  report has different numbers.  Some of them are

 9  the same, some of them are not.

10      Q.  I'm trying to track your numbers back
                         Page 144

Legier, William 08-03-07.txt

11  into the policy language.  That's all I'm trying

12  to do.

13        MR. GOODMAN:

14        Are you trying to use your numbers on

15  Exhibit 5 or his numbers in his report?

16        MR. BAAY:

17        The numbers on Exhibit 5 --

18        THE WITNESS:

19        They're two different numbers in certain

20  cases.

21        MR. GOODMAN:

22        He just answered that for you.

23        MR. BAAY:

24        I think you are right.  I think that's

25  right.


                                              158


 1        MR. GOODMAN:

 2        Right.  It's the 17.9, plus the 8.2,

 3  minus $279,000.  He just answered that.

 4        MR. BAAY:

 5        If that's how you are reading it, then

 6  that's fine.

 7        Let's do this.  I need to run over to

 8  Federal court for a status report conference real

 9  quick.  I should be back in 30 minutes, I'm

10  hoping by three o'clock.

11        I do not believe we are going to get to

12  Ms. Tuthill today.  I'll be back hopefully by

Legier, William 08-03-07.txt
13  3:00.

14        THE WITNESS:

15        I've got theatre tonight at 8:00.  I

16  have dinner at 6:30.

17        MR. GOODMAN:

18        You are the one taking the break.  You

19  are the one that scheduled it like this.

20        MR. BAAY:

21        I'm taking the break, and I'll be back

22  and we'll get as far as we can get.

23        MR. GOODMAN:

24        You are going to get finished, is what

25  we're going to do.  I'm not coming back here with


☐                                                      159


1  him.  I'm sorry.

2        MR. BAAY:

3        Well, we will do what we have to do on

4  all counts.

5        MR. GOODMAN:

6        I want it to go on the record that

7  Mr. Baay is the one leaving, even though he

8  noticed these depositions.  And I do not want

9  this going past the end of today.

10        MR. BAAY:

11        Just for the record, I will make every

12  effort to make that happen.  But I'm not waiving

13  any rights to continue it.

14        MR. GOODMAN:

15        I understand.  You've got to get into

Legier, William 08-03-07.txt

16    it.  We've wasted hours here, as far as I'm

17    concerned.

18           MR. BAAY:

19           Well, that's certainly not all my fault.

20                (Recess taken.)

21    BY MR. BAAY:

22       Q.  I have another hypothetical that I just

23    want to show you, and see if we can do this as

24    briefly as possible.  And let me just explain

25    what this hypothetical does.


                                    160


1            It relates to questions that have been

2    asked by Counsel in some of the other

3    depositions, so I just want to see how you'll

4    handle this scenario, because it's basically one

5    that's been given in the other depositions.

6            The scenario is where you have a but for

7    net profit is actually a net loss, okay.  In the

8    first scenario that we've talked about, my

9    hypothetical, the but for profit was a profit.

10   And I want to see how you would handle situations

11   where the but for profit is a loss; you

12   understand the hypothetical?

13       A.  Unlike what we're dealing with here?

14       Q.  Exactly.

15       A.  There's no loss in this situation.

16       Q.  That's right.  And the only reason I'm

17   doing this is this hypothetical has been asked of

                        Page 147

Legier, William 08-03-07.txt

18  both Lexington and our expert, and I want to see

19  how you handle it.

20       MR. GOODMAN:

21       What is the question?

22  BY MR. BAAY:

23  Q.  Under the two resumption of operations

24  scenarios that are outlined here, and assuming

25  that but for profit is actually a but for loss,

161

1   how would you calculate, under this policy

2   language, how would you calculate the business

3   interruption claim under those two scenarios in

4   columns 2 and 3?

5        MR. GOODMAN:

6        Object to the form.

7        THE WITNESS:

8        I've got several methods that I use.

9   BY MR. BAAY:

10  Q.  No.  I'm talking about the resumption of

11  operations method, when you calculated the

12  resumption of, assuming a resumption of

13  operations, the way you calculated it in your

14  report.

15  A.  In my report?

16  Q.  And what would you calculate the BI

17  claim in those two cases?

18  A.  Under each of these?

19  Q.  Yes, sir.

20  A.  Well, under this one, with ordinary

Legier, William 08-03-07.txt

21  payroll coverage, it would be the $200, plus the

22  $75, and the difference between the two of these

23  profits here, $45,000 or $45.

24      Q.  The $45, is that added or subtracted?

25      A.  It would be added.


                                                      162


1       Q.  To the $275?

2       A.  To the $275.

3       Q.  Can you use that pen, and underneath

4  that, write down the BI claim that you think is

5  calculated based on the policy?

6       A.  (Witness complies.)  And as you know,

7  I've done a number of different scenarios, so I

8  don't want to obviate that.  This is under the

9  one that we're talking about here.

10      Q.  Right.  The resumption of operations

11 scenario.

12      A.  That would be the $275, plus the $45,

13 which would be $300.

14      Q.  I got $320.  Did I add that up wrong?

15      A.  Well, let's see.  The difference between

16 that is $45, so you got $45.

17      Q.  Plus $275?

18      A.  $275.

19      Q.  No.  That's zero.

20      A.  That's $320.

21          MR. GOODMAN:

22          $220.  $320, I'm sorry.

                    Legier, William 08-03-07.txt
23  BY MR. BAAY:

24       Q.  So $320?

25       A.  Correct.


                                                  163


 1       Q.  Okay.  And what about if there is no

 2  ordinary profits coverage, so column --

 3       A.  I don't know what that means.

 4       Q.  Well, you added it.  You took the $200,

 5  plus the $75.  So if the 75 is not covered, then

 6  it would just be the $200, plus $45, right?

 7       A.  Oh, you said there was no ordinary

 8  profits coverage.

 9       Q.  I'm sorry.  I keep saying that.  My

10  mistake.  Let me start over.  The third column is

11  without ordinary profits coverage, so calculate

12  that for me.

13       MR. GOODMAN:

14       You said ordinary profits coverage.

15  BY MR. BAAY:

16       Q.  Ordinary payroll coverage.

17       A.  I think I know what you mean.  I'm

18  sorry.  I'm not sure.

19       Q.  Would be $245?

20       A.  Yes.

21       Q.  To get that, you just subtracted $320 --

22  you subtracted the $75 from $320, right?  I'm

23  reading backwards.

24       A.  Correct.  Now, I want to make clear that

25  I've used several methodologies in my report, and
                    Page 150

Legier, William 08-03-07.txt

⬜                                                              164

1   that does not necessarily conform with all of
2   them.
3        Q.  Right.  I understand that.
4        A.  That's one method.
5        Q.  That's the resumption of operation
6   method?
7        A.  No.  It is what it is.  But I think if
8   you read my report, it will become clear.
9        Q.  Okay.
10        A.  Now, I don't want to oversimplify this.
11   I think that you tend to do that with these
12   hypothetical questions.  And when you look at my
13   report, you'll see that it's much more detailed
14   in depth.
15        Q.  It is.  You are right.
16        MR. GOODMAN:
17        Can I have that last exhibit again,
18   Exhibit 6?
19        MR. BAAY:
20        Sure.
21   BY MR. BAAY:
22        Q.  Let me show you Legier -- wait a minute.
23   So in this particular scenario, I didn't realize
24   the difference was so big.  But I calculated that
25   the BI claim, when ordinary payroll is covered,

⬜                                                              165

Legier, William 08-03-07.txt

1  as $45.

2          And the way I did that, one way to do it

3  is the way you did it earlier, you just took the

4  difference between the but for profit or in this

5  case loss and the actual loss.  That would be

6  another way to do that, right?

7      A.  No, Counselor.  I think what we did the

8  last time was we took the $200 and the $75 and

9  the delta between the actual and the but for

10  profit.

11     Q.  Okay.  But we've got --

12         MR. GOODMAN:

13          He disagrees with you.  Let's move on.

14  You are just beating this horse to death.

15  BY MR. BAAY:

16     Q.  But in this calculation, when we do the

17  $200 plus the $75 plus the $45 -- oh, okay.

18  That's the reduction for the resumption of

19  operation, and in this case, it's an addition.  I

20  understand.

21         MR. GOODMAN:

22          Can I see that again?

23         MR. BAAY:

24          Sure.

25  BY MR. BAAY:

1      Q.  Let me show you Legier 8.  This is just

Legier, William 08-03-07.txt

2  to show you how I got to my two numbers.

3          MR. GOODMAN:

4          Legier 7.

5          MR. BAAY:

6          I'll be there in one minute.

7  BY MR. BAAY:

8      Q.  The only difference between Legier 8 and

9  Legier 6, it just includes the math that gets to

10  my two numbers.

11          MR. GOODMAN:

12          Which we disagree with.

13          MR. BAAY:

14          Right.

15          MR. GOODMAN:

16          So what's your point?  What's the

17  question?

18  BY MR. BAAY:

19      Q.  The question is:  In the with ordinary

20  payroll coverage scenario under column 2, you get

21  to $45 as the recoverable BI claim, if you take

22  the but for profit and add the continuing

23  expenses, the ordinary payroll, and the gross

24  margin as a reduction to the loss --

25          MR. GOODMAN:

                                                167

1          That's what you get.

2          MR. BAAY:

3          Right.

Page 153

Legier, William 08-03-07.txt
```
 4        MR. GOODMAN:

 5        Go ahead.  What's your question?

 6  BY MR. BAAY:

 7     Q.  The $80 that is the gross margin

 8  approximates the reduction in the loss and gets

 9  you to the exact number that is the difference

10  between the but for and the actual lost profits?

11        MR. GOODMAN:

12        What is your question?

13  BY MR. BAAY:

14     Q.  Isn't that true?

15        MR. GOODMAN:

16        Is the math accurate?

17  BY MR. BAAY:

18     Q.  Does the gross profit number, accounting

19  for the gross profit number, does that get you to

20  the -- precisely gets you to the difference

21  between the but for profit and the resumption of

22  operation profit?

23     A.  No.

24        MR. GOODMAN:

25        I'm objecting to the form.  I don't even
```

                                        168


```
 1  understand what you are asking anymore.

 2  Confusing.  I really don't.

 3  BY MR. BAAY:

 4     Q.  And just because I've marked it, and

 5  just so you can see, and this is Legier 8 -- I'm

 6  sorry, Legier 7.  This is the one we talked about
```

Legier, William 08-03-07.txt

7   earlier.  This is with your numbers broken out

8   that we did on Legier 5.

9       A.  I don't think it's all my numbers.

10          MR. GOODMAN:

11          Those are your numbers, not ours.  Go

12  ahead.

13  BY MR. BAAY:

14      Q.  They are your numbers broken into

15  categories that we already agreed on?

16          MR. GOODMAN:

17          And recalculated your way to come to a

18  result that we don't agree with.  Go ahead.

19          THE WITNESS:

20          All of those numbers are not our

21  numbers.

22          MR. GOODMAN:

23          You prepared this.  We did not.

24          THE WITNESS:

25          And I think that you are trying to

169

1   characterize those as our numbers.  Some are,

2   some are not.  But I can't subscribe to your

3   numbers, nor is the methodology anything that I

4   would undertake.

5          MR. GOODMAN:

6          You're twisting and turning the whole

7   thing.  But go ahead and ask your questions.

8   This is your exhibit, not ours.

Legier, William 08-03-07.txt
```
 9          MR. BAAY:

10          I'm actually trying to untwist it.

11          MR. GOODMAN:

12          Well, you're twisting it.  And I know

13  what you are doing.  Go ahead.  I'm trying to

14  move this along.  We're wasting time.

15  BY MR. BAAY:

16     Q.  The only difference between these two is

17  with and without ordinary payroll being covered;

18  and the only difference that I did is I did not

19  add that in the third column, calculating with --

20  I understand the methodology you don't agree

21  with, but at least that methodology came to your

22  number in scenario column number 2.

23          And if we apply my methodology without

24  the ordinary payroll, you come to a negative

25  number, which means that there is no business
```

                                            170


```
 1  interruption loss, if you get a negative number

 2  with that calculation?

 3     A.  I disagree.

 4          MR. GOODMAN:

 5          It's your calculation, we understand.

 6  Is there a question?

 7  BY MR. BAAY:

 8     Q.  Yes.  The question is:  If you counted

 9  the $30 million in gross profits as the reduction

10  in the business loss, then you would have no

11  business interruption loss, if ordinary payroll
```

Legier, William 08-03-07.txt

12   is not covered?  I mean, that's simple.

13        A.  I disagree.

14            MR. GOODMAN:

15            He disagrees with you.  You're never

16   going to get him to agree, John.  Let's go on.

17   You've been doing this all day, and that's why

18   we're still here.

19   BY MR. BAAY:

20        Q.  The second scenario in your report on

21   page 5, assuming that Conco had not resumed

22   operations, what's the purpose of doing that

23   scenario?

24        A.  Well, it's one interpretation of the

25   policy.


                                               171


1         Q.  Which -- can you point me to the policy

2    language that requires you to do this

3    calculation?

4         A.  Let's go to the policy.  It's the second

5    paragraph.

6         Q.  Where in the second paragraph does it

7    require you to do this calculation?

8         A.  Well, if you read it, it tells you that

9    that's what you do.  I mean, it says here:  The

10   net profit or loss which is thereby prevented

11   from being earned and all charges and expenses,

12   excluding ordinary payroll, and to the extent

13   that they must continue.  And that's what that

Legier, William 08-03-07.txt

14  is.

15      Q.  Let me ask you this question:  We know

16  what those charges are.  Why -- we know what the

17  charges and expenses are, excluding ordinary

18  payroll, what they actually were.

19          Why do you have to do an assumption that

20  the business didn't resume?  The business did

21  resume.

22      A.  You are asking me where this calculation

23  came from?

24      Q.  Yes.

25      A.  I'm telling you it came from that

                                                   172

1  paragraph and my interpretation of the paragraph.

2  I don't know how to explain it differently.

3      Q.  So you assume they don't operate, and

4  you just take the actuals.  I think that's your

5  first schedule.  You take the first 15 months --

6  I mean, the first couple months of the year, five

7  or six, I think, calculate a monthly average and

8  multiply that times 15.

9          I know there are some other calculations

10  in there, but basically, that's a derived number,

11  if the continuing expenses continue, if they had

12  been shut down?

13      A.  Had they not resumed their operations

14  and their expenses had continued the way that

15  they were leading up to the peril, then those

16  expenses that would have been continued under

                       Page 158

Legier, William 08-03-07.txt

17  this interpretation of the policy would be that

18  amount.

19       Q.  You believe, then, that you take that

20  number, added to -- and this is your second

21  thing, you took that number, added it to the

22  $8 million, to the but for profits?

23       A.  But for profits.  And that's exactly

24  what the policy says.  And we could have I guess

25  used as cost and expenses the actual cost and


                                                    173


 1  expenses in these categories that we used during

 2  the period of restoration, which would have made

 3  it higher, I guess, and maybe we'll do that.

 4          But for now, we use the ones just

 5  before, because of the policy language.

 6       Q.  So then the question is:  Since they, in

 7  fact -- so this is not a final number, the 21 is

 8  a hypothetical number, if the place is shut down

 9  and not opened back up again for 15 months, their

10  loss would have been $21 million, right?

11       A.  That's correct.

12       Q.  But certainly, we can agree that that's

13  not what happened.  Within 10 days, they were up

14  and operating.  And obviously, there were repairs

15  that needed to be done; but they resumed

16  operation to the fact or to the extent of

17  $205,000,000 in sales during that period, right?

18       A.  During the entire period of restoration.

Legier, William 08-03-07.txt
19     Q.  Right.

20     A.  But I'm not going to say here that they

21  were back and running, as you say.  I don't

22  believe that that was the case.  I think that

23  they were crippled and limping and a lot of other

24  things that took place during that period of

25  time.

174

1      Q.  But certainly, they had resumed

2  operations; will you agree with that?

3      A.  Partially.  To a certain extent, at

4  various times leading up to the end of the period

5  of restoration.

6      Q.  And the policy -- I know we won't agree

7  as to what the number is, but what do you think

8  the number should be that -- should be that that

9  loss, the $21 million loss, should be reduced by?

10     A.  Given these numbers, I would go to the

11  next methodology on page 7 and give credit for

12  the actual profits that were earned and reduce

13  that business interruption amount from

14  $21,089,939 to $20,922,342.

15     Q.  So you charged them the but for profits,

16  less the profits they actually made, plus the

17  hypothetical continuing expenses, if they had

18  been shut down; that's what that is?

19     A.  In accordance with the policy wording.

20     Q.  Do you believe that they should be able

21  to recover any of their costs and expenses twice?
Page 160

Legier, William 08-03-07.txt

22       A.  I believe that they should be entitled

23   to recover whatever is provided for in this

24   insurance policy, based on what they paid for.

25       Q.  You didn't answer my question.


⬚                                                      175


 1       MR. GOODMAN:

 2       Yes, he did.  He answered it precisely.

 3   BY MR. BAAY:

 4       Q.  Step outside of the policy.  Do you

 5   believe that they should be entitled to collect

 6   any of their charges and expenses twice?

 7       A.  I'm -- this whole deposition testimony

 8   has been based from the beginning on what's

 9   covered in an insurance policy, this particular

10   policy.  And that's what I'm here to testify to.

11       Q.  Do you believe this policy allows them

12   to collect any of their charges and expenses

13   twice?

14       A.  I believe it provides for whatever they

15   are entitled to get.  And however that's

16   calculated, it should be calculated, and they

17   should recover that.

18       They are entitled to get whatever they

19   have paid for when they bought this policy, and

20   that's what they are entitled to.

21       Q.  So if your calculations calculate that

22   they get their expenses twice to get them to $20

23   million --

Legier, William 08-03-07.txt
24   A. What expenses twice?

25   Q. The continuing expenses.  If you are

176

1  going to pay them $12,900,000 for costs and

2  expenses and $7.9 for but for profits, you are

3  giving them those charges and expenses twice.

4     A. I think what you are paying them is what

5  they bought from you.  They bought coverage that

6  provided for this exact calculation.  And that's

7  what this policy says.

8       So I think that to characterize it any

9  differently than what it says is an unfair

10  characterization.

11     Q. Okay.  But if we get -- the last thing,

12  this number 3, where we get to the $20,922,000,

13  that takes scenario number 1, resumption of

14  operations.

15     A. Which page?

16     Q. Page 7 of your report.

17     A. Yes, sir.

18     Q. You are going to offer your opinion in

19  court that this policy says, assuming the policy

20  wording interpreted as written, your

21  interpretation of the way it's written, they

22  should get $12,900,000 for costs and expenses

23  that you calculated under scenario number 2; and

24  they should get $7.9, the but for profits reduced

25  by actual income.  You believe that that's what

Page 162

Legier, William 08-03-07.txt

⬚                                                                    177


     1   the policy provides?
     2       A.  In my interpretation, that's correct.
     3   It's exactly what I said here.  And I think
     4   that's going to be something for the judge and
     5   jury to decide.
     6       Q.  Let me make sure that I understand.  But
     7   for the peril, as you have said, they would have
     8   made, at the end of the day, they would have had
     9   $8,200,000 in the bank.  Let's assume everything
    10   is cash, okay, they would have made $8,200,000 in
    11   net profit, right?
    12       A.  If they had achieved their budget,
    13   that's correct.  That's their but for profits.
    14       Q.  So if Hurricane Katrina doesn't happen,
    15   at the end of the --
    16           MR. GOODMAN:
    17           Whoa.  He said it.  Move on.
    18   BY MR. BAAY:
    19       Q.  -- period, they end up with $8,200,000,
    20   Hurricane Katrina happens, they have damages,
    21   they make $279,000; and in addition to that, you
    22   believe the policy should provide them with
    23   another $20 million.
    24           So instead of $8.2, they would make
    25   $20 million, plus the $279,00 that they've made,


⬚                                                                    178

Legier, William 08-03-07.txt

 1   and that would be what they would end up with at
 2   the end of the day?
 3      A.  The number is $20,922,342, based on the
 4   policy wording.
 5      Q.  Okay.
 6      A.  That's what the policy says.
 7      Q.  So your interpretation of the policy, I
 8   just want to make sure we're clear --
 9         MR. GOODMAN:
10         He said it three times now.  So it's
11   clear.  So you don't have to ask it again.  Ask
12   another question, please.
13   BY MR. BAAY:
14      Q.  That means the total number, which I
15   have not asked, but I will make sure I get it, is
16   $279,006, plus $20,922,000 --
17         MR. GOODMAN:
18         That's not what he said, John.  Strike
19   that.
20   BY MR. BAAY:
21      Q.  No, no.  The question is:  That's the
22   position that they should be in, based on your
23   interpretation of the policy, payment by the
24   insurance company of $20,922,000, plus the
25   $279,000 that they made?

                                            179


 1      A.  That's not my testimony, Counselor.
 2         MR. GOODMAN:
                    Page 164

Legier, William 08-03-07.txt

3        And that's not his report.

4  BY MR. BAAY:

5      Q.  Is the $20,922,000 what you believe is

6  owed under the policy?

7      A.  That's exactly what I said.

8      Q.  Okay.  And they had operations during

9  the period, and they made $279,000, right?

10      A.  I've given credit for that in that

11  number.

12      Q.  So we are not getting paid for that.  So

13  in addition to that money that they got a check

14  for, and they made money during the operation of

15  $279,000 --

16      A.  A check for what?

17      Q.  A check for the $20,922,000 from the

18  insurance company; that's what you believe is

19  payable under the policy?

20        MR. GOODMAN:

21        For BI.

22        MR. BAAY:

23        That's right.  For BI.

24        THE WITNESS:

25        Counselor I've answered that question

                                        180

1  several times.  And I thought I was clear.  But

2  based on the interpretation --

3        MR. GOODMAN:

4        You were.  You don't have to say it

                    Page 165

Legier, William 08-03-07.txt

5  again.

6  BY MR. BAAY:

7     Q.  I got it.  How did you determine the

8  period of restoration in your report, the 15

9  months?

10    A.  It was a given, as I said, in the

11 report.

12    Q.  That's an assumption, anyway?

13    A.  It was given to me to assume.

14    Q.  The 2006 budget, that was prepared by

15 Conco, correct?

16    A.  Yes.

17    Q.  That's the 26-page, 1 through 26 under

18 Tab D?

19    A.  Let me locate that, Counselor.

20 Twenty-six page?

21    Q.  Yes.

22    A.  For the 2006 period?

23    Q.  Yes.

24    A.  I need to find it.

25    Q.  It's right after the one you are just

181

1  looking at.  It's right after the 13-page report.

2     A.  I've got it.  It's page 29 through page

3  54.

4     Q.  You have it otherwise numbered.  I'm

5  looking at the numbers that the spreadsheet has

6  typed on there, 1 of 26.  Those are the only

7  numbers I have.  I don't have those other

Legier, William 08-03-07.txt

8   numbers.

9           So if I'm referring to pages, if you

10  could use those, that would be helpful.

11      A.  Sure.

12      Q.  Is it your appreciation that this was

13  prepared after Katrina?

14      A.  Yes.

15      Q.  Then there is a column, variance not

16  related to hurricane.  Can you explain what that

17  column is, and then we'll talk about a few

18  particular examples.

19      A.  Those were items that were not included

20  in the budget that were not budgeted for various

21  reasons that should have been budgeted when you

22  look at it from the perspective of what they

23  should have made.

24          MR. GOODMAN:

25          This is the '06 budget?


                                                    182


1           THE WITNESS:

2           Yes.

3   BY MR. BAAY:

4       Q.  So what you are attempting to do is get

5   a budget without the effect of Hurricane Katrina,

6   if the storm did not hit New Orleans, right?

7           MR. GOODMAN:

8           You said you.

9   BY MR. BAAY:

Legier, William 08-03-07.txt

10       Q.  Conco's budget.  Well, let me -- I think
11   it is you.  I think Conco -- what I understand is
12   Conco provided column B, the budget.  And then is
13   it your work product where you took these
14   variances not related to the hurricane to come up
15   with the adjusted budget?
16       A.  No.  Those were Conco's inputted
17   information, based on their knowledge of their
18   business.
19       Q.  My mistake, then.  So the whole sheet is
20   prepared by Conco?
21       A.  I would think so, with their input.
22   It's their information, their budget, and their
23   interpretation of those variances that were not
24   budgeted that should have been budgeted when you
25   look at it from a standpoint that we are.


                                              183


1        Q.  Do you know who particularly prepared
2    this budget?
3        A.  I do not.
4        Q.  Do you know when it was prepared?
5        A.  I do not.
6        Q.  Does this budget relate to the pre-loss
7    budgets, the budgets that were done in 2002 or
8    2003 and 2004?  Is there a relationship between
9    this budget and those budgets?
10       A.  I don't understand the question.
11       Q.  Is there -- were the prior years'
12   budgets used to generate this budget, if you
                    Page 168

Legier, William 08-03-07.txt

13    know, since Conco did it, do you know?

14         A.  I don't know.

15         Q.  So this is the budget that Hurricane

16    Katrina --

17              MR. GOODMAN:

18              If you are thinking to yourself, think

19    to yourself, please.

20              MR. BAAY:

21              I'm not.

22              MR. GOODMAN:

23              If you are asking a question, ask him a

24    question.  I'm trying to move it along, John.

25    BY MR. BAAY:


                                              184


 1         Q.  Do you know if a budget was prepared

 2    after Hurricane Katrina with the effects of

 3    Hurricane Katrina?

 4              Do you know if they have a budget that

 5    was prepared, not assuming that the hurricane

 6    didn't occur, but assuming that the hurricane did

 7    occur, what they budgeted, what they would have

 8    made, what their budget would have been, given

 9    the effect of the hurricane?

10         A.  I don't understand that question.  I

11    mean, I think I understand it, but I think that

12    it could be easily misconstrued.  So I think if

13    you could just be a little more clear on that.

14         Q.  Let me see if I can be a little more.

Legier, William 08-03-07.txt
15  There were certain things -- and we can go
16  through the certain line items.
17          MR. GOODMAN:
18          Can I try to help you here?
19          MR. BAAY:
20          Yes.
21          MR. GOODMAN:
22          Do you know if they prepared a budget
23  post-Katrina to include the effects of Katrina?
24          THE WITNESS:
25          You mean what they knew after Katrina?


                                                    185


1           MR. GOODMAN:
2           Yes.
3           THE WITNESS:
4           Yes.
5           MR. GOODMAN:
6           Is that your question?
7           MR. BAAY:
8           Yes.
9   BY MR. BAAY:
10          Q.  Is that what this is?
11          A.  That is my understanding, that this is
12  what the company knew after Katrina.
13          Q.  Okay.  Let's flip back to the other
14  budget, the 13-page budget for August through
15  December of '05 that's right in front.
16          A.  (Witness complies.)
17          Q.  This budget, and we've talked about
                            Page 170

Legier, William 08-03-07.txt

18  these numbers, this budget shows what the actual
19  budget was of $63 million.  I'm looking at the
20  sales column for right now, $63,262,000; do you
21  see that?
22      A.  I do.
23      Q.  And the actual sales was $50,702,000?
24      A.  Yes.
25      Q.  So the over and under budget is the

                                                    186


 1  $12 million, right?
 2      A.  For that period, $12,560,115.
 3      Q.  Do you know whether the $63 million was
 4  budgeted before -- same questions that I asked
 5  with the '06 budget, do you know if that was the
 6  budget that was prepared before or after Katrina?
 7      A.  It was before.
 8      Q.  So the $63 million assumes that Katrina
 9  never happens, right?
10      A.  It was before they had any knowledge of
11  Katrina.
12      Q.  That's what I want to understand.  As
13  you've got documented here, the sales were
14  $12,560,000 less than what they were budgeted
15  before the storm happened?
16      A.  As of the period ending -- let's see.
17      Q.  This is just for August through
18  December.
19      A.  Excuse me.  That is correct, $12,560,000
                        Page 171

                    Legier, William 08-03-07.txt
20  less.

21      Q.  Do you know how much, if any, of that

22  reduction in sales was due to the physical

23  property damage that was sustained by the Harahan

24  warehouse?

25      A.  Well, I'm sure at least that amount was.


                                                    187


1       Q.  Why do you say that?

2       A.  Because it should have been more.

3       Q.  I'm sorry, what should have been more?

4       A.  Their sales.  They budgeted $63,000,000,

5   they did $50,000,000.  And as you know, there was

6   a new account that they added about the time of

7   the storm that would have made that budget much

8   higher.

9       Q.  Which account is that?

10      A.  Piccadilly.

11      Q.  Is that accounted for here?

12      A.  No.

13      Q.  So that variable has been set aside,

14  hasn't it?

15      A.  It has been -- it has not been factored

16  into this and erring on the side of caution and

17  conservatism.

18      Q.  So back to my question:  The difference

19  between the budget and the actual for the balance

20  of 2005, can you attribute any of that to the

21  physical property damage or did you make an

22  effort to do that?

                    Page 172

Legier, William 08-03-07.txt

23    A.  Yes.

24    Q.  What did you do?  What documents or

25  evidence do you have that supports that that

                                                     188

1  difference is related to the physical property

2  damage?

3    A.  Well, it's the totality of everything

4  that we did in this case, the documents we

5  reviewed, the interviews that we conducted, the

6  tours of the operations.  I think it's all in the

7  front of our report.

8       It's all the basis and reasons for our

9  opinions and the summary of documents and

10  information considered; so based on the totality

11  of our study in connection with this calculation,

12  that is our opinion.

13    Q.  So your opinion is, but for the damage

14  to the roof, they would have done $63 million

15  worth of sales?

16    A.  Well, that's very, very abbreviated,

17  Counselor.  We all know that there was a lot more

18  than damage to the roof.

19    Q.  You're exactly right.  Let me rephrase

20  it.

21    MR. GOODMAN:

22       Asked and answered.  This is the third

23  time he's given you this.  He has said yes two to

24  three times already.  So I don't know why you

Legier, William 08-03-07.txt
25  need to ask it again.


                                                    189


1  BY MR. BAAY:

2      Q.  Well, let me ask you this question:

3  Were there any other market forces, that you are

4  aware of, that could have contributed to the

5  reduction in sales from the budgeted $63 million

6  to the $50 million that had nothing to do with

7  the physical damage to their property?

8      A.  What are you speaking of?

9      Q.  The fact that Katrina came and wiped out

10 certain of their customers.  I think we've got a

11 list from Conco that they lost some customers.

12     A.  Well, they also gained customers.

13     Q.  They did.  So the net effect of that,

14 have you made any calculations, have you factored

15 that in, what the net effect, the market effect

16 of Hurricane Katrina had on their sales?

17     A.  Well, we looked at and interviewed

18 management in connection with that, and it all

19 indicated very strongly that any business that

20 was lost was nominal compared to what was gained.

21         So as a result of that and as a result

22 of the damage that was caused as a result of the

23 reason why we're here, this diminution in sales

24 occurred.  In fact, it probably is much larger.

25     Q.  When you say it's --


                           Page 174

Legier, William 08-03-07.txt
                                              190
⬚

     1      A.  It probably is much larger.  We did not
     2  factor in things like Piccadilly into the budget.
     3  It wasn't budgeted, as I testified to earlier.
     4          Counselor, I'm repeating myself here,
     5  and it's getting late.  So I don't want to drag
     6  this thing on by repetitive answers.
     7      Q.  I don't, either.  I'm just not sure you
     8  answered the question.  But if that's your
     9  answer, then that's fine.
    10          Let's look at page 7 of 13 in that
    11  budget.  Look at the line about halfway down.  It
    12  says salaries, dietician, healthcare.  The actual
    13  was --
    14      A.  How much is it?
    15      Q.  $16,000 was the actual, the budget was
    16  $67,000?
    17      A.  Salaries, dietician, healthcare.
    18      Q.  Just that one line, right?
    19      A.  Yes, sir.
    20      Q.  You see it?
    21      A.  I do.
    22      Q.  So the difference between the budget and
    23  the actual was $51,000; and then there is a
    24  budget variance not pertaining to hurricane.  So
    25  it was not included, correct?  Was that

⬚                                               191

                    Legier, William 08-03-07.txt
1  reduction --

2      A.  That was part of the calculation that I

3  testified to earlier that would have been

4  factored out.

5      Q.  This is just one of those examples,

6  right?

7      A.  It is.  They go both ways.

8      Q.  Do you know why, as it relates to that

9  line item, do you know why that's not related to

10  the hurricane?

11      A.  It was represented by the company.

12      Q.  Does the inclusion of this item in the

13  amount of $51,000 in the budget variance pertain

14  to hurricane mean that you believe the budget

15  item amount for this item should be $16,000,

16  rather than $67,691?

17      A.  That is correct.

18      Q.  Look at page 8 of 13.

19      A.  (Witness complies.)

20      Q.  Account number 616742, handling fee

21  beverage; do you see that?

22      A.  What amount is it?

23      Q.  It is $20,734.

24      A.  Is that under the actual column?

25      Q.  Yes.


                                             192


1      A.  $20,7 --

2      Q.  -- 034.

3      A.  Page 8?
                    Page 176

Legier, William 08-03-07.txt

4      Q.  Okay.  I'm sorry.  The actual was a

5  negative.  I'm looking at the over and under

6  budget is the $20,000.  It's the top line, the

7  first line on the page.

8      A.  Right.

9      Q.  In this particular item, the actual was

10  a negative.  How does the actual show up as a

11  negative?

12      A.  Well, because the budget was a negative.

13      Q.  So the budget was a bigger negative

14  number than the actual, right?

15      A.  The budget was a bigger negative number

16  than the actual.

17      Q.  So the over and under budget, the over

18  budget is the $20,000; and then the budget

19  variance not pertaining to the hurricane, the

20  calculations were reversed?

21      A.  I don't know what you mean by that.  Is

22  that a question or a comment?

23      Q.  Well, the real question is:  How did you

24  determine or did you determine that this was not

25  pertaining to the hurricane or was that done by


                                          193


1  the company?

2      A.  It was done by the company.

3      Q.  Can you look at that first schedule for

4  me, assuming total shutdown, the first --

5      A.  (Witness complies.)

                    Page 177

Legier, William 08-03-07.txt

6    Q.  This is the spreadsheet that you used to

7  determine what the continuing expenses would have

8  been for the period, for the 15 month period,

9  correct?

10    A.  It is.

11    Q.  When you did this, when you carried over

12  some salaries and chose not to carry over other

13  salaries, you represented that in the continuing

14  cost column, and you marked that as either 100

15  percent or 0 percent, and I guess some of them

16  are 50 percent, if you thought that amount would

17  be carried forward, right?

18    A.  Yes.

19    Q.  For payroll taxes and expenses, did you

20  carry forward the payroll taxes and expenses that

21  were attributable to the people being carried

22  forward or did you carry forward all payroll

23  expenses and taxes?

24    A.  No.  It was carried forward, based on

25  the percentage of payroll taxes to total before

194

1  adjustment.

2    Q.  So your intent was to carry forward the

3  payroll taxes that would have been attributable

4  to the non-ordinary payroll people, right?

5    A.  That's correct.

6    Q.  Let me look at page 11.

7    A.  (Witness complies.)

8    Q.  It looks like --

Legier, William 08-03-07.txt

```
 9      A.  I think I can help you, Counselor.
10  There have been a few of these that we picked up
11  on since the report was issued, and we are in the
12  process of recalculating those.
13          The client gave them to us, and we went
14  back and revisited with them, because the
15  percentages were not consistently applied.  But I
16  don't think you are talking about material
17  dollars.  But we'll have a revised calculation at
18  some point in the future, but it's not material.
19      Q.  I just wanted to make sure which
20  methodology you meant to apply.  So then this
21  must be a mistake on page 11, where you carried
22  forward 100 percent of the payroll taxes, but
23  only carried forward --
24      A.  Which line?
25      Q.  You carried forward the salaries,
```

195

```
 1  operations manager, and the salary supervisor,
 2  right?
 3      A.  Which line?
 4      Q.  630.  You want me to give you the
 5  account numbers?
 6      A.  No.  Give me the amounts.
 7      Q.  The amounts are $26,700 and $92,461.
 8      A.  Is that in the first column on page 12?
 9      Q.  Page 11.
10      A.  Okay.
```

Page 179

Legier, William 08-03-07.txt

11    Q.  The salaries operations manager and the
12  salaries supervisors, those are the amounts that
13  carried forward at 100 percent?
14    A.  Correct.
15    Q.  And the total of their salaries would be
16  a little over $100,000, maybe $119,000?
17    A.  That's correct.
18    Q.  So what you meant to carry forward,
19  then, and it seems like you did it sometimes, but
20  not every time, as for payroll taxes for this
21  department, instead of carrying over 100 percent
22  of this $109,000, it should be the payroll taxes
23  just attributable to those two people?
24    A.  That's correct.  We picked up on that
25  just recently and called it to the client's

196

 1  attention.  And we have revised the schedule.
 2  But I don't think you're looking at a material
 3  amount of money.
 4        But you're correct.  It should have been
 5  done consistently as it was earlier.  And that is
 6  the percentage of the payroll taxes was to the
 7  total before the adjustment would be carried over
 8  to the fixed part that was ultimately kept in.
 9    Q.  And again, this gets me back to our --
10  in Legier No. 7, if we wanted to precisely
11  calculate this ordinary payroll from the charges
12  and expenses, including ordinary payroll, then we
13  could do that same calculation.

Legier, William 08-03-07.txt

14          These are the people that would be
15 included as non-ordinary payroll, are the people
16 that you've identified in this?
17      A.   To the best of the ability of the
18 company to do so from these numbers.  But it was
19 a pretty good effort.
20          Now, if you have someone that does a
21 different calculation of that, we certainly want
22 to look at that compared to ours to see where we
23 might differ on one way or the other.
24      Q.   We can certainly agree on the
25 methodology.  That would be the methodology, is

                                              197


 1 to find those people and carry forward their
 2 salaries, and only payroll taxes attributable to
 3 them; and the rest of the people would be
 4 considered, their actual payroll and their actual
 5 payroll expenses would be ordinary payroll,
 6 right?
 7      A.   Well, yes.  But there's also another
 8 thing that you have to keep in mind here is that
 9 we are assuming that the company would continue
10 with the ordinary and necessary expenses as set
11 forth in the policy that might be beyond those
12 that are ordinary payroll, quote/unquote, defined
13 by you.
14          So you have to go through here and look
15 at specifically what's payroll and what's not and
                    Page 181

Legier, William 08-03-07.txt
16  make that distinction, because some of these

17  things that are not continuing are not

18  necessarily payroll.

19       Q.  Right.  I understand.  And all I'm

20  trying to do is use this methodology just as it

21  relates to the payroll line items and come up

22  with the way the policy defines ordinary payroll

23  to be the entire payroll expenses for all

24  employees of the insured, except officers,

25  executives, and department managers.


                                            198


 1       A.  Sure.  And I would suggest that if you

 2  did that, you would also want to make sure that

 3  you looked at the other calculation, whatever it

 4  was based upon what your expert did, to make sure

 5  you reconciled the two, just so that you'd make

 6  the best possible assessment, because obviously,

 7  she's done something here.  We've done something

 8  here.  To the extent that there's a difference,

 9  you may want to reconcile it.  I think her number

10  is a little bit higher.

11       Q.  For ordinary payroll?

12       A.  Or it may be a little bit different.

13  But it's not -- I can't tell you if it's higher

14  or lower.  But whatever it is, it is.

15       Q.  The number, just so you understand the

16  number that I'm trying to get to with this

17  methodology is the actual ordinary payroll that

18  was actually incurred during this 15 months?
                        Page 182

Legier, William 08-03-07.txt

19     A.  That's my understanding.

20     Q.  Again, you didn't calculate that number;

21 you don't know what that number is?

22     A.  Well, it's in the sum total of all of

23 this information.  But it isn't extracted

24 separately, but it can be derived from this

25 information.

199

1     Q.  And I'm just curious, since ordinary

2 payroll is excluded, why you wouldn't do that

3 calculation?

4     A.  Because we did.  We included it in those

5 expenses that would not have necessarily

6 continued during the period of shutdown, during

7 the period of restoration, had the business gone

8 to that level.

9     Q.  For scenario number 2, the

10 non-resumption, that's that?

11     A.  Yes.

12     Q.  If Conco had not resumed?

13     A.  Correct.

14     Q.  You calculated for that scenario.  I'm

15 curious why you didn't calculate them for the

16 first scenario.

17     A.  We're assuming them to be the same.  We

18 used the same numbers.

19     Q.  But in the first scenario, you know what

20 the numbers are; in the first scenario, they

Legier, William_08-03-07.txt
21  resumed operations, so you could actually

22  calculate what --

23      A.  Well, we can, and we may do that yet,

24  because I think it will give us a higher damage

25  amount.


                                                    200


1       Q.  So that's a number that you could

2  calculate, the ordinary payroll?

3           MR. GOODMAN:

4           When you get to a break, I just need two

5  minutes.

6           MR. BAAY:

7           Let's go ahead and take a break.

8               (Short break taken.)

9  BY MR. BAAY:

10      Q.  On the '06 budget, page 25 of 26, it's

11  the third spreadsheet?

12      A.  Yes, sir.

13      Q.  There's an actual cost during the time

14  period for operating interest regular of

15  $797,774; you see that?

16      A.  Yes, sir.

17      Q.  In the budget, it shows zero; do you see

18  that?

19      A.  Yes, sir.

20      Q.  Do you know why there was no interest

21  budgeted?

22      A.  Well, that's really not interest.  It's

23  a charge that the holding company, the parent
                    Page 184

Legier, William 08-03-07.txt

24  company assesses for the use of assets.  So it's

25  not really something you can budget.  It's not a

⬜                                                    201

1  real expense.

2      Q.  But if you have it as zero in the budget

3  and $797,000 in the actuals, it shows up as a

4  variance to budget of $797,000, correct?

5      A.  Correct.

6      Q.  So a positive variance to the budget

7  will add $797,000 to the but for number, correct?

8      A.  Yes.

9      Q.  My question is:  Why is that increase

10  from 0 to $797,000 attributable to the physical

11  damage?

12      A.  As a matter of fact, our report was

13  issued, and we were in the process of refining

14  this calculation.

15          As we said, it was subject to update,

16  and we have undertaken some additional

17  calculations that will revise this and do the

18  calculation without that category completely,

19  because we found out that it's not a category

20  that is really related to an actual expenditure.

21  It's something that's passed down from the parent

22  corporation.

23          So these are charges that we consider to

24  be below the line, below the operating level, and

25  it should be the operating level that we do the

Legier, William 08-03-07.txt

202

1  assessment.  So we are now doing it as of the
2  operating profit or loss.
3      Q.  So we can expect a revised report with a
4  minimum of a $797,000 difference in it?
5      A.  Well, that will be part of the
6  difference, but it could go both ways.  And it
7  will go both ways.  But there will be a revised
8  calculation.
9      Q.  As we sit here today, so that I don't
10 have to wonder about any of the others, do you
11 know of any others?
12     A.  It's going to go at the level of
13 operating profit, which is the profits that are
14 attributable to the actual operations of the
15 company before these other categories of expenses
16 that are, as we found out after our report, we
17 were in the process of gaining this knowledge and
18 this information.  And we were under a strict
19 deadline.
20         So as we went back and reviewed it, we
21 found that it was not an operating number.  It
22 was something that was passed down from corporate
23 that has no relationship to an actual
24 expenditure.  So we are taking it all out from
25 the level above that, where operating profits

203

Legier, William 08-03-07.txt

1  begin; and everything below that is going to be
2  revised from the calculation.  So it will take
3  care of that as well.  But it will be part of the
4  updated calculation.
5       Q.  When are you planning on submitting
6  that?
7       A.  It's in process as we speak.  So I would
8  think that, you know, as soon as it's finished.
9       Q.  We have a settlement conference on
10  Tuesday.  Do you think it's going to be finished
11  before then?
12      A.  It could be.
13      Q.  Then on page 26, just so that I can
14  understand, the next page in the shaded box and
15  the handwritten underneath, that's your work
16  product applied to the source document from the
17  company, right?
18      A.  It is.
19      Q.  So that makes sense.  So if I need to
20  talk to somebody about why there were variances
21  not related to the hurricane, why some were
22  included and some weren't included, I need to
23  talk to somebody at the company like Scott or
24  somebody?
25      A.  That would be accurate.

                                                204

1       Q.  In your Tab N, and I guess this is where
                    Page 187

Legier, William 08-03-07.txt

2 this came from?

3     A.  Yes.

4     Q.  There are -- the operating interest

5 tracks pretty closely, actually; and then in '06,

6 you can see there are zeros in the budgets.  And

7 that's -- I guess that's where this got picked up

8 from, those zeros got transferred to this

9 schedule or vice-versa?

10     A.  This was derived from that schedule.  It

11 all comes from the same place, I would think.

12     Q.  But clearly, there are no reason -- had

13 they paid off all their debt in the end of '05 so

14 that they wouldn't have had interest expense or

15 were they planning to have interest expense, and

16 it's just not reflected here?

17     A.  Well, this category of interest is not

18 the interest of expense that they actually pay.

19 It's a charge from corporate for the use of

20 corporate assets, but not pertaining to the

21 interest that you'll see, for example, that they

22 would pay to the bank.

23     Q.  The interest that is reflected in your

24 report, the interest expense that is included in

25 your report or maybe it's not included in your

205

1 report under Tab G of your documents, there are a

2 couple of letters from Chase.

3     A.  Yes.

4     Q.  That represent basically just a

Legier, William 08-03-07.txt

5   statement of what interest was paid to Chase by

6   Consolidated Companies, right?

7        A.  Yes.

8        Q.  How did these numbers and why is this

9   documentation included?  Where did these go into

10  your calculation?

11       A.  Well, they are a part of the extra

12  expense in that they were not incurred prior to

13  the storm.  They were out of the bank.  They had

14  no debt.  And because of the peril and the damage

15  to their facilities, they incurred in their lost

16  profits, they incurred these interest costs.

17       Q.  Your belief is that these under G, these

18  interest expense, is from a loan that would not

19  have been taken out but for Hurricane Katrina?

20       A.  That's correct.

21       Q.  Do you know whether these loans were

22  directly related to the physical loss?  Did they

23  use this money to repair any of the physical

24  damage before they were paid by the insurance

25  company, for example, or do you know?

                                                206

1        A.  I don't know, other than because of the

2   diminution of the company's resources and cash as

3   a result of them having to fund the monies that

4   were not advanced by the insurance company and

5   their loss included in their cost that they

6   incurred this debt.

Page 189

Legier, William 08-03-07.txt

7          So I'm not saying that it's any one of

8    those things, but a whole combination of all of

9    that that drained the company's resources that

10   caused them to have to borrow in order to sustain

11   the damages and have them repaired and pay the

12   business interruption losses that they were

13   incurring.

14        Q.  Have you made any effort to track the

15   borrowing source of funds to the use of funds

16   where they exactly used those or they were just

17   used in operations?

18        A.  Well, I don't know that you could do

19   that, because it would just go into operations.

20   They would be seminated into the company's bank

21   account that went in a lot of different

22   directions.

23          But I'm sure that based on my interviews

24   and discussions with management that this

25   resulted from a line of credit from which funds

                                                    207

1    were drawn that were not drawn in prior years for

2    the purpose of funding their operations during

3    the loss period, which was all tied back to their

4    damages to the property and their business

5    operations, including business interruption, all

6    associated with the claim.

7        Q.  Let me ask you about page 7 of your

8    report, the sales trend before and after the

9    hurricane.

                    Page 190

Legier, William 08-03-07.txt

```
10      A.  Yes, sir.
11      Q.  How was this chart calculated?
12          MR. GOODMAN:
13          Are you looking at page 8?
14          MR. BAAY:
15          I'm sorry, page 8.
16          THE WITNESS:
17          How?  It was based on the monthly sales
18  prior to the peril, and those sales continuing
19  after the peril without the inclusion of the
20  Piccadilly sales, which were not a part of their
21  historical sales before the storm.
22  BY MR. BAAY:
23      Q.  So this is their actual monthly sales,
24  past the line, past August is their actual sales
25  number, correct?
```

                                                    208

```
 1      A.  Their actual in both before and after,
 2  but after without Piccadilly.
 3      Q.  Okay.
 4      A.  Because they had just obtained that
 5  account at the time of the storm.
 6      Q.  If you include --
 7      A.  It wasn't in the budget before.
 8      Q.  So if you included Piccadilly, obviously
 9  all those numbers would be raised, right?
10      A.  That is correct.  I can't say every one
11  of them, but I would think that for the most
```

Page 191

Legier, William 08-03-07.txt
12  part, they would be raised, after the storm.

13      Q.  With respect to extra expenses and the

14  extra expense claim, how did you calculate those

15  numbers?

16      A.  That's a pretty broad question.

17      Q.  What was your methodology?

18      A.  We compiled all of the data that was

19  provided to us by the client from all the various

20  source documents that we were given that

21  evidenced their expenditures in connection with

22  these expenditures.

23      Q.  And one of the things that you say in

24  your report is that I believe that's in footnote

25  3, that to the extent that certain of these

                                        209

 1  expenses -- and we're talking about actual

 2  expenses, I believe -- would have been separately

 3  categorized as extra expenses noted herein would

 4  have increased and decreased respectively in the

 5  same amounts, resulting in no change in the total

 6  amounts of the claim?

 7      A.  That is correct.

 8      Q.  So what I want to understand is:  If you

 9  took those charges out of wherever there were

10  increased charges, if we can identify increased

11  charges over budget, why were those charges not

12  counted as extra expenses?

13          Why didn't you go the extra step and

14  actually figure out what those charges were and

                    Page 192

Legier, William 08-03-07.txt

15  separate them out from the BI claim?

16      A.  I don't follow that question.  I don't

17  see how there's any relationship there between

18  the two.

19      Q.  Well, if there's an increased expense --

20      A.  These are the actual expenses.

21      Q.  Actual expenses increased against

22  budget.

23      A.  Uh-huh.

24      Q.  How did you determine that that

25  increased expense should be left in the BI claim

                                                    210

1  and not expensed out $5 cost us, $10, and put

2  that extra $5 in the extra expense category?

3      A.  Well, as I said, the client compiled the

4  various expenditures, and they accounted for, to

5  the best of their ability, in segregating those.

6          As you know, when you are dealing with a

7  company their size, exact 100 percent accurate

8  numbers of every expenditure, and sometimes the

9  expenditures were categorized perhaps as salaries

10  or labor costs, and that person would have been

11  cleaning up the floor, but they did their best to

12  account for that.

13          So what we're saying is that in one way

14  or the other, it was accounted for in the total

15  claim.  It wasn't overstating or understating.

16  It was exactly what it should be, based on this

                        Page 193

Legier, William 08-03-07.txt
17  observation we made here.

18      Q.  If you leave it in the BI claim, it gets

19  counted twice, doesn't it?

20      A.  No.

21      Q.  To get to the $20 million, you'd have to

22  count the increased expenses, you count those

23  expenses as charges and expenses going forward,

24  as well as the difference between but for profits

25  and actual profits?


⬜                                                        211


1       A.  These are actual expenditures that were

2   spent one way or the other, they were spent.

3   After you took them out of the actual calculation

4   of the actual income, you would increase the

5   income; but then you would increase the business

6   interruption claim.  So one way or the other, six

7   one way, half a dozen the other.

8       Q.  The only thing that would change the

9   claim is is if those expenses, those increased

10  expenses were ordinary expenses, were ordinary

11  payroll expenses, right?

12      A.  No.  I don't see that.

13      Q.  Because you are paying the ordinary

14  payroll expenses under both scenarios, right?

15      A.  No.  I don't see that.  If they are

16  ordinary payroll, then they are ordinary payroll.

17  If they are extra expense, they are extra

18  expense.  But I don't think that would change the

19  outcome.

Legier, William 08-03-07.txt

20      Q.  The reason that it doesn't change the
21  outcome is because you have not excluded ordinary
22  payroll in your calculation?
23      A.  Well, I did several calculations, and
24  the ones that dealt with ordinary payroll, we had
25  those excluded.

                                                          212

1       Q.  But where all you did was take the but
2   for profit and subtracted the $279,000, the but
3   for profit and the $279,000, the $279,000
4   includes ordinary payroll?
5       A.  It does.  But if you took something out
6   of there, and if you take ordinary payroll out of
7   there, you got to take it out of the other but
8   for profit.  So I don't agree with that.
9           But getting back to your question about
10  whether we double counted, I don't agree with
11  that, because we either included it under the
12  expenses of the company and its actual operations
13  or we included it in the extra expense.  One
14  place or the other, you are still going to have
15  that in the claim.  So it has a zero effect.
16      Q.  I guess that was my -- really, that's my
17  point.  It has a zero effect, because under both
18  calculations, ordinary payroll is included in the
19  BI claim calculation that you've made?
20      A.  As it should be, if I'm understanding
21  you correctly.

                        Page 195

Legier, William 08-03-07.txt

22    Q.  Based on your interpretation of the

23  policy?

24    A.  I don't think that's in the policy.  I

25  think it's a different application than the


                                                       213


 1  policy provides for.  We have several different

 2  methodologies, as we noted.

 3    Q.  Right.  Under your Tab F, is this the

 4  spreadsheet that basically totals those and gets

 5  you to your extra expense number?

 6    A.  Yes.

 7    Q.  I just want to understand what is the

 8  source document and what is your work product.

 9  Is the schedule 6E following those two pages, is

10  that the source document?

11    A.  Well, that's a reference that was

12  provided on the schedule originally by the

13  client.  Our references are in some cases

14  different.

15    Q.  Did you prepare this one page, this

16  first page, or is that a client source document,

17  the first page?

18    A.  We prepared that.

19    Q.  The first page of F?

20    A.  That's correct.

21    Q.  Whose handwriting is this on here, do

22  you know?

23    A.  I don't know.

24    Q.  It's not yours?

                          Page 196

Legier, William 08-03-07.txt
25     A.  No.


                                                214

     1        Q.  With respect to the property damage
     2   claim, the numbers that are provided in here, are
     3   those -- you are just including the numbers that
     4   come from the Ficon report, correct?
     5        A.  Yes.  We have a supporting schedule of
     6   that.  Which number are you referring to?
     7        Q.  The $1,692,000.  Did you make any
     8   adjustments?
     9        A.  Well, I'd have to go to the schedule
    10   that supports that.  Let's see.
    11        Q.  I'm looking at the contractor's report.
    12        A.  Are you looking at this one here
    13   (indicating)?
    14        Q.  That's the sum of his work.
    15        A.  The $1,692,000 is part of the $1,879,000
    16   on Schedule C1 or C2.  C1 originally.
    17        Q.  But that number comes from Ficon; you
    18   didn't make any adjustments on that?
    19        A.  It came from the documents that were
    20   part of that.  That's correct.  But if you go
    21   back to the schedule, it will give you all of the
    22   details that support it and how it was
    23   calculated.
    24        Q.  Are you adopting that as your work
    25   product or is that Ficon's work product?

                          Page 197

Legier, William 08-03-07.txt

215

1      A.  Everything that would support anything
2  dealing with the calculation of the amounts would
3  be ours.  Anything that would deal with the
4  opinions given by them as to the derivation of
5  their numbers would be theirs or someone else.
6          We're not providing an opinion as to the
7  underlying numbers, other than the compilation of
8  these amounts that we were provided with.
9      Q.  I understand.  Do you remember in the
10  Arnaud's case whether the policy included
11  ordinary payroll coverage?
12      A.  I don't remember.  I seem to recall that
13  it had a provision for that; but I do so many of
14  these things, once I'm finished, I move on to the
15  next one.
16          I've got enough to remember with the
17  ones I've got going on.  I'm sorry I couldn't do
18  any better than that.
19      Q.  Have you ever offered the calculations
20  the way you have them in your report, the way
21  you've done -- the way you are reading this
22  policy and coming up with what I understand is
23  what you believe we owe under the BI claim, the
24  $20,923,342, have you offered an opinion similar
25  to that with the same methodology in any court?

216

Legier, William 08-03-07.txt

1      A.   I don't remember.  But I believe I've

2 done calculations given the differences in policy

3 language that would be similar to that.

4      Q.   Have you done -- offered opinions on BI

5 claims where the amount that you were claiming

6 should be paid under the BI policy would put the

7 plaintiff or the insured in a better position

8 than they would have been, but for the loss?

9      A.   Well, if you are asking me if I've done

10 calculations that were in accordance with the

11 policy language, the answer to that is yes.

12           As I sit here today, I can't tell you

13 that I remember how they may have been similar or

14 not, because this policy is, like all other

15 policies, unique.

16      Q.   I understand that.  What I'm trying to

17 understand is, aside from this case where you've

18 said that the but for profit is $8,200,000 and

19 that you believe the company owes $20,922,000,

20 have you ever offered an opinion where you

21 believe -- where you've offered the opinion that

22 the amount due under the BI claim is greater than

23 and puts the insured in a greater position, in a

24 better position than he would have been, if the

25 loss had not occurred?

217

1           MR. GOODMAN:

2           Asked and answered.

Legier, William 08-03-07.txt

3          MR. BAAY:

4          He didn't answer.

5          MR. GOODMAN:

6          Yes, he did.  You didn't like his

7   answer.  You asked the exact same question.

8          MR. FORRESTER:

9          You can read the transcript.

10          THE WITNESS:

11          Can I go back to the transcript answer.

12          (Answer read back as requested.)

13   BY MR. BAAY:

14     Q.  That was the answer.  And I understand

15   that.  It's not that I don't like that answer at

16   all.  It clearly doesn't answer the question.

17          Here's my question:  In this case, you

18   are advocating for the company to pay $20,922,342

19   for the BI claim.  We can hopefully agree that

20   that's your --

21          MR. GOODMAN:

22          Without advocating anything, giving an

23   opinion.

24          THE WITNESS:

25          $20,922,342.


                                        218



1          MR. GOODMAN:

2          For BI.

3   BY MR. BAAY:

4     Q.  For BI.  That's the opinion that you are

5   going to give in court that is due under the BI

Legier, William 08-03-07.txt

 6  policy?

 7      A.  Yes.

 8      Q.  But for the loss, if Hurricane Katrina

 9  doesn't happen, your opinion is they would have

10  made $8.2 million?

11      A.  That's correct.

12      Q.  So the interpretation that you are

13  offering in this case, the result is, if it's

14  accepted, the result would be, based on your

15  interpretation, that the insured would end up

16  roughly $12 million better than he would have

17  been if this storm hadn't happened, correct?

18      A.  Well, I can't tell you that.  I can only

19  tell you that it is in accordance with the policy

20  language.  And the policy that was bought by the

21  company provided language and how they formulated

22  that.  So for me to say that I would deviate from

23  what they intended under the policy, what they

24  said in their policy.

25          So my answer to that question is it is

⬚                                                  219

 1  strictly in accordance with the wording of the

 2  policy that was bought by the company.

 3      Q.  Your interpretation of that language

 4  puts them in a better place than if the storm

 5  hadn't happened, obviously?

 6      A.  Who knows.  I mean, Counselor, you

 7  wouldn't wish this storm on anybody, would you?

Legier, William 08-03-07.txt

 8      Q.  Of course not.  But if the storm hadn't

 9  happened, they would have made $8.2 million, and

10  you want us to write them a check for

11  $20,000,000.

12      A.  Isn't that what the policy says?  It's

13  laid out in this particular case.

14      Q.  That's your interpretation.  So

15  rather -- and all I'm trying to ask you, in other

16  cases, have you ever had another case where the

17  interpretation of the policy that you offered as

18  an opinion puts the insured in a better place

19  than he would have been if the storm hadn't

20  happened?

21          MR. GOODMAN:

22          Asked and answered.

23          MR. BAAY:

24          No.  He said he's offered opinions.

25          MR. GOODMAN:

                                                   220

 1          He couldn't remember all those other

 2  cases, but go ahead.

 3  BY MR. BAAY:

 4      Q.  My question is simple.  Have you ever

 5  offered an opinion where you have interpreted the

 6  policy language to put the insured in a better

 7  position, but for the loss?

 8      A.  To the extent that the policy wording

 9  provided for such a calculation, the answer to

10  that would be yes.

                    Page 202

Legier, William 08-03-07.txt

11      Q.  That was simple.  Can you tell me which

12  one of those cases?  Can you give me an example?

13      A.  I really can't.  I'd have to go back and

14  look through the volumes of the papers that we

15  have.  And I can't do that as I sit here,

16  Counselor.

17      Q.  If you looked at any of your cases --

18      A.  It's not the kind of thing -- once you

19  are finished with study and preparation, we move

20  on to the next one.

21      Q.  Is this unusual that your interpretation

22  of the policy puts the insured in a better

23  position than he would have been, but for the

24  loss?

25      A.  I can't say what his position would have

                                            221

1  been but for the loss.  Like I said, this

2  hurricane was pretty devastating.  You don't --

3  my answer to that question is it is what it is.

4         If the policy language shows that it is

5  that amount, then you calculate it that way; if

6  it turns out by your standards that somebody is

7  better off in going through all of this and

8  getting what they are entitled to under their

9  policy, it is what it is.

10      Q.  Again --

11      MR. BAAY:

12         I'm going to object to responsiveness.

Legier, William 08-03-07.txt

13  It's asked and not answered.

14      MR. GOODMAN:

15          I'm going to object that he's answered

16  your question.

17      MR. BAAY:

18          The answer is nonresponsive.

19  BY MR. BAAY:

20      Q.  My question is:  Is this an unusual

21  situation or does this ordinarily happen?

22      A.  No.  I don't think it's unusual.  The

23  situation you are speaking about is what the

24  policy language says.

25      Q.  If the result of your calculation and


                                                222


 1  your interpretation yields a result where the

 2  claim amount would put the insured in a place

 3  that's better than he would have been but for the

 4  loss, you already told me; but for the loss, he

 5  would have made $8.2 million?

 6      MR. GOODMAN:

 7          I'm going to object on so many grounds.

 8  Asked and answered, to the form.  Come on, man.

 9  Unless this is the last question, we are just

10  wasting time.

11      THE WITNESS:

12          It has been asked, and it has been

13  answered.  So I don't know what else to say.

14  BY MR. BAAY:

15      Q.  You haven't answered it one way or the
                    Page 204

Legier, William 08-03-07.txt

16  other whether it's an unusual situation or

17  whether it happens in every case.

18        MR. GOODMAN:

19          He just answered it.  It's not unusual,

20  is what he answered to you.  You don't like his

21  answer.  Let's move on.  Come on.

22          Unless you are at the end, we've got 15

23  minutes.  He's leaving.

24        MR. BAAY:

25          I'm going to take a two-minute break.


⬜                                                    223


1              (Short break taken.)

2   BY MR. BAAY:

3       Q.  Last question.  On the 26-page report,

4   the 26-page budget, the '06, January to --

5       A.  Which tab?

6       Q.  D, Tab D, the third spreadsheet.

7         MR. GOODMAN:

8           One question.

9         MR. BAAY:

10          Line of questions.

11  BY MR. BAAY:

12      Q.  On corporate of management bonus and

13  corporate allocations, this is another big ticket

14  item, $567,000, this is actual but not budgeted

15  which resulted in a $567,000 variance to the

16  budget.  And there's no variance not related to

17  hurricane backout.

Page 205

Legier, William 08-03-07.txt
18      A.  Where is that?

19      Q.  Page 24 of 26, on the third spreadsheet,

20  the next one, the '06.

21      A.  Twenty-four?

22      Q.  Right.

23      A.  Uh-huh.  $567,000.

24      Q.  That resulted in a net increase in the

25  variance to budget that you would have attributed

                                                    224

1  to --

2      A.  Yes, for the same reasons that I talked

3  about earlier.  We're going to be having our

4  numbers stop at total operating income, because

5  these are items that are not really budgetable.

6  They are somewhat -- they are not affected by the

7  storm one way or another.  They are what they

8  are.  So it's corporate type stuff.

9      Q.  So your numbers are stopping, then, at

10  net operating profit?

11      A.  Yes.

12      Q.  So these adjustments that are made

13  below, the numbers are going to be removed?

14      A.  They'll be moot, yes.

15      Q.  Earlier, you said they were relatively

16  small numbers.

17      A.  They go in two directions.

18      Q.  You don't know what the net effect is

19  now?

20      A.  No.  I don't think it's material.  I
                    Page 206

Legier, William 08-03-07.txt

21 can't tell you that I have the analysis, so I can
22 tell you what it is.  So my overall, generally
23 speaking, will not be a material amount; but you
24 will have it.
25     Q.  And just so I can make sure all of these

                                                    225

1 netting effects are going to affect, back to your
2 report, it's going to ultimately affect the
3 $8,200,000, right, your but for profit number?
4     A.  Yes.  Yes.
5         MR. BAAY:
6         I'm done.
7         MR. GOODMAN:
8         We do to want read and sign.
9     (Deposition was concluded about 5:03 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22

Legier, William 08-03-07.txt
23
24
25


                                                      226


  1                WITNESS' ATTESTATION

  2

  3           I have read or have had the foregoing

  4   testimony read to me, pursuant to Rule 30 (e) of

  5   the Federal Rules of Civil Procedure and/or

  6   Article 1445 of the Louisiana Code of Civil

  7   Procedure, and hereby attest that, to the best of

  8   my ability and understanding, it is a true and

  9   correct transcription of my testimony, with the

 10   exception of any attached corrections or changes,

 11   complete with reasons for changes, on the

 12   Witness' Amendment Pages;

 13           I have in no way altered the printed

 14   transcript pages containing testimony herein,

 15   tampered with the seal on the last numbered page

 16   herein, or tampered with the security strip on

 17   the binder hereof.  The integrity of this

 18   certified transcript has been maintained in the

 19   identical form as it was received by me, with the

 20   exception of any changes on the Witness'

 21   Amendment Pages.

 22

 23

 24   _____  Signature _____

       Date              WILLIAM R. LEGIER
 25
                        Page 208

Legier, William 08-03-07.txt

227

```
 1            C E R T I F I C A T E
 2        This certification is valid only for a
 3    transcript accompanied by my original signature
 4    and original stamp on this page.
 5        I, Buffie Vindel Flair, Certified Court
 6    Reporter, Registered Professional Reporter, in
 7    and for the State of Louisiana, as the officer
 8    before whom this testimony was taken, do hereby
 9    certify that WILLIAM R. LEGIER, after having been
10    duly sworn by me upon authority of R.S. 37:2554,
11    did testify as hereinbefore set forth in the
12    foregoing two hundred twenty-six (226) pages;
13        That this testimony was reported by me in
14    the stenotype reporting method, was prepared and
15    transcribed by me or under my personal direction
16    and supervision, and is a true and correct
17    transcript to the best of my ability and
18    understanding;
19        That I am not related to counsel or to the
20    parties herein, nor am I otherwise interested in
21    the outcome of this matter.
22
23            _____
            BUFFIE VINDEL FLAIR
            Certified Court Reporter
24          Registered Professional Reporter
            State of Louisiana
25          Certificate No. 22035
```